**FILED**

**In the United States District Court for the District of Columbia**

NOV 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Samuel H. Mwabira-Simera }
  And }
Esther E. Mutonyi-Simera }
1835 Central Pl. #14  P.O. Box 1405 }
Washington, DC 20013 }
    }
  Plaintiffs }
    }
Vs }

Sodexho/Marriot Management Services
Attn.Ardra M.O'Neal
Senior Attorney, Labor & Employment Law
9801 Washingtonian Blvd
Gaithersburg, MD 20678

And }
Donna McCants, Marcus Worley, and Vincent Jones }
Sodexho Campus Services, Howard University }
Blackburn Center }
2400 6th Street, NW }
Washington, DC 20059 }
    }
Defendants }

CASE NUMBER   1:06CV02052

JUDGE: Richard W. Roberts

DECK TYPE: Employment Discrimination

DATE STAMP:  11 30 /2006

*JURY ACTION*

## Complaint and Prayer for Jury Trial

1. Samuel H. Mwabira-Simera (hereinafter "Plaintiff Mwabira-Simera") and Esther Mutonyi-Simera (hereinafter "Plaintiff Mutonyi-Simera"), sue Defendants Sodexho/Marriot Management Services (hereinafter "Sodexho"), Howard University (hereinafter "Howard"), Donna McCants (hereinafter "McCants"), and Marcus Worley (hereinafter "Worley"), and Vincent Jones (hereinafter "Jones") and state the following.

## Parties

2. Plaintiff Mwabira-Simera is a forty-five year-old African male, of Ugandan national origin, and is, at all times relevant, a resident of Washington, District of Columbia.

3. Plaintiff Mutonyi-Simera is a twenty-two year old, daughter of the Plaintiff Mwabira-Simera, of African, Ugandan national origin, and, is at all times relevant, a resident of Washington, D.C.

**RECEIVED**

OCT 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

4. Defendant Sodexho is a corporation doing business in Washington, D.C. Defendant carries on a regular business in this District, including but not limited to its food care services at Howard University at 2400 6th Street, N.W. Washington, D.C. 20059.

5. Defendant McCants, is and was at all times a relevant agent, servant, and employee as Unit Manager of defendant Sodexho, defendant Worley, is and was at all times a relevant agent, servant, and employee as Executive Chef of defendant Sodexho, and defendant Jones is and was at all times a relevant agent, servant, and employee as Chief Chef of defendant Sodexho located at Howard University 2400 6th Street N.W Washington, D.C.20059

**Jurisdiction and Venue**

6. This Court has jurisdiction over this action by virtue of Plaintiff Mwabira-Simera's claim under Title VII of the Civil Rights Act of 1964, 42 USC 2000e *et sequel* 5(f)(3) as amended and Retaliation (sec.704 (a) as amended. Plaintiff Mwabira–Simera also sues defendant Sodexho for the following-: (1) under Title I the Americans with Disability Act (ADA) 1990, 42 USCA Section 12101 *et sequel,* (2) under Title VII of the Civil Rights Act of 1964 42 USC 2000e *et sequel* 5(f)(3),; under Section 504 of the Rehabilitation Act of 1973; (3) (4) under Title IX Gender and Minority Act (G&M) of 1972, as amended; (5) under the Fair Housing and Employment Act (G&E) of 1971 and Title VII of the Civil Rights Act of 1971, (6) under Family, and Medical Leave Act (G&E) of 1971 and (7) under the civil Rights Act of 1866 Title 42 U.S.C.A 1981; (8) Plaintiffs Mwabira-Simera, and Mutonyi-Simera also sue defendant Sodexho Under Constitutional rights under Title 42 U.S.C.A 1983; (9) Fourth Amendment: "[t]he right of the people to be secure … against unreasonable searches and seizures;" (10) and, Due Process Clause of the Fifth Amendment of the United States Constitution. Plaintiffs further plead for relief for pendent claims for all counts under the laws of the District of Columbia, and common law, as the pendent claims arise from a "common nucleus of operative facts" for Sodexho's persistent and egregious discrimination customs, and traditions[1] in violation of Rights, guaranteed by a Statutory federal statute conferring jurisdiction on this Court.

---

[1] A discrimination case was filed by Cynthia McReyolds and Ellen Early on behalf of more than 2,400 minorities currently working with Sodexho Inc., which boasts one of the highest rates of job availability for minorities-But, according to a class lawsuit claim, only as long as they are content to remain in the lower ranks for their entire careers. Company spokeswoman Leslie Aun "called the action groundless Sodexho has won awards for its work placesity," she said *The Examiner Newspaper*, Monday, April 25, 2005.

   Sodexho Inc., the Gaithersburg based food and facilities management, agreed Wednesday to pay 80 million dollars to settle a lawsuit that claimed it systematically denied 3400 blacks mid-level management positions. *The Washington Post*, Thursday April 28th, 2005.

**Administrative Prerequisites**

7. Plaintiff Mwabira-Simera timely filed charges of employment discrimination against defendant Sodexho, under Title VII of the Civil Rights Act of 1964, as amended, and under the ADA were filed with the U.S. EEOC, on or about August 4, 2003,July 2003, January 2005 and attached hereto as Plaintiff's **Exhibit 1A**, **Exhibit 1B,** and **Exhibit IC**. Plaintiff Mwabira-Simera received notices of the right to sue, which are attached hereto as evidenced by Plaintiff's **Exhibit 2A**, **Exhibit 2B** and **Exhibit 2C**. Plaintiffs Mwabira-Simera and Mutonyi have met all conditions precedent to filling this suit.

**Facts Common to all Counts**

8. Plaintiff Mwabira-Simera was employed by Defendant Sodexho, since March 26, 2001, as a Utility worker at Defendant's place of business at Howard University, located at 2400 6th Street N.W., Washington, D.C.

9. At all times relevant, Plaintiff Mwabira-Simera performed his duties in a satisfactory manner. **(Exhibit 3)**

10. While still a Sodexho employee, Sodexho and its agents, employees, and servants, have willingly and knowingly subjected Appellant Mwabira-Simera to racial discrimination, harassment, bullying, a hostile working environment, false imprisonment, illegal arrest, derogatory epithets about Plaintiff's national origin, ethnic jokes, slurs, and disability, falsification, malicious prosecution, abuse such as smelling like "urine", "mops", "cats", **(Exhibit 4)** "unhygienic", "gluttony", invasion of privacy (daily strip searches, bags searches, his body & car searches), denial of breaks **(Exhibit 5)**, to use bathroom, denial to eat at work, assignment of unpleasant and dangerous tasks, and defamatory events [spying on him as thief] monitoring, on occasions where similarly situated employees of American national origin, were permitted to eat. All these acts and or omissions were carried out by Sodexho, its agents, employees, and servants within the course and scope of employment at Sodexho.

11. Defendant Sodexho, an employer, is vicariously liable for the acts and/or omissions of her employees and supervisors done in the scope and course of the academic year, which deprived plaintiff of his rights as alleged herein.

## Count I (Unlawful Discrimination Based on National Origin (Under Title VII of the Civil Rights Act, 1964, as amended, 42 USCA 2000e et sequel)

12. Plaintiff Mwabira sues defendant Sodexho on the basis of Sodexho's unlawful discrimination (right to sue on discriminations see. *Pierce v. Ortho Pharmaceutical Corp.* (N.J.1980)); *United States v. Price,* 383 U.S. 787, 800 (1966)(statute precludes interference with all rights protected by Constitution or federal statutes); *Washington State Serv. Employees* (NLRB 1971) against Plaintiff Mwabira-Simera on the basis of his African (Ugandan) national origin, sues defendant, under Title VII of the Civil Rights Act of 1964, as amended, and incorporates, by reference, the allegations in paragraph 1 through paragraph 11, as set forth herein, and further states.

13. Plaintiff Mwabira-Simera is and was an "employee" within the meaning of Title VII and belongs to a class protected under the statute, based on his African (Ugandan) national origin. Defendant Sodexho is an "employer" and defendants McCants, Worley, and Jones are/were "agents" of the employer within the meaning of the Titles VII.

14. On several occasions, while Plaintiff Mwabira-Simera is and was still employed by Sodexho, defendant Sodexho and her agents, servants, and employees, including, but not limited to Defendant s McCants, Worley, and Jones, intentionally discriminated against Plaintiff Mwabira-Simera on the basis of his African, Ugandan national origin, violating Plaintiff Mwabira-Simera's right to be free of racial and national origin discrimination under Titles VII of the Civil Rights Act of 1964, as amended.

15. Defendant Sodexho's discriminatory customs, policies, and practices covered a wide spectrum of the terms, conditions, and privileges of employment, including, but not limited to the following:

A) Plaintiff was deformed, falsely arrested/imprisoned, reprimanded daily, and denied use of bathroom, regular breaks and eating that were given to similarly situated employees who are American-born, African-American, and/or persons of Latin American national origin.

B) Agents, servants, and employees of Sodexho made derogatory, insulting, and humiliating ethnic slurs and comments about Plaintiff Mwabira-Simera, based on his African, Ugandan, national origin, including, but not limited to, his physical characteristics, his "long African name", his "funny accent", and his "smelly African odor". Defendants McCants and Worley (managers, and African Americans)

were some of the people who made such derogatory ethnic comments about Plaintiff Mwabira-Simera while he was at work.

C) Plaintiff was subjected to searches of his body and properties on numerous occasions, including, but not limited to, February 28 2002, June 29, 2002; August 2004, 2005 [daily] Plaintiff's locker and bag was illegally searched on January 10, 2002; his car was illegally searched by Sodexho employees on January 11, 2002, by Tony Stewart; Tony Steward searched trash cans on 06/1, 2003, 08/19/2003. McCants falsely imprisoned  insinuating that Plaintiff Mwabira-Simera has stolen food. None of the employees who are American-born was subjected to such indignities and discriminatory treatment.

16. Discrimination against Plaintiff also involved assigning multiple and difficult tasks to him, working hours were cut, denied transfer and promotions which were assigned to similarly situated employees [juniors] who are American-born.

17. Plaintiff Mwabira-Simera complained about these discriminatory practices to defendant McCants, Unit Manager of Sodexho, on or about June 2, 2003, as well as Mohamed, director of Operations, and John parker, General Manager, but the discriminatory treatment against Plaintiff continued, and Defendant Sodexho failed to take measures to rectify the situation of Sodexho's persistent and egregious discrimination customs, and traditions. **(Exhibit 6)**

18. Defendant Sodexho maintains a custom, policy, usage, and practices of intentional discrimination against persons born in foreign countries, such as Africa, and persons with distinctive foreign names, accents, and physical characteristics, such as the plaintiff.

19. Defendant Sodexho treated plaintiff differently and in a less favorable manner than other similarly situated employees, who were American-born, African American, Caribbean Black, and Caucasian, in terms, conditions, and privileges of employment.

20. Defendant Sodexho condoned, ratified, and tolerated intentional discrimination against plaintiff Mwabira-Simera with malice and a callous indifference to his federally protected rights.

21. The stated acts and omissions of defendant Sodexho and her agents, servants, and employees, as

alleged, constitute unlawful employment practices and violate Title VII of the Civil Rights Act of 1964, as amended, 42 USCA, Section 2000e *et sequel see  Fitzpatrick v.Bitzer*, 427 U.S.445 (1976).

22. As a direct and proximate result of Defendants' acts, omissions, and conduct in discriminating against Plaintiff on the basis of his African (Ugandan) national origin, Plaintiff suffered damages, including physical pains, loss of self-esteem, headaches, loss of appetite, and emotional distress.

Wherefore Plaintiff Mwabira-Simera seeks judgment against defendant Sodexho as follows: a) 5,000,000.00 (five million dollars) as compensatory damages b) 15,000,000 (fifteen million dollars) as punitive damages for defendant's willful, intentional, and callous discrimination, and indifference to violations of plaintiff's rights c) attorney fees and costs.

### Count II Retaliation [twice] under Title VII of Civil Rights Act of 1964, as amended (sec.704 (a)

23. Plaintiff Mwabira-Simera sues defendant Sodexho under Title VII of Civil Rights Act of 1964, (sec.704 (a), as amended, for defendant's violation of Plaintiff's right to be free from unlawful retaliation [twice] (right to sue for retaliation see. *Frampton v. Central Indiana Co*. (Ind.1973); *Washington State Serv. Employees* (NLRB 1971); *Tennessee v. Garner*, 471 U.S. 1 (1985)(elements of the Constitutional violation in the context of 42 U.S.C. §1983) because he was engaged in activities protected by Title VII of the Civil Rights Act of 1964, as amended, and incorporates, by reference, the allegations in paragraph 1 through paragraph 22, as set forth herein, and further states:

24. Plaintiff is a member of the employee's Union at Sodexho.

25. Plaintiff Mwabira-Simera complained to the Hotel and Restaurant Employees Union (HERE), filed a wrongful termination to deprive Plaintiff of relief Benefits 28 U.S.C §246[2] which was characterized under color of law whereby Donna McCants, and Marcus Worley in a conspiracy with Howard University Security Officer ones were involved leading to a release agreement of arbitration case

---

[2]Deprivation of the relief Benefits 28 U.S.C §246 states:  Whoever directly or indirectly deprives, attempts to deprive, or threatens to deprive any person of any employment, position, work, compensation, or any other benefit provided for or made possible in whole or in part by any Act of Congress appropriating funds for work relief or relief purposes, on account of political affiliation, race, color, sex, religion, or national origin, shall be fined under this article, or imprisoned not more than one year, or both.

FMSC #041211-51307-A of March15th 2004. Plaintiff filed EEOC three charges [discrimination, retaliation, and re-retaliation] against my employer Sodexho.

26. EEOC issued Plaintiff with the right to sue in all three cases, a suit of the first [discrimination, and retaliation] two consolidated against my employer is still pending in Court and the most recent was on September 2006 giving rise to seeking injunctions relief in this Civil Action for retaliation of federally protected Statutes against Sodexho "persistent and egregious discrimination" against Plaintiff. My employer has intensified her acts of hostility, retaliation, and discrimination against me. Sodexho denied me Uniform, and food, short term disability benefits, rehabilitation, re-assigning me as casher, hours cut, denied health insurance benefit which forced me to seek other treatment, and fell into debts while money was still being deducted for the same health benefits and privileges, which were given to similarly situated employees who are female and African American born, Abney Laneford, James Houck, Lambert Valencia, McKinley Kevin, Robinson Sodonia, Thomas Smoot, Halloman Tyrone Tyrone Johnson, Jack Hobart, Hispanic, Nelson Cardova, and others. (**Exhibit7**).

27. On 1/05/05, Donna McCants, Café Unit Manager ordered me to quit because I had filed a case against Sodexho and had consistently told me that she would fire me, if I did not quit. On1/05/05 Donna McCants reprimanded for stealing food [without proof]. Donna McCants has reprimanded me many times including but limited for not working on a day that I attended a deposition in November 2004, which McCants attended as a party in the suit. My employer maintained an abusive and hostile work environment, including strip-searches on me, example on 08/18/2004, when my daughter, Esther Mutonyi-Simera, and myself, were harassed and stripped searched on employer's premises for no reason. On 11/17/2004, my employer falsely accused me of stealing food, intending to use that as justification for terminating my employment.

28. Said complaints resulted in more discriminatory treatment. In or about January 2002, 2003, 2004, and 2005 Plaintiff Mwabira-Simera's car, lockers, bags, and pockets were unlawfully searched by Sodexho, her agents, employees, and servants. In or about September 2005, Marcus coercing Donna Anderson, Director for Catering, denied Plaintiff from driving a truck [stated]: "You are not the type of person we can allow to drive and be in this company because you filed a case against Sodexho."

29. On numerous occasions and instances, including, but not limited to, on or about the August 11th,

2004, Sodexho authorized employees, Jones and Worley, reprimanded Plaintiff for not reporting to them for visiting the bathroom. When plaintiff Mwabira-Simera was on the toilet, they shouted that "Donna wants you out", referring to defendant McCants.

30. Other times were 2/12[th], 2005, 1/30[th], 2005 including January 05th, 2005 by Jones, Supervisor James Houck, and Worley searched my locker.The same day Donna McCants told me to quit for filing a case against Sodexho 12/12[th]/13[th], 2004 Jones searched my locker, called on Supervisor Bryant Nasheka, and General Manager John Parker with what he called evidence of food theft for firing me. Later, John Parker summoned Samuel Dorothy to reprimand me.

31. Defendant's acts of retaliation against plaintiff Mwabira-Simera included but not limited to making insulting remarks about Plaintiff and reducing his work hours, denied Family and Medical leave [Act of 1993] benefits, cashers position as compared to similarly situated employees [Junior] which is contrary to Union pre-bargaining Agreement; said retaliation being the result of plaintiff's complaints about defendant's unlawful employment practices.

32. I believe my employer intentionally retaliated and discriminated against me, in violation of my rights under Title VII of the Civil Rights Act of 1964, as amended, on account of race, sex, and national origin.  As a direct and proximate result of defendant's malicious defamation and retaliation against Plaintiff Mwabira-Simera suffered damages.

33. Wherefore Plaintiff Mwabira-Simera seeks judgment against Defendant Sodexho as follows: a) 5,000,000.00 (five million dollars) as compensatory damages b) 15,000,000 (fifteen million dollars) as punitive damages for defendant's willful, intentional, and callous retaliation against plaintiff, and indifference to violation of Plaintiff's rights c) attorney fees and costs.

**Count III Unlawful Discrimination under Title VII of the Civil Rights Act of 1964 42 USC 2000e _et sequel_  5(f)(3) Section 504 of the Rehabilitation Act of 1973; Family, and Medical Leave Act (G&E) of 1993, and Occupation Safety and Health  (OSHAct) of 1970 P.L.91-596**

34. Plaintiff Mwabira-Simera also sues defendant Sodexho under Title VII of the Civil Rights Act of 1964, 42USC 2000e _et sequel_ 5(f)(3) under Section 504 of the Rehabilitation Act of 1973; under the Fair Housing and Employment Act; Family and Medical Leave Act (G&E) of 1993, and Title VII of

the Civil Rights Act of 1971, as amended, and Occupation Safety and Health (OSH. Act) of 1970
P.L.91-596, as set forth herein and further states:

35. Plaintiff provided Defendant Sodexho with all the medical documents and filed for sick leave to
undergo surgery on his left ankle. Plaintiff was denied rehabilitation and as a means of finding a way
to dismissing Plaintiff. When Plaintiff reported for duty became a victim of discrimination, harassed
and bullied on 1/10/2006, 1/15/2006, 2/13/2006 and most recently 10/2/2006, see *Nevada Department
of Resources v.Hibbs*, 538 U.S.721 (2003). *Tennessee v.Lane*, 541 U.S.509 (2004) (**Exhibit4**).

36. On May 16th, 2006, Plaintiff could not be assisted by Defendant McCants as Unit Manager on duty
when he was struck by about 200 pound hand driven wreck at work in violation of Occupation Safety
and Health (OSH. Act) of 1970 P.L.91-596 which provides that: "Occupation Safety and Health
Administration in Department of Labor assures safe and healthful working conditions for men and
women throughout the nation". Donna McCants coercing other employees scorned that Plaintiff was
seeking for free money yet Sodexho failed to provide safe and healthful working conditions.

37. Defendant Sodexho retaliatory action violates a Federally Protected Institutions by bullying, and
intimidating him and finding a way of dismissing Plaintiff, and denied Plaintiff the short-term
disability like other employees of American born like Valencia, and others.(**Exhibit 5**). This was a
cruel and unusual punishment as compared to similarly situated employees; said retaliation being the
result of plaintiff's complaints about defendant's unlawful employment practices see. 42
U.S.C§(2000);*Tennessee v.Lane* 541 U.S.509(2004);*United States v.Georgia* No.04-1203, 04-1236,
2006 WL.43973. Defendant Sodexho treated plaintiff differently and in a less favorable manner than
other similarly situated employees, who are American-born, African American, Caribbean Black, and
Caucasian, in terms, conditions, and privileges of employment.

Wherefore Plaintiff Mwabira-Simera seeks judgment against defendant Sodexho as follows: a)
5,000,000.00 (five million dollars) as compensatory damages b) 15,000,000 (fifteen million dollars) as
punitive damages for defendant's willful, intentional, and callous discrimination, and indifference to
violation of plaintiff's rights c) attorney fees and costs.

**Counts IV Title VII (Hostile and Abusive Work Environment of substantive provisions of the Protective clause)**

38. Plaintiff Mwabira-Simera sues defendant Sodexho for maintaining an abusive, hostile and work environment under Title VII of the Civil Rights Act of 1964, as amended, and defendant's violation of Plaintiff Mwabira-Simera's right to be free from an abusive and hostile work environment. Plaintiff incorporates, by references, the allegations in paragraph 1 through paragraph 37, as set forth herein and further states.

39. Defendant Sodexho is/was an "employer", and Plaintiff is/was an "employee" as defined under Title VII and belongs to a class protected under said statute based on his African (Ugandan) national origin.

40. Defendant Sodexho intentionally discriminated against Plaintiff, in violation of plaintiff Mwabira-Simera's right to be free from discrimination including but not limited to re-assigning Plaintiff's position to a less qualified employee of American national origin and terminating him from employment while retaining similarly situated employees of American national origin.

41. Plaintiff's bags were searched on numerous occasions for no legal reason, except to harass him. Plaintiff was subjected to verbal abuse and ethnic comments based on his African physical characteristics, like his long name.

42. Several co-workers made fun of Plaintiff Mwabira-Simera and told him, in the presence of other co-workers, that he smelled like cats, like "urine", and unhygienic. Defendants' filed false charges against Plaintiff is because of his African national origin.

43. Plaintiff had to seek permission from his superiors before visiting the washroom, even though, similarly situated employees [always basking in the sun], who were American-born, did not have to.

44. Said acts and omissions as alleged, constitute an abusive and hostile work environment based on Plaintiff's African (Ugandan) national origin, violating Plaintiff's right to be free from an abusive and hostile work environment, under Title VII of the Civil Rights Act of 1964, as amended.

45. As a direct result of Sodexho's acts and omissions in engaging in an abusive and hostile work

environment, based on plaintiff Mwabira-Simera's Ugandan, African national origin, Plaintiff suffered damages including but not limited to severe and extreme emotional distress, loss of income, loss of reputation, and physical harm.

Wherefore Plaintiff Mwabira-Simera seeks judgment against Defendant Sodexho as follows: a) 5,000,000.00 (five million dollars) as compensatory damages b) 15,000,000.00 (fifteen million dollars) as punitive damages for defendant's willful, intentional, and callous maintenance of abusive and hostile work environment, and indifference to violation of plaintiff's rights c) attorney fees and costs.

## Count V Violation of Plaintiff Mwabira's Rights Under the Americans With Disability Act (ADA) of 1990 42 USCA, Section 12101 et sequel

46. Plaintiff Mwabira-Simera sues defendant Sodexho for violating his rights secured under the American with Disability Act of 1990, 42 USCA, section 12101 *et sequel*. Plaintiff re-alleges the allegations in paragraph 1 through paragraph 45, as set forth herein, and states.

47. Plaintiff Mwabira-Simera filed a complaint under the ADA with the U.S. EEOC prior to filing this suit, and has complied with all conditions precedent to filing suit under the ADA, as indicated by the Exhibits 1A, 1B, 1C attached herein, as part of this Complaint.

48. Plaintiff Mwabira-Simera is and was an employee, within the meaning of the ADA.

49. Plaintiff Mwabira-Simera is disabled, as defined by the Americans with Disability Act (ADA). Plaintiff is an individual with a disability, having physical and mental impairment that substantially limits Plaintiffs major life activity (walking, hearing, speaking, working, interacting with others, and sleeping). (**Exhibit 6**). Plaintiff is otherwise qualified to perform the essential functions of his job as a utility worker, casher or even higher positions.

50. Plaintiff Mwabira-Simera is a victim of state-sponsored torture, as evidenced by **Exhibit 7**, attached herein as part of his Complaint.

51. Defendant Sodexho intentionally discriminated against plaintiff Mwabira-Simera because of his disability by denying the Plaintiff a chance to walk out through "punch out".

52. Plaintiff Mwabira-Simera has a hearing impairment and difficulty walking and bending. Defendant Sodexho co-workers and supervisors made fun of him because of his disabilities, told him that he could not take certain assignments, and omitted information throughout the scope and course of his employment with Sodexho.

53. All of defendant Sodexho's agents, servants, and employees acted illegally, or failed to act, and such acts and omissions were conducted within the scope and course of his employment with defendant Sodexho see *Nevada Department of Human resources v. Hibbs*,538 U.S.721 (2003);*Tennessee v.Lane*,541 U.S.509 (2004); 42 U.S.C 12132 (2000)

54. Defendant Howard is vicariously liable for the tortuous acts and omissions of defendant Jones.

55. Plaintiff Mwabira-Simera informed Defendants about this unlawful search, but defendants failed to act and otherwise ratified these acts.

56. At all times relevant, plaintiff Mwabira-Simera had a reasonable expectation of privacy for his person, bags, and clothing, and Defendants acts and/or omissions constituted intentional intrusion, which was unjustified and would be offensive to a reasonable person in plaintiff's situation, upon the seclusion and private affairs of Plaintiffs.

57. As a direct and proximate result of Defendants' invasion of Plaintiffs' privacy, plaintiff Mwabira-Simera and plaintiff Mutonyi suffered damages.

Wherefore Plaintiff Mwabira-Simera and plaintiff Mutonyi individually seek judgment against Defendant Sodexho, jointly and/or separately, as follows: a) $5,000,000.00 (five million dollars) as compensatory damages b) $15,000,000.00 (fifteen million dollars) as punitive damages for defendant's willful, intentional, and callous invasion of the privacy of plaintiffs, and indifference to violation of Plaintiffs rights c) attorney fees and costs.

## **Count VI Invasion of Privacy**

58. Plaintiff Mwabira-Simera and Plaintiff Mutonyi-Simera individually sue defendant Sodexho,

defendant Worley, and defendant Jones for invasion of privacy [searches in violation of Fourth Amendment[3] ] See *Katz v. United States*, 389 U.S.347 (1967)), and re-allege the allegations in paragraph 1 through paragraph 57, as set forth herein and state.

59. Without plaintiff Mwabira-Simera's consent, defendant Sodexho, and its agents, servants, employees strip searched plaintiff Mwabira-Simera on numerous occasions.

(A) The searches included, but not limited to, on or about August 7th, 2004 at 11:00, Sodexho authorized employees, Vincent Jones and Marcus Worley to spy on plaintiff Mwabira-Simera while plaintiff Mwabira-Simera was getting something from his locker for plaintiff Mutonyi-Simera because Vincent Jones and Worley Marcus wanted to incriminate both plaintiffs Mwabira-Simera and Esther Mutonyi-Simera for the glass of water they [Jones & Marcus] served Esther Mutonyi-Simera.. Defendants Vincent Jones Chief Chef searched my locker and strip-searched me. At 11; 25 Marcus Worley Executive Chef searched plaintiffs Mwabira-Simera and Esther Mutonyi-Simera in front of information center on first floor on Blackburn Center

(B) On 11/19th,/2004 Donna McCant, then Unit Manger Bethune, Supervisor James Houck, Worley, and Jones searched my locker and coercing Herman, Unit Manger, Blackburn Café to fire me for not working on 9/19[th], 2004 while attending deposition [McCants did attend same depositions] because that Plaintiff filed a case against Sodexho. Herman reprimanded Plaintiff [plaintiff was off that day].

(C) On 10/ 16th, 2004 Supervisor James Hague, Worley, and Jones searched my locker. On 10/ 16th/ 2004 Supervisor James Houck, Worley, and Jones continued searching my locker, other lockers, and Roofs picked some trash which they brought to Supervisor Bryant Nasheda and Samuels Dorothy Shop Steward as evidence of stealing and demanded that I be fired. On 9/ 22nd, 2004 Jones, rebuked Antonia Thompson, General utility not to speak to me because I am not an American, type of person, and because I filed a case against Sodexho.

---

[3] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath of affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., Amdt, 4.

(D) On 9/ 19th/ 2004 Vincent Jones, Chief Chef coercing Lisa Brown, then assistant Manager, and now Putch-Out Unit Manager pulled me out of the queue of employers for breakfast that I have taken Sodexho to court. On 9/ 20th,/2004 Donna Anderson catering Coordinator, and Worley ejected me from driving a vehicle where Mr. Mohammad Abdelilah, Director of Operations had assigned me to deliver some items to Howard University West Campus-Law School that I was not the type of person they want because I filled a case against Sodexho. On 9/18th, 2004 Jones after searching my Locker denied me to help Troy in Putch-out, because I was [only employee] prohibited to be near or in Punch Out at anytime.

(E)On 8/29st/ 2004, Supervisor James Houck, Worley, and Jones searched my locker, and other lockers to find what I had stolen. On 8/ 21st/ 2004, Supervisor James Hague in corroborations with both Worley and Jones for the fifth time broke into my locker in the Locker room destroyed my bag equipped with a watch, compass, tore it, and dumped other items [clothes, books and assignments] threw them in toilet and urinal bowels. James Houck on more than once, threw all my clothes, books, assignments, and stole one black pair of new working shoes and the bag and forced me out of his way at the locker room door. I called on Mr.Muhammed Abdelilah Director of Operations who went to the locker room and witnessed these evil acts, and harassments. James Houck kept telling me that they [Sodexho, McCants, Worley and Jones] maintain that I stink, unhygienic, thief and eat too much.

55. Plaintiff made many times reports to Muhammad, Director of Operations who saw the acts in the locker room, later to General Manager Mr. John Packer and Herman, the Unit manager. Mr.Muhammed Abdelilah Director of Operations entrusted Mr. Herman to investigate the matter, but failed to do it. On November 15th, 2004, Plaintiff filed a grievance with Shop steward Sam Foster, and in this meeting, I requested Mr. Herman to tell Mr. Hague [McCants, Worley & Jones mouth piece] to stop any informal or formal talking with me. Because McCants, Worley, and Jones, were coercing James Houck, they technically reversed the course of this complaint that I was to be suspended for harassing James Houck, and my report was trashed.

56. All agents, servants, and employees of defendant Sodexho acted, or failed to act, and such acts and omissions were conducted within the scope and course of his employment with defendant Sodexho.

57. From the moment Plaintiff Mutonyi entered Defendant Sodexho's cafeteria at Blackburn Center to

talk with Plaintiff Mwabira-Simera, Plaintiffs were under constant surveillances and spied on by defendant Worley, and Jones. When Plaintiffs went downstairs to the employees' locker room, they were immediately followed and searched by the Defendant Jones and Defendant Worley, and did not leave the locker room until plaintiff Mutonyi exited the building and plaintiff Mwabira-Simera returned to work.

58. At all times relevant, defendant McCants, Worley, and Jones, and Houck were acting within the scope and course of his employment with Sodexho, and defendant Jones was acting within the scope of his employment with defendant Sodexho.

59. As a direct and proximate result of defamation of plaintiffs Mwabira-Simera and Mutonyi-Simera suffered damages, including but not limited to reputation.

Wherefore, Plaintiff Mwabira-Simera and plaintiff Mutonyi-Simera individually seek judgment against Defendant Sodexho, jointly and/or separately, as follows: a) $5,000,000.00 (five million dollars) as compensatory damages b) $15,000,000.00 (fifteen million dollars) as punitive damages for defendant's willful, intentional, and callous invasion of the privacy of plaintiffs, and indifference to violation of Plaintiffs rights c) attorney fees and costs.

## Count VII Negligence

60. Plaintiff Mwabira-Simera and Plaintiff Mutonyi-Simera individually sue Defendant Sodexho for negligence and incorporates, by reference, the allegations made in paragraph 1 through paragraph 59, as set forth herein and states.

61. Defendant Sodexho owed a duty toward plaintiff Mwabira-Simera to provide a working environment free from discrimination, intimidation, and harassment, as promised by defendants in their employment manual. Further, defendants Sodexho owed a duty to plaintiffs Mwabira-Simera and Mutonyi-Simera to use reasonable care in hiring, retaining, supervising, and disciplining her workers, including but not limited to defendants McCants, Steward, Worley, and Jones, so as not to cause harm to plaintiffs, including violation of their rights to be free from intimidation and spying.

62. Defendants Sodexho are vicariously liable for the acts and omissions of their agents, servants, and

employees committed in the course and scope of employment. Defendant Sodexho was negligent in hiring, training, retaining, and supervising defendant Worley, her employee.

63. Defendants Sodexho breached its duty of reasonable care owed toward Plaintiffs by failing to properly investigate facts of harassment, intimidation, and hostility when Plaintiff Mwabira-Simera informed defendants of them and by negligently recruiting, training, supervising, and retaining defendants McCants, Worley, Tony Steward, and Jones.

64. Defendants had a duty to properly investigate these facts and to make appropriate decisions, so as to prevent further harm to plaintiffs.

65. As a direct and proximate result of defendants' acts and/or omissions, plaintiffs Mwabira-Simera and Mutonyi-Simera suffered damages, including but not limited to loss of reputation, emotional distress, and loss of weight.

Wherefore, Plaintiff Mwabira-Simera and plaintiff Mutonyi-Simera individually seek judgment against Defendant Sodexho, jointly and/or separately, as follows: a) $5,000,000.00 (five million dollars) as compensatory damages b) $15,000,000.00 (fifteen million dollars) as punitive damages for defendant's willful, intentional, and callous invasion of the privacy of plaintiffs, and indifference to violation of Plaintiffs rights c) attorney fees and costs.

## COUNT VIII DEFARMATION

66. Plaintiff Mwabira-Simera and plaintiff Mutonyi-Simera individually sue defendants Sodexho, Donna McCants, Marcus Worley, and Vincent Jones for intentional infliction of emotional distress and re-allege the allegations in paragraph 1 through paragraph 65, as set forth herein.

67. On many occasions but not limited to February 3rd, 2005, March 2nd, 2005 at about 10:10am and other above mentioned dates, Donna McCants, Marcus Worley, Jones and Houck acting within the scope and course of their employments summoned Shop Stewards Sam Foster and Dorotti Samuels to accompany them to search for stolen box of fresh chickens hidden in men's locker room by Plaintiff Mwabira-Simera. After searching the locker room, they found none of the items.

68.On Other incidences but not limited to incidence at 5:15 pm, Sunday January 30th, 2005 Vincent Jones, harassed me with a wrong card [Mandaline Nguimbous] insinuating to fire me for cheating time for break and eating. At 11:15 am, and 7:15 pm Saturday January 29th, 2005 McCants, was monitoring my movements me. At 8;45 pm Wednesday January12[th], 2005 Donna McCant Unit Manager, Blackburn Center Cafe, and Vincent Jones Chie Chef continued searching my locker, and accused me of stealing Sodas. McCant reprimanded me unprecedented.

69. The truth of the matter turned out that Donna McCants, Marcus Worley, and Vincent Jones had kept the box of chickens in the freezer and they only wanted to find something to use as evidence to incriminate and fire Plaintiff Mwabira-Simera. Plaintiff shifts by the way started at twelve thirty pm.

70. Said statements, acts and mission were false, and Donna McCants, Marcus Worley, Houck, and Vincent Jones knew of the falsity when they planned to execute their mission.

71. Defendant Sodexho adopted the statements as true and benefited from the defamatory statement.

72. This was an "intertwined conspiracy episode" between Defendants McCants and Jones, under color of law malicious defamation,[4] oppressive, and in reckless disregard for the truth (**Exhibit 1**). *see Martin Marrietta Corp v. Lorenz (Colo.1992);Harless v. First Nat. Bank in Fairmount (*W.Va1978*); McQuary v. Bel Air Convalescent Home, Inc. (*Or.App.1984*).*Defendants Sodexho's' full caption for complaint was deceit-overt false representation[5] of a material fact under the color of law (**Exhibit5**).

---

[4] Citation: "*Plaintiff entitled to punitive damages in slander suit where defendant stated to others that Plaintiff had been convicted of a crime in a falsity statement with disregard of truth. See Davis v. Schmit 166 App DC 351 510 F2d 731 4). Monroe v. Pape,* 365 U.S. 167, 183-187 (1961)("under color of state law" includes misuse of power possessed by virtue of state law and made possible because the wrongdoer is clothed with the authority of state law). 5.*Griffin v. Maryland,* 378 U.S. 130 (1964)("If an individual is possessed of state authority and purports to act under that authority, his action is state action...").

[5] Misrepresentation
The Defendants knew of their falsity and yet made fraudulent misrepresentation with such reckless indifference to the truth that it would be reasonable to charge them with knowledge of this falsity
The Defendant made the fraudulent misrepresentation intending that the plaintiff would act in reliance on it. By willfully and knowingly falsifying material fact violates statute article 18 USC § 1001 which states:
Whoever willfully and knowingly falsifies a material fact or makes use of a false statement or makes use of a false document will be fined up to U.S. $10,000 or imprisoned up to five years or both. Also must be charged under penalty of perjury 28 U.S.C. §1731

73. As a direct and proximate result of defamation of plaintiffs Mwabira-Simera and Mutonyi-Simera, they suffered damages, including but not limited to reputation.

Wherefore, Plaintiff Mwabira-Simera and plaintiff Mutonyi-Simera individually seek judgment against Defendant Sodexho, jointly and/or separately, as follows: a) $5,000,000.00 (five million dollars) as compensatory damages b) $15,000,000.00 (fifteen million dollars) as punitive damages for defendant's willful, intentional, and callous invasion of the privacy of plaintiffs, and indifference to violation of Plaintiffs rights c) attorney fees and costs.

**Intentional Infliction of Emotional Distress**

74. Plaintiff Mwabira-Simera and plaintiff Mutonyi-Simera individually sue defendants Sodexho, Donna McCants, Marcus Worley, James Houck, and Vincent Jones and Vincent Jones for intentional infliction of emotional distress and re-allege the allegations in paragraph 1 through paragraph 71, as set forth herein.

75. Defendants' conduct were intentional, reckless and in deliberate disregard of a high probability that emotional distress would result to plaintiff Mutonyi-Simera and her father plaintiff Mwabira-Simera who witnessed the reckless conduct of the defendant harassing the plaintiffs.

76. The aforesaid conduct of defendants was extreme, outrageous, and beyond the bounds of decency in society, and defendants Worley knew that said acts would cause, and did cause, severe and extreme emotional distress to plaintiffs. At all times defendant Sodexho were vicariously liable for the acts and omissions of their employees that were committed in the course and scope of employment, and they ratified these acts and/or benefited from the acts.

77. As a direct and proximate result of the acts of defendants McCants, Worley, Houck, and Jones plaintiffs suffered damages, including but not limited to severe and extreme emotional distress leading to mental hospitalization, and neurological surgery at Howard University Hospital, loss of appetite, headaches, physical pains, and suffering which still keep him under psychiatric care. (**Exhibit8**)

Wherefore, Plaintiff Mwabira-Simera and plaintiff Mutonyi-Simera individually seek judgment against Defendant Sodexho, jointly and/or separately, as follows: a) $5,000,000.00 (five million dollars) as compensatory damages b) $15,000,000.00 (fifteen million dollars) as punitive damages for defendant's willful, intentional, and callous invasion of the privacy of plaintiffs, and indifference to violation of Plaintiffs rights c) attorney fees and costs.

### **Plaintiffs hereby request a trial by jury in this matter**

Respectfully submitted

Samuel H.Mwabira-Simera
and Esther Mutonyi
Esther E.Mutonyi-Simera
P.O.Box 1405
Washington D.C 20013
Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that the motions, Complaints, and sermons for judgments against Sodexho Marriott Management Services, Donna McCants, Marcus Worley, and Vincent Jones for a good cause was mailed to Defendants by Process Server on 10/22/2006 to

Sodexho Marriott Management Services,
Attn.Ardra M.O'Neal,
Senior Attorney, Labor & Employment Law
9801 Washingtonian Blvd
Gaithersburg, MD 20678

Donna McCants, Marcus Worley, Vincent Jones
Sodexho Campus Services, Howard University, Blackburn Center
2400 6th Street, NW, Washington, DC 20059

Respectfully submitted

Samuel H.Mwabira-Simera and
Esther E.Mutonyi-Simera

H
06-2052
RWR

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

Samuel H. Mwabira-Simera

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 11001
(EXCEPT IN U.S. PLAINTIFF CASES)

PRO SE (ATP)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

## DEFENDANTS

Sodexho/Marriott Management Services, et al.,

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

CASE NUMBER   1:06CV02052

JUDGE: Richard W. Roberts

DECK TYPE: Employment Discrimination

DATE STAMP:  11 30 /2006

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES

FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ☐ A. Antitrust

☐ 410 Antitrust

### ☐ B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ☐ C. Administrative Agency Review

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ☐ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

—0—

| ☐ **G.** *Habeas Corpus/ 2255* | ☐ **H.** *Employment Discrimination* | ☐ **I.** *FOIA/PRIVACY ACT* | ☐ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530** Habeas Corpus-General<br>☐ **510** Motion/Vacate Sentence | ☐ **442** Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895** Freedom of Information Act<br>☐ **890** Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152** Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ **K.** *Labor/ERISA (non-employment)* | ☐ **L.** *Other Civil Rights (non-employment)* | ☐ **M.** *Contract* | ☐ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710** Fair Labor Standards Act<br>☐ **720** Labor/Mgmt. Relations<br>☐ **730** Labor/Mgmt. Reporting & Disclosure Act<br>☐ **740** Labor Railway Act<br>☐ **790** Other Labor Litigation<br>☐ **791** Empl. Ret. Inc. Security Act | ☐ **441** Voting (if not Voting Rights Act)<br>☐ **443** Housing/Accommodations<br>☐ **444** Welfare<br>☐ **440** Other Civil Rights<br>☐ **445** American w/Disabilities-Employment<br>☐ **446** Americans w/Disabilities-Other | ☐ **110** Insurance<br>☐ **120** Marine<br>☐ **130** Miller Act<br>☐ **140** Negotiable Instrument<br>☐ **150** Recovery of Overpayment & Enforcement of Judgment<br>☐ **153** Recovery of Overpayment of Veteran's Benefits<br>☐ **160** Stockholder's Suits<br>☐ **190** Other Contracts<br>☐ **195** Contract Product Liability<br>☐ **196** Franchise | ☐ **441** Civil Rights-Voting (if Voting Rights Act) |

**ORIGIN**

| ⊗ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ Multi district Litigation | ☐ 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 USC 2000

---

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   **DEMAND $** 0   Check YES only if demanded in complaint **JURY DEMAND** ⊗ YES   ☐ NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   ⊗ YES   ☐ NO   If yes, please complete related case form.

**DATE** 11.30.06   **SIGNATURE OF ATTORNEY OF RECORD** NCD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd

ADDEDUM

Charges of employment discrimination filed with U.S. EEOC, against defendant Sodexho.

**[EXHIBIT 1] Exhibit 1A, 1B,** and **IC**.

To Equal Employment Opportunity Commission 100-2005-0c
1801 L Street NW
Washington DC

04/29/03

Atten John Woods

From: Samuel Mwabira-Simera "Mwas,"
    P. O. Box 1405
    Washington DC 20013
    202 635-0595

Subject: Right to sue:

Sir/Madam

Due to increased hostilities, abuses, discrimination
and retaliation from Sodexho Managers, I request
that the commission issue me the right to
sue.

Your cooperation is highly welcomed

EEOC
WASHINGTON FIELD OFFICE
2005 APR 29 A 10: 01
1400 L ST NW
WASHINGTON D.C. 20005

06 2052

**FILED**

NOV 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

MR. Wwabira - SimERA —

ENCLOSED please find a copy of
the charge that you recently submitted
the WFO

✗ NOTE PLEASE NOTE That we placed
your NEW CORRECT CHARGE Number
NUMBER ON the doc document in
the upper Right Corner.

NOTE: (You Wrong fully typed you OLD Charge
number from an OLD Case on
this document)

PR
4/1/05

EEOC Form 5 (5/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

EEOC
WASHINGTON FIELD OFFICE

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | 100-2005-00704 |
| ☒ EEOC | |

**D.C. Office Of Human Rights**
2005 MAR 28 A 10 38         *State or local Agency, if any*         and EEOC

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Mr. Samuel H. Mwabira-Simera ST NW | (202) 388-3488 | 12-03-1960 |

Street Address: WASHINGTON D.C. 20005      City, State and ZIP Code
P.O. Box 1405, Washington, DC 20013

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| SODEXHO Marriott Management Services | 500 or More | |

Street Address: 2400 6th Street, N.W., Washington, DC 20059        City, State and ZIP Code

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Donna McCants | | |

Street Address: 2400 6th Street NW., Washington, DC 20059       City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☒ OTHER (Specify below.)
Hostile & Abusive work environment

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 08-18-2004      Latest: 01 20 2004
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Iam 43 year old black male, of African (Ugandan), national ori
gin, who has been employed by Sodexho, since 2001. I filed an
employment discrimination suit against Respondents in 2004
which suit is pending in US District Court, Washington, DC.
In response my employer has retaliated and discriminated again—
st me, by denying me uniforms, food, health insurance, which
benefits/privelges were given to similarly situated employees
who are fem_ale, Dorothy Samuels, American born, Tyrone
Johnson. or Hispanic, Nelson CaRDOVA.   I was denied promotion, hours cut,
and transfer in 07, 09, 11 of 2004. My employer engaged in
abusive & hostlle work environment, including strip searching
me and my daughter, Esther M. Simera on 08-18-2004. Donna
McCants (Supervisor) threatened to terminate my employment for
filing suit against Sodexho and attending deposition in
November, 2004. On 11-17-2004, Employer falsely accused me
of stealing food, intending to justify a pllanned termination
of my emploment. My employer has targetted me for monitoring.
     I believe my employer intentionally retaliated and discri-
minated against me on the b 's of my national origin, sex, and
race, in violation of Title    Civil Rights Act, 1964, as amended.

I want this charge filed with both the EEOC and the State advise the agencies if I change my address or phone nu with them in the processing of my charge in accordanc

NOTARY – When necessary for State and Local Agency Requirements

I declare under penalty of perjury th                                          is true to

Mar 27 200 5
Date

Charging Party Signature



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington Field Office**

1400 L Street, N.W., Suite 200
Washington, D.C. 20005
(202) 275-7377
TTY (202) 275-7518
FAX (202) 275-6834 & 0025

Direct Line
(202) 275-6884

April 7, 2004


Exhibit Plantiff
5 a

Mr. Samuel Mwabira-Simera
P.O. Box 1405
Washington, D.C. 20013

RE:     Samuel Mwabira-Simera vs. Sodexho Mangement, Inc.
        Charge Number 100-2004-00388

Dear Mr. Mwabira-Simera:

I was unable to reach you by telephone. I called to discuss your charge of discrimination.
Respondent indicated that you reached a settlement through arbitration. Please contact me within
five days of the date of this letter so that we can discuss whether you settled your charge of
discrimination. You can reach me at (202) 275-6884 . If you reach my voice mail, please leave a
phone number where I can reach you during the hours of 8:00 a.m. to 4:30 p.m.

Your cooperation in this matter is greatly appreciated.

Sincerely,

Janet A. Stump

Janet A. Stump
Federal Investigator

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA <br> ☒ EEOC | AMENDMENT <br> 100-2003-00561 |

|  |  |
|---|---|
| **D.C. Office Of Human Rights** | and EEOC |
| *State or local Agency, if any* |  |

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone No. *(Incl Area Code)* | Date of Birth |
|---|---|---|
| **Mr. Samuel H. Mwabira-Simera** | **(202) 388-3488** | **12-03-1960** |

Street Address                City, State and ZIP Code

**P.O. Box 1405 Washington, DC 20013**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **SODEXHO** | **500 or More** | **(202) 387-2306** |

Street Address                City, State and ZIP Code

**2400 6th St., N W  Washington, DC 20059**

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|

Street Address                City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE   ☒ COLOR   ☒ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN
☒ RETALIATION   ☒ AGE   ☒ DISABILITY   ☐ OTHER *(Specify below.)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **03-12-2001** | **06-22-2003** |
| ☒ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am employed by Sodexho as a utility worker. I have been harassed and intimidated in that I have been falsely accused of stealing; my person has been searched repeatedly; my car has been searched; I have been assigned difficult assignments; my hours were cut; I was denied breaks; I was told that I am too old; and I was called a smelly frustrating son of a bitch. These are just some examples of the harassment and intimidation. I believe that this is due to my age, my national origin, my sex, my color, my race, and in retaliation for complaining about the situation.

I believe that I have been discriminated against due to my age, 42, in violation of the Age Discrimination in Employment Act of 1967, as amended, my national origin, Uganda, my race and color, Black, my gender, male, and retaliation, which is in violation of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. <br> SIGNATURE OF COMPLAINANT |
| 8/04/03     *Date*     *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

**EEOC Notices of the right to sue
[Exhibit 2] Exhibit 2A, 2B and 2C**

# M E M O R A N D U M

| | |
|---|---|
| **To:** | File |
| **From:** | Janet Stump  |
| **Date:** | June 19, 2003 |
| **Subject:** | Intake Interview with PCP, Samuel  Mwabira-Simera |

*Inquiry # 100-2003-00561N*

I met with PCP in intake on 6/19/03.  PCP provided the following information.

Additional witnesses to the harassment are as follows:

  Joseph Ramasyn    (202) 218-0957

  Sheman Burt    (202) 899-1288
  1200 N. Capital, N.W.
  Apt. 506
  Washington, D.C.

John Parker also witnessed some of the harassment.  CP did not always receive his breaks and this will be substantiated by looking at his time card.  CP had to report when he went to the bathroom.  CP tried to hide the fact that he was originally from South Africa.  He told people he was from Canada since he came to the U.S. from Canada.   Employees did not like him because he is a foreigner.

CP was terminated and reinstated in 2002 for allegedly stealing.

I told CP that he needed to provide me with specifics of what the harassment/intimidation entailed.  I informed CP that the time line he provided used the terms, harassment and intimidation without going into detail.  I explained to CP that I need him to provide the details of the harassment or intimidation such as what was said, what was done, etc.  CP said that he would try to provide this in a week or so.

When I returned to the intake waiting area from inputing CP's charge, CP was gone.  CP did not sign the charge so I mailed the charge to him.

EEOC Form 161-B (3/98)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: Samuel H. Mwabira-Simera<br>P.O. Box 1405<br>Washington, DC 20013 | From: Washington Field Office - 570<br>1801 L Street, N.W.<br>Suite 100<br>Washington, DC 20507 |
|---|---|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No.<br><br>**100-2005-00704** | EEOC Representative<br>**Janet Stump,**<br>**Enforcement Supervisor** | Telephone No.<br><br>**(202) 419-0700** |
|---|---|---|

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

SEP 15 2006

Enclosures(s)

**Dana Hutter,**
**Director**

*(Date Mailed)*

CC:    Ardra M. O'Neal
Senior Attorney, Labor & Employment Law
SODEXHO
9801 Washingtonian Blvd.
Gaithersburg, MD 20878

06 2052
**FILED**
NOV 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

EEOC Form 161 (3/98)



### U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Samuel H. Mwabira-Simera
P.O. Box 1405
Washington, DC 20013

From: **Washington DC Field Office**
**1400 L Street, NW**
**Suite 200**
**Washington, DC 20005**

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 00-2004-00388 | **Janice B. Campbell,**<br>**Enforcement Supervisor** | **(202) 275-7377** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| ☐ | Your allegations did not involve a disability as defined by the Americans with Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge. |
| ☐ | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| ☐ | While reasonable efforts were made to locate you, we were not able to do so. |
| ☐ | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| ☒ | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☐ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☐ | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Dana R Hutter* (signature)

**Dana Hutter,**
**Acting Director**

APR 26 2004

*(Date Mailed)*

Enclosure(s)

c: Vilecia C. Summers
Senior EEO Representative
SODEXHO
9801 Washington Blvd.
Gaithersburg, MD 20878

EEOC Form 161-B (10/96)

## U.S. ~~AL~~ EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*


*Plaintiff Exhibit*

| To: | From: |
|---|---|
| Mr. Samuel H. Mwabira-Simera<br>P.O. Box 1405<br>Washington, D.C. 20013 | U.S. Equal Employment Opportunity Commission<br>Washington Field Office<br>1400 L. Street, N.W.  Suite 200<br>Washington, D.C. 20005 |

[  ]    *On behalf of person(s) aggrieved whose identity is*
        *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No.<br>100-2003-00561 | EEOC Representative<br>Dana Hutter,  Acting Director | Telephone No.<br>(202) 275-7377 |
|---|---|---|

## NOTICE TO THE PERSON AGGRIEVED:

*(See also the additional information attached to this form.)*

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge.  It has been issued at your request.  Your suit under Title VII or the ADA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.  Otherwise, your right to sue based on the above-numbered charge will be lost.

[X ]    More than 180 days have passed since the filing of this charge.

[  ]    Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge. .

[ ]    The EEOC is terminating its processing of this charge.

[ ]    The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

[  ]    The EEOC is closing your case.  Therefore, your lawsuit under the ADEA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.  Otherwise, your right to sue based on the above-numbered charge will be lost.

[  ]    The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required).  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit based this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Dana R Hutter*

Dana Hutter, Acting Director

**JAN 0 5 2004**

*(Date Mailed)*

Enclosure(s)

cc:

Charles O. Kwarteng, J.D. Ph.D.
Law Offices
6215 Harford Road
P.O. Box 24568
Baltimore, MD 21214

Vilecia C. Summers
Senior EEO Representative
Sodexho
9801 Washington Boulevard
Gaithersburg, MD 20878

Enclosure with EEOC
Form 161-B (3/98)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should keep a record of this date. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before 7/1/02 – *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**Plaintiff Mwabira-Simera performed his duties in a satisfactory manner.**

**Exhibit 3**



# sodexho
— CAMPUS SERVICES —

AT

HOWARD UNIVERSITY
WOULD LIKE TO GIVE THANKS TO

*Samuel Mwangira Simera*

FOR A SUCCESSFUL 2001~2002 SCHOOL YEAR

Director of Operations

Unit Manager

06 2052

**FILED**

NOV 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Abuse such as ""smelling like mops", "cats" "urine",

**Exhibit 4**

# Sodexho

**Vilecia C. Summers**
Senior EEO Representative

Telephone: (301) 987-4529
Facsimile:  (301) 987-4299

November 7, 2003

Plaintiffs'
Exhibit

**VIA CERTIFIED MAIL AND**
**FACSIMILE:  (202) 275-6834**

Janice Campbell
Enforcement Supervisor
Equal Employment Opportunity Commission
Washington Field Office
1400 L Street, N.W., Suite 200
Washington, D.C.  20005

**Re:  Samuel H. Mwabira-Simera v. Sodexho Management, Inc.**
    **EEOC No. 100-2003-00561**

Dear Ms. Campbell:

This submission represents Sodexho Management, Inc.'s ("Sodexho") response to the above-referenced charge.  This submission and any accompanying exhibits are being provided in confidence for use by the Commission in processing the charge.  Sodexho does not concede the admissibility of this submission or the information contained therein for purposes of any administrative or other future proceeding.  Accordingly, please do not release this information to any other person or party without obtaining Sodexho's prior consent.

**NAME AND ADDRESS OF RESPONDENT**

While the charge lists the respondent as "Sodexho", the proper respondent is Sodexho Management, Inc., a subsidiary of Sodexho, Inc.  Sodexho Management, Inc., the successor to Sodexho Marriott Management Corp., is incorporated in New York and maintains its headquarters at 9801 Washingtonian Boulevard in Gaithersburg, Maryland  20878.

**STATEMENT OF POSITION**

Sodexho denies that it discriminated against Samuel Mwabira-Simera for any reason.  He was terminated for theft after having been caught a second time.  Furthermore, Sodexho has not retaliated against him by reducing his work hours.

Sodexho regards the issue of discrimination as a serious matter.  Accordingly, it has established its Equal Employment Opportunity policy, which prohibits such conduct.  In addition, Sodexho has instituted its Promise of Respect and Fair Treatment policy, which provides its workers with an avenue to voice their employment concerns without fear of retaliation. (See, Exhibit A)

06 2052

**FILED**

NOV 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Sodexho • 9801 Washingtonian Boulevard, Gaithersburg, MD 20878
Telephone: 800-763-3946 • Fax: 301-987-4499 • Internet: www.sodexhoUSA.com

Member of Sodexho Alliance

Ms. Campbell
November 7, 2003
Page 4

C.     Mr. Worley Made No Inappropriate Statements about Mr. Mwabira-Simera

In or about July 14, 2003, Mr. Worley noticed that Mr. Mwabira-Simera was mopping the kitchen floor with dirty water.  He told Mr. Mwabira-Simera that the water smelled sour like urine but made no inappropriate statements about Mr. Mwabira-Simera.  Mr. Worley merely asked him to discard the dirty water and to use clean water.  Contrary to Mr. Mwabira-Simera's assertions, this was not making his assignment more difficult.  Rather, Mr. Worley was ensuring that proper sanitation standards were upheld in a food preparation area.

Mr. Mwabira-Simera complained to John Parker, the General Manager, that Mr. Worley said he smelled like urine.  When Mr. Parker approached Mr. Worley about matter, he denied the same and explained that he was discussing only the dirty water that Mr. Mwabira-Simera was using.  Mr. Parker returned to Mr. Mwabira-Simera and conveyed what Mr. Worley had told him.

D.     Sodexho Did Not Retaliate Against Mr. Mwabira-Simera

As for his hours, generally, Mr. Mwabira-Simera worked full time.  However, during the account's slower periods, i.e., the summer months and holidays, he worked fewer hours due to diminished business.  Sodexho denies having retaliated against him for any reason.  If Mr. Mwabira-Simera is asserting that his hours were reduced based on his complaint surrounding the mop water, it should be noted that Mr. Worley does not schedule his work hours.  Ms. McCants does.  Moreover, the evidence shows that Mr. Mwabira-Simera worked more hours from July to mid-September of 2003 than he did during the comparable period of the previous year.  Consider the following chart:

| YEAR 2002 | | YEAR 2003 | |
|---|---|---|---|
| Week Ending | Hours Worked | Week Ending | Hours Worked |
| 07/05/02 | 25.4 | 07/04/03 | 18.6 |
| 07/12/02 | 0.0 | 07/11/03 | 8.1 |
| 07/19/02 | 0.0 | 07/18/03 | 24.5 |
| 07/26/02 | 24.0 | 07/25/03 | 17.2 |
| 08/02/02 | 0.0 | 08/01/03 | 21.9 |
| 08/09/02 | 10.1 | 08/08/03 | 15.6 |
| 08/16/02 | 45.7 | 08/15/03 | 17.5 |
| 08/23/02 | 46.8 | 08/22/03 | 30.0 |
| 08/30/02 | 38.0 | 08/29/03 | 37.0 |
| 09/06/02 | 40.6 | 09/05/03 | 38.2 |
| 09/13/02 | 36.3 | 09/12/03 | 37.8 |
| 09/20/02 | 24.7 | 09/19/03 | 45.1 |
| TOTAL HOURS | 291.6 | TOTAL HOURS | 311.5 |

It is apparent that Sodexho did not reduce his hours.  In fact, he worked more regularly, as well.

Agreements to arbitrate will be specifically enforced by the courts. Awards of arbitrators receive limited judicial review. They are set aside only if the award failed to "draw its essence" from the collective agreement. *United Steelworkers of America v. Enterprise Wheel & Car Corp.* (S.Ct. 1960).

Claims of invidious discrimination in breach of the *collective agreement* which also violate federal statutory law may be resolved under the grievance arbitration provisions of the contract. Collective bargaining provisions do not preclude the *individual employee from pursuing federal statutory rights. Alexander v. Gardner-Denver Co.* (S.Ct. 1974). Agreements *by individuals* not covered by collective agreements to submit contract grievances to arbitration may, however, preclude judicial remedies for statutory rights. *Gilmer v. Interstate/Johnson Lane Corp.* (S.Ct. 1991). See, Chapter 23.

### I—2.07 Internal Union Affairs: Landrum-Griffin Act

Federal law regulates the internal affairs of labor organizations. 29 U.S.C.A. 401. Members are granted equal rights to participate in meetings, vote, and nominate officers. Members have the right to speak at meetings and make public pronouncements, a protection similar to a citizen's First Amendment free speech protections. Unions cannot limit the right of members to institute administrative or judicial proceedings against the organization or its officers. Members may not be fined, suspend-

ed, expelled, or disciplined for violating union rules, except for nonpayment of dues, unless the member is served with charges and is afforded a full and fair hearing, similar to that granted public employees under the Due Process Clause of the Constitution.

# CHAPTER 10

## DISPARATE IMPACT: LIABILITY IN THE ABSENCE OF MOTIVE

### IV-10.01 The Disparate Impact Concept: Griggs v. Duke Power Co.

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive * * * is not required under a disparate impact theory. Either theory may, of course, be applied to a particular set of facts.

*Int'l Br'hd of Teamsters v. U.S.* (S.Ct. 1977).

Impact liability was created judicially in *Griggs v. Duke Power Co.* (S.Ct. 1971). In *Griggs* the employer required a high school diploma and a passing score on two professionally developed tests that purported to measure intellectual ability. The lower court concluded that Title VII required proof of discriminatory motive and found that plaintiff had not proved the employer's racial motivation in

adopting the selection devices. The Supreme Court reversed, stating:

The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. * * * [A]bsence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as "built-in headwinds" for minority groups and are unrelated to measuring job capability.

The Court articulated the steps for establishing liability:

The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

The Civil Rights Act of 1991 codified the impact concept. Plaintiff carries the initial burden of establishing that an identified employment practice in fact operates to exclude persons in a protected class. If plaintiff succeeds in proving impact, the burden shifts to the defendant to prove that the "challenged practice is job related and consistent with business necessity." 42 U.S.C.A. 2000e-2(k)(1)(A)(i).

In sum, employers need not justify all of their selection devices, only those which are proved by plaintiff to produce an adverse impact on a protected class. On the other hand, the adverse impact of a device does not establish liability. A neutral device violates the statutes only where the employer can-

other, such differences will be sex discrimination. For example, the employer may impose a weight-to-height ratio requirement for men and women that varies according to the natural weight differences between genders. However, if an employer requires female employees to remain svelte but allows male employees to become portly, this is sex discrimination because women are burdened by the differential requirement. *Laffey v. Northwest Airlines, Inc.* (D.C.Cir.1976).

Where women are required to wear provocative clothing that is humiliating in itself or provokes sexual harassment from customers, the working environment of women is more burdensome than the working environment of men. Even if the uniform prescribed for female workers is not in itself provocative, it is discriminatory where it reflects a sexual stereotyping that places women in inferior positions. For example, in *Carroll v. Talman Fed. Sav. & Loan Ass'n.* (7th Cir.1979), the employer created a discriminatory working environment by permitting men to wear business attire of their choice while requiring female employees to wear an ensemble selected by the employer.

A rule that is both burdensome and imposed *because of the predominate gender* of the work force is illegal sex discrimination, notwithstanding the fact that all or most of the employees are of one gender. *Gerdom v. Continental Airlines, Inc.* (9th Cir.1982)(burdensome weight program imposed on all-female employment unit violates Title VII).

# CHAPTER 12

# HARASSMENT

## V–12.01 Harassment Concepts Generally

Harassment principles are applicable to all protected classes: race, sex, national origin, religion, age, and disability. The most common, and perhaps the most complex, involve sexual harassment. There are two distinct types of discriminatory harassment: 1) Actions denying tangible job benefits, such as hiring, firing, promotion, compensation, and work assignments ("quid pro quo") and 2) Creation or toleration of a hostile or abusive working environment because of the victim's protected status: *Meritor Savings Bank v. Vinson* (S.Ct. 1986).

## V–12.02 Tangible Employment Action ("Quid Pro Quo")

If an employee is denied a promotion or is dismissed by a supervisor because of the employee's race, this discrimination is attributable to the employer even if the employer knew nothing of the supervisor's motivation and generally has had an exemplary record in its race relations. *Anderson v. Methodist Evangelical Hospital, Inc.* (6th Cir.1972). Similarly, when a female (or male) employee is subjected to a tangible employment action because of the employee's gender or because the employee

refused to have a sexual relationship with the supervisor, this is actionable sex discrimination. "Tangible employment action taken by a supervisor becomes for Title VII purposes the act of the employer." *Burlington Industries Inc. v. Ellerth* (S.Ct. 1998).

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries v. Ellerth* (S.Ct. 1998). Minor job changes or assignments to a slightly more inconvenient positions may not, in themselves, adversely affect a term and condition of employment. However, a coalescence of minor job actions may create a hostile working environment.

**V–12.03  Hostile Environment**

*a.  Generally*

Discriminatory creation of a hostile work environment is actionable, but the analysis is more complex. "The environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so." *Harris v. Forklift Systems* (S.Ct.1993). It is not necessary for the victim to show economic or personal injury, such as psychological harm, or that the harassment in fact interfered with the employee's job performance. *Harris v. Forklift Systems*, supra. The race

or gender of the victim or of the perpetrator is not controlling. When the treatment makes the working environment oppressive or hostile and is "because of" the gender of the victim, the employee subjected to the harassment, male or female, is entitled to identical protection. *Oncale v. Sundowner Offshore Services, Inc.* (S.Ct. 1998) (male sexual harassment by male co-workers is actionable).

*b.  "Unwelcome": The Subjective Element*

The victim must in fact find the conduct offensive or unwelcome. A ribald atmosphere that others might have found offensive, but which the plaintiff fully welcomed and joined, is not actionable. *Jones v. Flagship International* (5th Cir.1986). Plaintiff's acquiescence or "voluntary" participation does not necessarily establish that the conduct was welcomed by the plaintiff. Employees often quietly tolerate behavior they find unwelcome or offensive. Participation by the employee in sexually explicit behavior in the past, or in non-employment contexts, such as posing nude for a magazine, does not establish that sexual advances at the workplace were welcomed. Even so, defendant may probe plaintiff's failure to object to the conduct by presenting past sexual conduct with supervisors, as well as her "sexual fantasies," to determine whether the activity of which she is now complaining in fact was unwelcome. *Meritor Savings Bank, FSB v. Vinson* (S.Ct. 1986). Whether the conduct was subjectively "unwelcome" is an issue of fact.

Case 1:06-cv-02052-RWR    Document 1-3    Filed 11/30/2006    Page 22 of 110

**Court Appeals rules against denial of breaks**

**Exhibit 5**

Exhibit

Friday, December 23, 2005    **Business**    THE EXAMINER   19

# Jury awards $172M to Wal-Mart workers denied lunch breaks

**BY DAVID KRAVETS**
*Associated Press*

OAKLAND, Calif. – A California jury Thursday awarded $172 million to thousands of employees at Wal-Mart Stores Inc. who claimed they were illegally denied lunch breaks.

The world's largest retailer was ordered to pay $57 million in general damages and $115 million in punitive damages to about 116,000 current and former California employees for violating a 2001 state law that requires employers to give 30-minute unpaid lunch breaks to employees who work at least six hours.

The damages were originally tallied as $207 million after a court clerk misread the punitive damages as $150 million. The amount of punitive damages was later



Bloomberg file photo

clarified.

The class-action lawsuit in Alameda County Superior Court is one of about 40 nationwide alleging workplace violations by Wal-Mart, and the first to go to trial. The Bentonville, Ark.-based retailer, which earned $10 billion last year, settled a similar lawsuit in Colorado for $50 million.

In the California suit, Wal-Mart had claimed that workers did not demand penalty wages on a timely basis. Under the law, the company must pay workers a full hour's wages for every missed lunch.

The company also said it paid some employees their penalty pay and, in 2003, most workers agreed to waive their meal periods as the law allows.

The lawsuit covers former and current employees in California from 2001-05. The workers claimed they were owed more than $66 million plus interest, and sought damages to punish the company for alleged wrongdoing.

The lawsuit was filed by several former Wal-Mart employees in the San Francisco Bay area in 2001. It took four years of legal wrangling to get to trial.

06 2052

**FILED**

NOV 3 0 2006

**NANCY MAYER WHITTINGTON, CLERK**
U.S. DISTRICT COURT

*Exhibit*

Friday, December 23, 2005    Local News    THE EXAMINER   11

# Suit against preacher gets appeals court nod

**BY BILL MYERS**
*Examiner Staff Writer*

A preacher can't hide behind his calling to defend himself against a suit that claims he bore false witness, the D.C. Court of Appeals ruled Thursday.

Retired mailman McKinley Crudup sued the Rev. Leon C. Lipscombe Sr. after the reverend allegedly claimed that Crudup was the subject of a sexual harassment suit.

At a preliminary hearing, Lipscombe claimed that even if he had made that statement, he was shielded by the First Amendment because he said it while practicing his religious duties.

But the Moses found with the Pharaoh of old. Lipscombe found Thursday that the judges' hearts had been hardened. A three-judge panel of the D.C. Court of Appeals said that Crudup's suit can go forward.

The story began in 2003, when Lipscombe — then the pastor of Allen Chapel African Methodist Episcopal Church — bought a

Mercedes Benz. Crudup, a trustee at the church, wanted to know where the reverend got the money for the car.



*Jessie Webb/for the Examiner*
McKinley Crudup stands in his Southeast D.C. home on Thursday. An appeals court ruled that his suit against a preacher can go forward.

**LONG-TIME CHURCHGOER**
■ McKinley Crudup has been a member of the church since 1982.
■ He has yet to put a dollar demand on his defamation suit.

After Crudup sent a letter to fellow parishioners, Lipscombe allegedly stood up at a meeting and said that Crudup had been sued for sexual harassment.

Crudup's lawyer, William P. Farley, hailed Thursday's ruling.

"He spent 80 years building his name and has a good reputation as a good man and good husband and a moral leader," Farley said of Crudup.

Lipscombe has retired and couldn't be reached for comment. His lawyer did not respond to calls seeking comment.

*bmyers@dcexaminer.com*

**Sodexho's persistent and egregious discrimination customs and traditions.**

**Exhibit 6**

78        ILLEGAL "DISCRIMINATION"        Ch. 8

(3) *Justification for the Plan.* A governmental employer utilizing a suspect classification must establish a "compelling governmental interest" for doing so. Specific findings of past illegal discrimination by a court or executive agency empowered to make such findings create a governmental interest sufficient to permit adoption of a remedial plan. However, mere racial imbalance, sufficient under Title VII to justify race or gender conscious affirmative action plans, may not be sufficiently "compelling" under the Constitution. *Wygant v. Jackson Bd. of Educ.* (S.Ct.1986). Even an extreme and historical lack of diversity may not present a compelling need for race conscious remedies. *Hopwood v. Texas* (5th Cir.1996).

(4) *Content of the Plan.* If a plan is justified because of the compelling interest to remedy past patterns of discrimination, the plan must be narrowly tailored, using the least discriminatory means to serve the state's remedial interest. Broad, imprecise plans will be struck down. *Podberesky v. Kirwen* (4th Cir.1994). A plan authorizing the use of race as one of many factors for making hiring decisions, as was done in *Johnson*, is sufficiently narrow to be sustained. However, it is unclear whether a public employer could utilize specific numerical hiring ratios, as was sanctioned under Title VII in *Weber. Regents, University of California v. Bakke* (S.Ct. 1978).

e. *Decrees, Settlements, and Collective Bargaining Agreements*

A judicial finding of illegal treatment will allow, if not compel, the court to provide a remedy to the

IV-8.02        PROSCRIBED CLASSIFICATION        79

victim of discrimination that includes remedial seniority running from the date of the illegal treatment. Rights under a collective bargaining agreement do not preclude such a remedy. *Franks v. Bowman Transp. Co.* (S.Ct. 1976). A judicial finding of "persistent and egregious discrimination" permits courts to order employers to undertake affirmative action programs as a class remedy that overrides contractual seniority rights. See Chapter 20.10.

Voluntarily adopted and otherwise lawful affirmative action plans, even those adopted in *settlement* of pending litigation against the employer, do not override rights created by collective bargaining agreements. To illustrate, an affirmative action plan was adopted to settle litigation filed against the employer (but not the union) by minority workers. Thereafter, the employer awarded promotions using the racially premised ratio agreed upon in the settlement. Promotion of the minority workers was inconsistent with the seniority rights of the white workers created in the collective bargaining agreement. White employees, through their union, successfully enforced the seniority provisions of the collective bargaining agreement. As neither the union nor the white workers were parties to the original litigation, the plan adopted in settlement thereof did not bind them or alter their existing contract rights. *W.R. Grace & Co. v. Local Union 759* (S.Ct. 1983).

Traditional rules of procedure permit a non-party to challenge judgments which affect him. Conse-

FILED

NOV 3 0 2006

06 2052

**Wizards Drop Second Straight Playoff Game to Bulls, 113-103**

# The Washington Post

THURSDAY, APRIL 28, 2005

128TH YEAR No. 144    M2    DC

**Weather**

**Today:** Partly sunny.
High 66, Low 49.
**Friday:** Cloudy, rain
possible. High 65, Low 57.

Details, B8

INSIDE

Plaintiffs'
Exhibits
2

## $80 Million Settles Race-Bias Case

### Black Managers Said Md. Firm Wouldn't Promote Them

By ANNYS SHIN
Washington Post Staff Writer

Sodexho Inc., the Gaithersburg-based food and facilities-management company, agreed Wednesday to pay $80 million to settle a lawsuit that claimed it systematically denied promotions to 3,400 black mid-level managers.

The company also agreed to a widespread training and a more structured hiring process for its 105,000 employees throughout the country, in an effort to promote more minorities into higher corporate jobs. A panel appointed by the plaintiffs and the company will monitor Sodexho's compliance.

Sodexho officials said they have already implemented many of the remedies included in the settlement, such as tying bonuses for top executives to the company's progress toward workforce diversity goals.

"In some cases we will continue what we started and in some cases we will be expanding what we are

doing," said Leslie Aun, a company spokeswoman.

Sodexho admitted no wrongdoing, but plaintiffs said settlement of the case, which was to go to trial next week, vindicates their contention that the company regularly overlooked qualified blacks for corporate promotions. The thousands of members of the certified class will receive as much as $60,000 each, based on their length of service,

See SODEXHO, A8, Col. 1



Case 1:06-cv-02057-RWR   Document 1   Filed 11/30/2006   Page 29 of 110

A8 THURSDAY, APRIL 28, 2005   M2

# Sodexho to Settle Suit for $80 Million

**SODEXHO, From A1**

while 10 named plaintiffs who brought the case in 2001 will receive an additional $120,000 each.

Cynthia Carter McReynolds, one of the named plaintiffs, said she hoped the settlement would let others avoid the sense of frustration she felt over 20 years as Sodexho moved her laterally from one location to another but never promoted her. McReynolds, who has a master's degree in management and human resources, is now general manager of food and nutrition at Howard University.

"Most of the 21 years, I have pretty much been in the same position . . . not being promoted," she said. "This settlement is going to open up the door of opportunity not only for me but for all who follow. I'm more hopeful than ever."

Sodexho runs corporate cafeterias and provides groundskeeping and other services to more than 6,000 companies, government offices, universities and other institutions in the United States.

The settlement amount is less than the $192.5 million that Coca-Cola Co., a much larger company, agreed to pay in 2000 to settle a race-discrimination suit. But experts said the Sodexho case is part of a larger shift in the use of civil rights laws, enacted to combat discrimination in hiring, to tackle more subtle forms of racial exclusion.

"As the numbers of middle-class African Americans has grown, it has created a critical mass of people who are savvy. When they see blockage of upward mobility, there is more and more of a reaction to that," said Bart Landry, professor of sociology at the University of Maryland and author of "The New Black Middle Class." "It is extremely frustrating for them having done everything society says to get the credentials and education and not see the rewards."

In recent years, women have filed similar lawsuits aimed at opening access to higher-paying jobs. Last year, investment bank Morgan Stanley agreed to pay $54 million to settle claims that it paid women less than men and failed to promote them.

"For the first 20 years, Title VII [of the Civil Rights Act of 1964] was applied to lower-level employees and people getting jobs for the first time. The law has been applied more recently to a new generation of cases to positions higher up in the management structure," said Kerry A. Scanlon of the Washington law firm Kaye Scholer LLP, who represents the Sodexho employees. "The reforms in this case will allow African Americans to get to the most valuable jobs in management positions."

In the years since the Sodexho lawsuit was filed, the proportion of blacks in management positions at the company has remained around 12 percent, Aun said. Currently, 1,921 of Sodexho's 15,532 managers are black.

In contrast, the plaintiffs maintained, only 2 percent of the company's upper management is black. About one-fourth of the company's total workforce is black.

Many of the allegations in the lawsuit date back to Sodexho's predecessor company, Sodexho Marriott Services Inc., a combination of the food-service and facilities-management arms of Paris-based Sodexho and Marriott. In 2001, the company became a wholly owned subsidiary of the Sodexho Alliance.

For years, Sodexho fought to get the lawsuit dismissed. After a federal judge certified it as a class action in 2002, the company appealed all the way to the U.S. Supreme Court, which declined to hear the case.

The pending trial reinvigorated settlement talks. U.S. District Judge Ellen S. Huvelle is expected to approve the settlement later this year.



# Local News

**MONDAY**
APRIL 25, 2005

**3**

# Sodexho discrimination suit to begin

## Plaintiffs allege minorities unable to move up

BY KARL B. HILLE
*Examiner Staff Writer*

Sodexho Alliance boasts one of the highest rates of job availability for minorities — but according to a class action lawsuit claim, only as long as they are content to remain in the lower ranks for their entire careers.

The lawsuit was filed on behalf of more than 2,400 minorities currently working in Sodexho's middle-management ranks and goes to trial this week.

The plaintiffs argue they have not been able to break into the predominantly white upper echelon of the Gaithersburg-based multinational company that provides food and hospitality management services to companies such as Marriott.

One-time division president Richard Macedonia said that white managers used the "N-word" as "a form of endearment," according to a recorded deposition. He has since been promoted twice and is now the company's chief executive officer.

The lawsuit claims that in 2000, the year the initial equal opportunity complaint was filed, there were nearly 700 upper-management jobs in Sodexho in this country, but only 18 were held by blacks.

At the same time, Sodexho employed 1,100 blacks in middle management, and more than 21,000 black hourly employees. Since then, the company has grown, but opportunities for blacks have not, the suit alleges.

The lawsuit, scheduled for jury selection Thursday in U.S. District Court in Washington, D.C., seeks unspecified damages and concrete changes to company policies on promotion and advancement, said attorney Nicole Becton.

### Company denies accusations

Plaintiffs assert that blacks represented 13 percent of Sodexho's work force but only about 3 percent of top managers. They also claim blacks are stuck in inner-city hospitals and other so-called "black accounts."

Company spokesman Leslie Aun called the action groundless. Sodexho has won awards for its workplace diversity, she said.

"We don't believe that the charges that have come forth in this lawsuit truly reflect the culture of our company," Aun said. "There is no systematic discrimination as is alleged in this lawsuit."

Sodexho is advertising heavily on black-programmed radio stations like WPGC and has made contributions to the United Negro Col-



From left: Attorney Kerry Scanlon and plaintiffs Cynthia Carter-McReynolds and Ellen Early discuss a class action law suit against Sodexho Alliance on Tuesday at the Kaye Scholer Law Offices in Washington.

# A tale of two women

BY KARL B. HILLE
*Examiner Staff Writer*

The careers of Cynthia McReynolds and Kelly Hymes began almost identically in 1984.

The two women, both 23 at the time and holding degrees in dietetics and nutrition, seemed poised for greatness in hospital food service companies.

That is where the similarities quickly crumbled.

Within two years, McReynolds, who is black, said she hit a glass ceiling that Hymes, who is white, seemed to break through.

McReynolds was promoted from food services coordinator to general manager overseeing one of Marriott's hospital contracts. There she languished for 19 years.

She even worked for Hymes briefly.

"She only reported to me for a very short time," Hymes said. "My overall notion was that she exceeded expectations."

Hymes started working as a food service manager and soon became a food service director, then district manager for Marriott in Gaithersburg. In all she rolled in eight promotions in 17 years, compared to McReynolds'

two promotions in 21 years.

Hymes, who has since left to work for a subcontractor for Sodexho Alliance, never thought twice about her success.

"What I paid attention to and noticed was that I was doing well. I never actively was seeking promotions. I was kind of invited to apply for higher jobs," Hymes said. "The first thing I noticed that was pretty weird to me was that a lot of people were getting jobs by taps on the shoulder and some of them weren't really qualified."

### Spinning wheels

McReynolds could not seem to break through, despite earning a master's degree in human resources management on the company tab. "I felt that since Sodexho paid for tuition reimbursement, that would help my career. You would think the company would want to get something back on that investment."

McReynolds applied for numerous positions, including several of Hymes' former posts. Most of the time, she said, no one even told her the outcome of her applications.

Through an internal mentorship program, she molded herself into the employee her superiors want-

ed. McReynolds joined the Society of Human Resources Managers, started reading HR publications and volunteered for college job fairs and career counseling.

Then her mentor had a recruiting job available, reporting directly to him. "I thought that was my lucky chance," she said.

Her mentor, who was white, chose a white woman who did not have a master's degree in human resources.

### The ceiling, from above

Hymes noticed people got promoted who looked like their superiors. When she looked at her own staff, Hymes realized she handpicked mostly white, Irish Catholic women in her age group.

She tried to point out the patterns. "I had people say, 'Look Kelly, you need to let this go. I getting in your way.'"

Hymes said she believes the lawsuit is necessary to make sure Sodexho executives "get it."

"I felt like I had witnessed a crime. If I don't come forward I felt like there wouldn't be anyone else who would," Hymes said. "It would be like watching an assault and closing the blind, going back to watch the TV."

Since mergers created Sodexho International, Aun said Chief Operating Officer Michele Landel

sity report on its Web site as an example of the lengths Sodexho has gone to show its commitment to these principles.

trict manager and another rank in the company's health division. The rest appear to be middle managers of very special

**Paid for denied health insurance benefit which forced into debts.**

**Exhibit 7**



I do not have health insurance since July 2004 Application (See attached)



VERIFY ADDRESS AND ZIP CODE SHOWN ON YOUR ATTACHED CHECK.
IMMEDIATELY ADVISE YOUR MANAGER IF A CORRECTION IS NEEDED.

06 2052

**FILED**

NOV 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



# Disability Claim
## Employer/Employee Statement

The Standard Benefit Administrators
PO Box 5031  White Plains NY 10602-5031  800.426.4332 Tel  800.378.3361 Fax

## TO BE COMPLETED BY EMPLOYER

Employee's Full Name: _____

Social Security No.: _____

Job Title: *(Please attach a copy of the job description.)* _____

1. Date Employed: _____

1. Is employee insured for Short Term Disability? ☐ Yes ☐ No

Effective date: _____

Is employee insured for Long Term Disability? ☐ Yes ☐ No

Effective date: _____

Is employee insured for Group Life Insurance through The Standard? ☐ Yes ☐ No

3. Is disability work related? ☐ Yes ☐ No ☐ Undetermined

4. Has the employee filed for: Workers' Compensation ☐ Yes ☐ No

State Disability: ☐ Yes ☐ No

Other: _____ ☐ Yes ☐ No

Weekly Amount: _____

Employee's earnings: $ _____

(Check one) ☐ hourly ☐ weekly ☐ monthly ☐ annual ☐ commission ☐ other

Date of last increase: _____ Earnings prior to increase: $ _____

6. Last active day at work: _____

7. Job status when disability began: ☐ Full-time (____ hours/week) ☐ Part-time (____ hours/week)

Date employee returned to work: _____

9. Last day through which sick leave benefits were paid by employer: _____

10. Last day through which any compensation was paid by employer: _____

11. Is employee subject to: Social Security taxes? ☐ Yes ☐ No
    Medicare taxes? ☐ Yes ☐ No

13. Are employee premiums paid with pre-tax dollars (IRC Section 125 cafeteria plans)? ☐ Yes ☐ No

12. What percentage of the STD premium does the **employer** pay? _____%

What percentage of the LTD premium does the **employer** pay? _____%

Has either percentage changed within the last three years? ☐ Yes ☐ No

Employer: _____

Phone No.: (____) _____

Policy No.: _____

Mailing Address: _____

City: _____ State: _____ Zip Code: _____

### Acknowledgement

I hereby certify that the answers I have made to the foregoing questions are both complete and true to the best of my knowledge and belief. I acknowledge that I have read the fraud notice on the following page of this form.

Signature: _____

Date: _____

## TO BE COMPLETED BY EMPLOYEE

Full Name: AMWELL H. MWABIRA-SIMERA

Social Security No.: 578 31 5695

Phone No.: 460-5959 (202) 635-0595

Birthdate: 12/03/60

Sex: ☒ M ☐ F

Address: P.O. Box 1405 W

City: WASHINGTON

State: DC

Zip Code: 20013

1. Is your disability work related? ☐ Yes ☒ No

2. Have you filed a Workers' Compensation claim? ☐ Yes ☒ No

Do you intend to file? ☐ Yes ☒ No

4. Last active day at work: SEPTEMBER 29th 2005

5. Date you became unable to work at your occupation because of disability: SEPTEMBER 2003—JULY 2004

6. Date you returned or expect to return to work: DECEMBER 2005

7. Accident. When and where did it happen? SEPTEMBER 2 2003 ANOTHER DRIVER DROVE INTO MY CAR THAT RESULTED IN MY LEFT LEG TRAPPED TEARING H BONE LEADING TO SURGERY ROBBERS TOOK ADVANTAGE BROKE MY NOSE & MY NECK LEADING TO SURGERY. ROBBERS ROBBED ME illness. When did you first notice and what is the nature of your disability? ON SEPTEMBER 2ND 2005 I REALIZED STIFFNESS AND PAIN INCREASING IN MY BACK, NECK, JOINTS AND LEFT ANKLE STARTED SWELLING WITH PIERCING PAIN

8. How does your disability prevent you from working? I AM NURSING SURGERIES IN CASTS

9. Have you had a previous disability claim with The Standard? ☐ Yes ☒ No

10. Pregnancy: Expected delivery date: _____

Actual delivery date: _____

Type of delivery: ☐ Vaginal ☐ C-section

### Acknowledgement

I hereby certify that the answers I have made to the foregoing questions are both complete and true to the best of my knowledge and belief. I acknowledge that I have read the fraud notice on the following page of this form.

Signature: Simera

Date: 11/16/06

The Standard Benefit Administrators
PO Box 5031  White Plains NY 10602-5031  800.426.4332 Tel  800.378.8361 Fax

Disability Claim Attending Physician's Statement

## TO BE COMPLETED BY EMPLOYEE

Full Name: SAMUEL H. MWABIRA-SIMERA
Employer: SODEXCHO INC
Group Policy No.:

*The following information is needed to document the patient's inability to work. The patient is responsible for completing this form without expense to The Standard. Please complete this form and mail it to The Standard at the address listed above.*

## TO BE COMPLETED BY THE ATTENDING PHYSICIAN

### 1. Diagnosis

A. Diagnosis: Calcaneal spur with fragmentation
ICDA Classification: 726·73

E. Symptoms: Pain in right heel

C. Objective Findings:

Height: 5'7"    Weight: 205 lbs    B/P: 120/70

### 2. Pregnancy (if applicable)

A. Expected date of delivery:

B. Actual date of delivery:

C. Significant complications, if any:

C. Type of delivery: ____ ☐ Vaginal ☐ C-section

### 3. History

A. Date you recommended the patient stop work: 9/30/05

B. When did symptoms appear or accident happen?

C. Has the patient ever had the same or similar condition?  ☐ Yes ☐ No    If yes, when?

D. Is this condition related to the patient's employment?  ☐ Yes ☒ No    E. Did you complete a workers' compensation claim form?  ☐ Yes ☐ No

### 4. Treatment

A. Date of first visit: 6/14/05
B. Dates of subsequent visits: 8/4, 9/27, 10/1, 10/25
Date of most recent visit: 11/8/05

D. Planned course and duration of treatment (include surgery and medications, if any): 9/30/05 — Excision of calcaneal spur, left foot, with use of C-cam.

### 5. Level of Functional Impairment

A. Describe the patient's mental and cognitive limitations, if any:

B. In a work day given two breaks and a meal break, your patient can:

Lift (in pounds):    ☐ 1-10  ☐ 11-20  ☐ 21-50  ☐ 51-75  ☐ 76-
Carry (in pounds):   ☐ 1-10  ☐ 11-20  ☐ 21-50  ☐ 51-75  ☐ 76+

|  | Total Hours |  |  |  |  |  |  | With positional change |
|---|---|---|---|---|---|---|---|---|
| Sit | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 (hrs) |
| Stand | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 (hrs) |
| Walk | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 (hrs) |
| Alternately sit/stand | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 (hrs) |
| Bend/stoop: | ☒ Never | | ☐ Occasionally | | | ☐ Frequently | | |

C. Is this patient competent to endorse checks and direct the use of proceeds?  ☒ Yes ☐ No

### 6. Hospitalization (if applicable)

A. Date admitted:    B. Date discharged:    C. Reason:

D. Name of hospital:

### 7. Prognosis

A. Since onset of symptoms, the patient's condition has:  ☒ Improved ☐ Not changed ☐ Retrogressed

B. When do you anticipate the patient can return to work?  ☒ Date: 12 error Act    ☒ Unable to determine, follow up in: 1/10/06 weeks  ☐ Never

### 8. Physician Information (Please type or print.)

Name of physician completing this form: Stephen M Ross d Py

Specialty: Podiatry

Phone No.: (202) 898-5700

Address: 1011 North Capitol St · NE    Tax ID. No.: 52 0954463    Fax No.: (  )
City: Wash· DC    State:    Zip Code: 20002

### Acknowledgement

I hereby certify that the answers I have made to the foregoing questions are both complete and true to the best of my knowledge and belief. I acknowledge that I have read the fraud notice on the following page of this form.

KAISER PERMANENTE
MEDICINE CENTER
1011 North Capitol Street, NE
Washington, DC 20002

Signature: [signature]    Date: 11/29/05

# Sodexho

March 11, 2004

SAMUEL H. MWABIRA-SIMERA & FAMILY
P.O. BOX 1405
WASHINGTON, DC 20013

Dear Mr. Mwabira-Simera & FAMILY:                    CBA 00 25 04

Effective **February 29, 2004** you or your family members are no longer eligible for regular coverage under our group health and/or dental plan due to the fact you had a *reduction* in hours or *stopped* working for SODEXHO or any of its subsidiaries. Federal law requires SODEXHO to offer the option of continuing medical and/or dental coverage to employees and their dependents who were participants in those plans on the day before their regular benefits ended. This is called "continuation coverage" and must be the same as the coverage available to similarly situated active Sodexho employees and their dependents. Our records indicate that you were enrolled as follows:

        KAISER PERMANTE

(Note: Anyone who did not participate in a plan on the day before regular coverage ended is not eligible for continuation coverage now.)

You have until **April 30, 2004** to choose continuation coverage. If you do, your participation in the plans listed above will continue **with no break in coverage.** However, continuation coverage will take effect only if you pay the required contribution. If you do not return your application (s) for continuation coverage within 60 days, you will forfeit your right to such coverage. Your coverage will remain cancelled effective the last day of the month in which you were terminated. Should you decide not to continue coverage, your eligible dependents still have the option to enroll within 60 days of this letter. Even if you do elect continuation coverage, your spouse or dependents may elect different coverage than you; for example, your spouse may elect dental coverage (if applicable) regardless of whether you choose such coverage.

You (or your dependents) must pay the full cost of continuation coverage under the above-noted plan (s). Contribution payments must be made in advance to the SODEXHO, Labor Relations Department in Buffalo, New York. You may elect either single or family coverage and the amount you must pay each month is as follows:

| | | |
|---|---|---|
| Single Health:  $232.25 | EE + 1 $448.79 | Family Health $659.12 |
| Single Dental:  $ | EE & 1 $ | Family Dental: $ |

Premiums for any plans selected are due by the *first of each month*. If we do not receive full payment within 30 days of the due date, your coverage will be cancelled.

SUBJECT TO COST INCREASE/DECREASE –HEALTH - DECEMBER 1ST

Financial Service Center
Sodexho, P.O. Box 352, Buffalo, NY 14240
Telephone: 716-633-2222

Enclosed you will find an **application form IF APPLICABLE.** This form should be returned **along with your payment for all the months** that have passed since your regular benefits coverage ended, as well as payment for the next month. These payments **must** be sent to the Labor Relations Department within 45 days of the date on which you elect continuation coverage. Partial payments will not be accepted. Make your check or money order payable to the SODEXHO, and send it along with your application form (s) to the Sodexho, Labor Relations Dept., P. O. Box 352, Buffalo, NY 14240. **Please include your Social Security Number under your signature**. You may retain your continuation coverage for a period of 18-36 months depending on the qualifying event. However, regardless of this period, your coverage will end if:

1. You do not pay your required contribution.
2. You or your dependents become covered under another group health plan.
3. You become entitled to Medicare Benefits.
4. Sodexho discontinues the plan (s) with no substitute plan (s) provided.

It is your responsibility to inform the Labor Relations Department if you or your dependent (s) obtain other medical and/or dental coverage. We will then end your coverage under the Sodexho plan (s) and refund any remaining advance payments.


Yours truly,



SODEXHO
Labor Relations Department


Enc.
MEW



**Marriott.**

EMPLOYEES' FEDERAL

# CREDIT UNION

P.O. Box 6006
Bethesda, MD 20827

1-800-821-7280, or
301-634-5100 in the
Washington, DC
metro area

**MEMBER STATEMENT**

Account Number: 1686556
Statement Period: 11/01/05 to 11/30/05
Page Number:    1 of 2

23316

SAMUEL H MWABIRA-SIMERA
PO BOX 1405
WASHINGTON DC  20013-1405



*HAPPY HOLIDAYS*

| Transaction Date | S1 SHARE A/C - PRIMARY SHARES | WITHDRAWALS | DEPOSITS | BALANCE |
|---|---|---|---|---|
| 11/01/05 | Previous Balance | | | 414.08 |
| | Balance Inquiry | | | |
| | Presidential Arlington VA 002129 BAVA0177 11/01@ 9:49AM | | | |
| 11/01/05 | ATM TXN Fee | 1.50 | | 412.58 |
| 11/01/05 | ATM Withdrawal | 200.75 | | 211.83 |
| | Presidential Arlington VA 002130 BAVA0177 11/01@ 9:50AM | | | |
| 11/01/05 | ATM TXN Fee | 1.50 | | 210.33 |
| 11/02/05 | Minimum Balance Fee | 2.00 | | 208.33 |
| 11/11/05 | # ATM Withdrawal | 82.00 | | 126.33 |
| | 1801 West Virginia Washington DC 531400949755 80990172 | | | |
| | 11/11 @ 9:59AM | | | |
| 11/14/05 | ATM TXN Fee | 1.50 | | 124.83 |
| 11/12/05 | # ATM Withdrawal | 42.25 | | 82.58 |
| | Pentagon Centre Mall 1 Arlington VA 00000069 PCM1 L 11/12 @ 10:37AM | | | |
| 11/14/05 | ATM TXN Fee | 1.50 | | 81.08 |
| 11/15/05 | Cash Withdrawal | 40.00 | | 41.08 |
| 11/22/05 | ATM Withdrawal | 22.00 | | 19.08 |
| | 1913 Mass Ave Nw Washington DC 532600008223 PN7090 11/22 @ 9:41AM | | | |
| 11/22/05 | ATM TXN Fee | 1.50 | | 17.58 |
| 11/22/05 | Denied Transaction Fee | 0.50 | | 17.08 |
| | 1913 Mass Ave Nw Washington DC 532600008222 PN7090 11/22 @ 9:40AM | | | |
| | 068 - Insufficient Funds | | | |
| 11/30/05 | Closing Date. . . New Balance | | | 17.08 |

| Transaction Date | L40 LOAN A/C - SIGNATURE - F/R | FINANCE CHARGE | LATE PAYMENT CHARGE | ADVANCES | PAYMENTS | BALANCE |
|---|---|---|---|---|---|---|
| 11/28/05 | Previous Balance | | | | | 0.00 |
| | Next Payment Due Date 12/28/05 | | | | | |
| | Repayment Amount    90.02 | | | | | |
| | * Annual Percentage Rate  14.490 * | | | | | |
| | Daily Periodic Rate 0.00039699 | | | | | |
| 11/28/05 | Check To - Samuel H Mwabira- Simera | | | 1,000.00 | | 1,000.00 |
| 11/30/05 | Closing Date. . . New Balance | | | | | 1,000.00 |



NCUA
National Credit Union Administration
a U.S. Government Agency

Your Savings are federally
insured up to $100,000

EQUAL HOUSING
LENDER

MEFCU is an Equal Opportunity Lender.

....................................**CONTINUED ON NEXT PAGE** ....................................

4920400.2005120269001.23316



**Marriott**

EMPLOYEES' FEDERAL

# CREDIT UNION

P.O. Box 6006
Bethesda, MD 20827

1-800-821-7280, or
301-634-5100 in the
Washington, DC
metro area

**MEMBER STATEMENT**

Member's Name:  SAMUEL H MWABIRA-SIMERA
Account Number: 1086556
Statement Period: 01/01/06 to 03/31/06
Page Number:   2 of 2

*Disclosures*

**IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR STATEMENT.** Please retain this statement. It is your permanent record of account. If this statement is in error notify the Credit Union at the address shown on the reverse side and furnish the necessary information to effect correction. If no error is reported within 60 days, this statement will be considered correct! The Federal Truth in Lending Act requires prompt correction of mistakes on your statement. If you think your statement is wrong, or if you need more information about a transaction on your statement write us on a separate sheet at the address shown on your statement as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter give us the following information: (a) Your name and account number; (b) the dollar amount of the suspected error; (c) describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about. You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question.

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS.** If you think your statement or receipt is wrong, or if you need more information, please contact the Credit Union as soon as possible. You can reach us by telephone at 1 (800) 821-7280, Monday through Friday 9:00 AM to 5:00 PM Eastern Standard Time. Or, you can write us at the address on the front of this statement. You must notify us no later than 60 days after you receive the FIRST statement on which the error or problem appeared. The following information should be supplied: (a) Your name and account number; (b) a description of the error or transfer you are unsure about and an explanation as to why you believe it is an error or why you need more information; (c) give the dollar amount of the suspected error. The Credit Union will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will re-credit your account for the amount you believe is in error so that you will have use of the money during the time it takes us to complete our investigation.

**PERIODIC STATEMENT DISCLOSURES FOR OPEN END LOANS. PERIODIC RATE:** The periodic rate used in calculating the FINANCE CHARGE is the daily periodic rate (shown on the reverse) corresponding to the **ANNUAL PERCENTAGE RATE. WHEN PERIODIC FINANCE CHARGE IS IMPOSED:** The periodic FINANCE CHARGE begins on the date each advance is posted to your account.  TO DETERMINE THE BALANCE UPON WHICH YOUR PERIODIC FINANCE CHARGE IS COMPUTED: The unpaid balance is the amount of the loan outstanding and unpaid after each transaction. HOW YOU DETERMINE YOUR TOTAL PERIODIC FINANCE CHARGE: Each time you make a payment on your account (or from the date of your first advance on a new account), we will multiply the unpaid balance by the daily periodic rate (see reverse), and multiply that result by the number of days since the date of the last payment (or from the date of your first advance on a new account). When advances are added to the loan, the periodic FINANCE CHARGE is computed on the unpaid balance from the date of the last payment (or from the date of your first advance on a new account) to the date of the additional advance, then on the total unpaid balance to the date of next payment. This determines your total periodic FINANCE CHARGE for the billing cycle. A minus (-) figure in the periodic FINANCE CHARGE column on the reverse indicates a credit of a periodic FINANCE CHARGE to your account. A "closing date" on the reverse indicates the closing date of your billing cycle.

**PAID LOANS: NOTIFICATION.** The front of this statement reports the status of your loan with the Credit Union, including payments made and outstanding balance, if any. If your loan has been paid off during the quarter, your loan balance will be reflected as zero ($0.00). **This statement is the only notification you will receive that your loan has been satisfied.** No separate notice will be sent except where collateral is involved. After your loan has been paid, you must submit a change of deduction form (C.O.D.) if you wish the amount of the loan payment to stop going to your savings account.

**DORMANT ACCOUNTS.** If an account has no activity (except for dividend payments and fees charged) for a period of six (6) months, and has a balance of less than $1,000.00, the account will be considered dormant. Dormant accounts are transferred to an inactive file, do not receive statements or dividends, and are charged a nonrefundable fee each quarter. If the funds are not claimed within five years, the law, Title 17 of the Commercial Law Article of the Annotated Code of Maryland - Abandoned Property, requires the Credit Union to remit these funds to the state.

Questions or concerns that are unresolved by the Credit Union should be addressed to:

Marriott Employees' Federal Credit Union
Attn: Supervisory Committee
P.O. Box 34764
Bethesda, MD 20827-0764



**PROVIDENCE HOSPITAL**

1150 Varnum Street NE
Washington DC 20017

Date:   November 29, 2005
Patient Name:  **NWABIRA-SIMERA, SAMUEL**
Patient Account Numbers: 505500090; 2501481424; 2501481432
Date of Service: July 14, 2004; July 23, 2004 and August 2, 2004 respectively
SSN:  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

To Whom It May Concern:

This letter is to inform you that there are no outstanding balances owed to Providence Hospital by the above referenced individual to date.

No legal actions are being pursued by our collection agency.

Thank you.

Sincerely,

IMELDA AVELLANEDA
Self Pay Collection Rep
Patient Financial Services
(202) 269-7890 x5007

# KASIER PERMANENTE
## MEMBERSHIP SERVICES
## NORTH CAPITOL MEDICAL CENTER

## Membership Service Questionnaire

_971-253-71_

**Today's Date:** _11/21/04_    **Time:** _10.45_    _S79-71-5695_

**Member's Name:** _Samuel Mwabira-Simera_ (PLEASE PRINT)

**Medical Record #** _496·_    **Date of Birth** _12/03/60_

**Home Telephone #** _202 6350595_  **Work Telephone** _202 4870623_

While waiting for the Membership Services Representative, please take a few moments to describe the issues that need to be resolved or questions that you would like answered. This will assist the Membership Services Representative both during and after your conversation investigating and documenting your inquiry.

☐ **Billing Issues**             **Benefit Question**

☑ **Claims/Referral Issues**     **New Card Request** (please print address below)

☑ **Complaint**                  _Host The robbers took my wallet and the cards in_

☐ **Other** _I am also requesting to write me a letter (copy to to Sodexho informing them that I had my health benefits withdrawn from March 1st/2004 up to November 2nd 2004. This is because the Sodexho Inc. has been deducting from my pay as effect from July 2nd 2004 to cover up this period when at the same time had revoked my health benfil denying me health services_











SIMERA SAMUEL H. MWABIRA

| WEEK ENDING DATE | WKS | CHECK NUMBER | | SOC. SEC. NO. |
|---|---|---|---|---|
| 07/23/04 | 1 | 0079170717 | | 578315695 |

RETAIN FOR TAX PURPOSES

| DIV. | MAIN | SUB | SUB UNITS |
|---|---|---|---|
| 07 | DY3 | 51 | |

PAYMENTS

| OCCUP. | DESCR. | RATE | HRS/DAYS | AMOUNT |
|---|---|---|---|---|
| 840000 | RATE 1 | 8180 | 174 | 14233 |
| 840000 | LNDRY | | | 174 |

| | TOTAL | 14407 |

| YTD. FED. WAGES | 47853 |
| YTD. FICA WAGES | 47853 |

TAX DEDUCTIONS

| DESCR. | AMOUNT | YTD |
|---|---|---|
| FICA | 1089 | 3660 |

| EXEMPTIONS | FED | ST |
|---|---|---|
| | 4 | 4 |
| EXEMPT STATUS | FED | ST |
| | 00 | 00 |
| HOURS VESTED | 0 |

| | TOTAL | 1089 |

DEDUCTIONS-BACKCHARGES-MEMO ITEMS

| DESCR. | DEDN. AMT. | MEMO/BK CHG AMT. |
|---|---|---|
| SBCC-H | 13318 | 26789 |

| HOURS UNVESTED | 0 |
| HOURS SICK | 0 |

| | TOTAL | 13318 |

| | TOTAL | |
| | NET AMOUNT | |
| | $******.00 |

VERIFY ADDRESS AND ZIP CODE SHOWN ON YOUR ATTACHED CHECK.
IMMEDIATELY ADVISE YOUR MANAGER IF A CORRECTION IS NEEDED.

SIMERA SAMUEL H. MWABIRA

| WEEK ENDING DATE | WKS | CHECK NUMBER | | SOC. SEC. NO. |
|---|---|---|---|---|
| 07/16/04 | 1 | 0079128960 | | 578315695 |

RETAIN FOR TAX PURPOSES

| DIV. | MAIN | SUB | SUB UNITS |
|---|---|---|---|
| 07 | DY3 | 51 | |

PAYMENTS

| OCCUP. | DESCR. | RATE | HRS/DAYS | AMOUNT |
|---|---|---|---|---|
| 840000 | RATE 1 | 8180 | 214 | 17505 |
| 840000 | LNDRY | | | 214 |

| | TOTAL | 17719 |

| YTD. FED. WAGES | 33620 |
| YTD. FICA WAGES | 33620 |

TAX DEDUCTIONS

| DESCR. | AMOUNT | YTD |
|---|---|---|
| FICA | 1339 | 2571 |
| ST DC | 156 | 242 |

| EXEMPTIONS | FED | ST |
|---|---|---|
| | 4 | 4 |
| EXEMPT STATUS | FED | ST |
| | 00 | 00 |
| HOURS VESTED | 0 |

| | TOTAL | 1495 |

DEDUCTIONS-BACKCHARGES-MEMO ITEMS

| DESCR. | DEDN. AMT. | MEMO/BK CHG AMT. |
|---|---|---|
| SBCC-H | 16224 | 40107 |

| HOURS UNVESTED | 0 |
| HOURS SICK | 0 |

| | TOTAL | 16224 |

| | TOTAL | |
| | NET AMOUNT | |
| | $******.00 |

VERIFY ADDRESS AND ZIP CODE SHOWN ON YOUR ATTACHED CHECK.
IMMEDIATELY ADVISE YOUR MANAGER IF A CORRECTION IS NEEDED.





Federal Tax Id:        521275587

Chart No. 540840D

ENC ID 0287714        OFF FTL

| PATIENT  MWABIRA-SIMERA, SAMUEL | ACCT. NO. 2178970 | STATEMENT DATE 10/10/04 |
|---|---|---|

PHS-FT LINCOLN
PO BOX 1471
MERRIFIELD, VA 221161471

**SEND PAYMENT TO**

**BILL TO**
MWABIRA-SIMERA, SAMUEL
P. O. BOX 1405
WASHINGTON, DC 20013

MAKE CHECK PAYABLE TO:

PHS-FT LINCOLN

| PAY THIS AMOUNT | ENTER AMOUNT PAID |
|---|---|
| 188.00 | |

PAYMENT DUE DATE 10/25/04

PLEASE RETURN TOP PORTION OF BILL TO INSURE PROPER CREDIT TO YOUR ACCOUNT

| PATIENT NAME MWABIRA-SIMERA, SAMUEL | ACCOUNT NUMBER 2178970 | STATEMENT DATE 10/10/04 | TRANSACTIONS MADE AFTER STMT. DATE WILL APPEAR ON YOUR NEXT STATEMENT. | PAGE 1 |
|---|---|---|---|---|

| Trans. Date | Description | Total Billed | Billed Ins | Payment Amount | Adjust Amount | Amount You Owe | Ex Cd |
|---|---|---|---|---|---|---|---|
| 07/23/04 | 99213 | 104.00 | | 10.00- | | 94.00 | |
| | OFFICE/OUTPATIENT VISIT, EST | | | | | | |
| DOC: PG2 GERREN PERRY MD | | | LOC: FBP PROVIDENCE HOSPITAL | | | | |
| Out Patient | DX CODES: 4659 | | | | | | |
| 08/02/04 | 99213 | 104.00 | | 10.00- | | 94.00 | |
| | OFFICE/OUTPATIENT VISIT, EST | | | | | | |
| DOC: BSC SUSAN C BRUNSELL MD | | | LOC: FBP PROVIDENCE HOSPITAL | | | | |
| Out Patient | DX CODES: 4659 | | | | | | |

| | | Total Billed | Billed Ins | Payment Amount | Adjust Amount | Amount You Owe |
|---|---|---|---|---|---|---|
| | PATIENT INSURANCE | 208.00 | | 20.00- | | 188.00 |

CHARGES ARE FOR THE PHYSICIAN
SERVICES AT FT. LINCOLN FAMILY
MEDICAL CENTER.

IF YOU HAVE QUESTIONS CALL US:
MONDAY - FRIDAY 8:00 - 4:30
Phone Number:    202-269-7172

*****FINAL NOTICE*****
IF NO PAYMENT IN 15 DAYS
COLLECTIONS WILL OCCUR.

ENC ID:          0287714
1 Tax Id:      521275587      Off FTL

PHS-FT LINCOLN
PO BOX 1471
MERRIFIELD, VA 221161471



Federal Tax Id:      521275587

Chart No. 540840D

ENC ID 0287714        OFF FTL

| PATIENT | MWABIRA-SIMERA, SAMUEL | ACCT. NO. | 2145652 | STATEMENT DATE | 09/12/04 |

PHS-FT LINCOLN
PO BOX 1471
MERRIFIELD, VA 221161471

SEND PAYMENT TO

BILL TO

MWABIRA-SIMERA, SAMUEL
P. O. BOX 1405
WASHINGTON, DC 20013

MAKE CHECK PAYABLE TO:

PHS-FT LINCOLN

| PAY THIS AMOUNT | ENTER AMOUNT PAID |
| 188.00 | |

PAYMENT DUE DATE 10/07/04

PLEASE RETURN TOP PORTION OF BILL TO INSURE PROPER CREDIT TO YOUR ACCOUNT

| PATIENT NAME | ACCOUNT NUMBER | STATEMENT DATE | TRANSACTIONS MADE AFTER STMT. DATE WILL APPEAR ON YOUR NEXT STATEMENT. | PAGE |
| MWABIRA-SIMERA, SAMUEL | 2145652 | 09/12/04 | | 1 |

| Trans. Date | Description | Total Billed | Billed Ins | Payment Amount | Adjust Amount | Amount You Owe | Ex Cd |
|---|---|---|---|---|---|---|---|
| 07/23/04 | 99213 | 104.00 | | 10.00- | | 94.00 | |
| | OFFICE/OUTPATIENT VISIT, EST | | | | | | |
| | DOC: PG2 GERREN PERRY MD | | | LOC: FBP PROVIDENCE HOSPITAL | | | |
| | Out Patient    DX CODES: 4659 | | | | | | |
| 08/02/04 | 99213 | 104.00 | | 10.00- | | 94.00 | |
| | OFFICE/OUTPATIENT VISIT, EST | | | | | | |
| | DOC: BSC SUSAN C BRUNSELL MD | | | LOC: FBP PROVIDENCE HOSPITAL | | | |
| | Out Patient    DX CODES: 4659 | | | | | | |

| | Total Billed | Billed Ins | Payment Amount | Adjust Amount | Amount You Owe |
|---|---|---|---|---|---|
| PATIENT INSURANCE | 208.00 | | 20.00- | | 188.00 |

CHARGES ARE FOR THE PHYSICIAN
SERVICES AT FT. LINCOLN FAMILY
MEDICAL CENTER.

IF YOU HAVE QUESTIONS CALL US:
MONDAY - FRIDAY 8:00 - 4:30
Phone Number:    202-269-7172

*****PAST DUE NOTICE*****
IF YOUR PAYMENT HAS BEEN
MAILED, THANK YOU.

ENC ID:        0287714
l Tax Id:      521275587        Off FTL



PHS-FT LINCOLN
PO BOX 1471
MERRIFIELD, VA 2211614

Federal Tax Id:    521275587

ENC ID 0287714      OFF FTL

| PATIENT MWABIRA-SIMERA, SAMUEL | ACCT NO. 2105885 | STATEMENT DATE 08/08/04 |

PHS-FT LINCOLN
PO BOX 1471
MERRIFIELD, VA 221161471

SEND PAYMENT TO

BILL TO
MWABIRA-SIMERA, SAMUEL
P. O. BOX 1405
WASHINGTON, DC 20013

MAKE CHECK PAYABLE TO:

PHS-FT LINCOLN

PAY THIS AMOUNT
188.00

ENTER AMOUNT PAID

PAYMENT DUE DATE 09/02/04

PLEASE RETURN TOP PORTION OF BILL TO INSURE PROPER CREDIT TO YOUR ACCOUNT

| PATIENT NAME MWABIRA-SIMERA, SAMUEL | ACCOUNT NUMBER 2105885 | STATEMENT DATE 08/08/04 | TRANSACTIONS MADE AFTER STMT. DATE WILL APPEAR ON YOUR NEXT STATEMENT. | PAGE 1 |

| Trans. Date | Description | Total Billed | Billed Ins | Payment Amount | Adjust Amount | Amount You Owe | Ex Cd |
|---|---|---|---|---|---|---|---|
| 07/23/04 | 99213 | 104.00 | | 10.00- | | 94.00 | |
| | OFFICE/OUTPATIENT VISIT, EST | | | | | | |
| DOC: PG2 GERREN PERRY MD | | | | | | | |
| Out Patient | DX CODES: 4659 | | | LOC: FBP PROVIDENCE HOSPITAL | | | |
| 08/02/04 | 99213 | 104.00 | | 10.00- | | 94.00 | |
| | OFFICE/OUTPATIENT VISIT, EST | | | | | | |
| DOC: BSC SUSAN C BRUNSELL MD | | | | | | | |
| Out Patient | DX CODES: 4659 | | | LOC: FBP PROVIDENCE HOSPITAL | | | |

| | Total Billed | Billed Ins | Payment Amount | Adjust Amount | Amount You Owe |
|---|---|---|---|---|---|
| PATIENT INSURANCE | 208.00 | | 20.00- | | 188.00 |

CHARGES ARE FOR THE PHYSICIAN
SERVICES AT FT. LINCOLN FAMILY
MEDICAL CENTER.

IF YOU HAVE QUESTIONS CALL US:
MONDAY - FRIDAY 8:00 - 4:30
Phone Number:    202-269-7172

THIS BALANCE IS DUE FROM
YOU. PLEASE SEND PAYMENT
WITHIN 21 DAYS. THANK YOU

ENC ID:        0287714
  l Tax Id:    521275587      Off FTL

# Providence Hospital
Washington, D.C. 20017

| Statement Date | Service Date From | Service Date Thru |
|---|---|---|
| 10/02/2004 | 8/02/2004 | 8/02/2004 0000 |

ACCOUNT #   2501481432

PATIENT NAME:   NWABIRA-SIMERA, SAMUEL

NWABIRA-SIMERA, SAMUEL
P.O. BOX 1405
WASHINGTON, DC   200131405

**For Billing Inquiries Call: 202/269-7890**

WALK-IN and TELEPHONE INQUIRIES MON-FRI, BETWEEN
THE HOURS OF 8:30 a.m. – 12:30 p.m., 1:30 p.m – 4:00 p.m

Your Service Representative is:

| DESCRIPTION CHARGE SUMMARY | UNITS | AMOUNT |
|---|---|---|
| LABORATORY | | 99.00 |
| CLINICS | | 65.00 |
| INS PAYMENTS AND ADJUSTMENTS | | 60.00 |

Rejection Reason Code #
See Reverse Side for Definition

BALANCE DUE ➔   104.00

NWABIRA-SIMERA, SAMUEL
P.O. BOX 1405

WASHINGTON, DC 200131405

**To Pay By Credit**

**Check The Applicable Card,**
fill in your charge account number and expiration
date, sign in the space provided and return stub.

**Return This Portion With Payment To**

PROVIDENCE HOSPITAL
P.O. BOX 17547
BALTIMORE, MD 21297-1547

| | MasterCard | | VISA | | | | Discover |
|---|---|---|---|---|---|---|---|

Card Number

Signature - Charge Payment Only

**MAKE CHECK PAYABLE TO PROVIDENCE HOSPITAL**

ACCOUNT #   2501481432

AMOUNT ENCLOSED:

O BOX 1471
MERRIFIELD, VA 221161471



Federal Tax Id:    521275587

ENC ID 0287714                  OFF FTL

PATIENT  MWABIRA-SIMERA, SAMUEL                2100868              08/01/0



PHS-FT LINCOLN
PO BOX 1471
MERRIFIELD, VA 221161471

MWABIRA-SIMERA, SAMUEL
P. O. BOX 1405
WASHINGTON, DC 20013

MAKE CHECK PAYABLE TO:

PHS-FT LINCOLN

PAY THIS AMOUNT

94.00

ENTER
AMOUNT
PAID

PAYMENT DUE DATE 08/26/04

PLEASE RETURN TOP PORTION OF BILL TO INSURE PROPER CREDIT TO YOUR ACCOUNT

| PATIENT NAME | ACCOUNT NUMBER | STATEMENT DATE | TRANSACTIONS MADE AFTER STMT. DATE WILL APPEAR ON YOUR NEXT STATEMENT. | PAGE |
|---|---|---|---|---|
| MWABIRA-SIMERA, SAMUEL | 2100868 | 08/01/04 | | 1 |

| Trans. Date | Description | Total Billed | Billed Ins | Payment Amount | Adjust Amount | Amount You Owe | Ex Cd |
|---|---|---|---|---|---|---|---|
| 07/23/04 | 99213 | 104.00 | | 10.00- | | 94.00 | |
| | OFFICE/OUTPATIENT VISIT, EST | | | | | | |

DOC: PG2 GERREN PERRY MD
Out Patient      DX CODES: 4659

LOC: FBP PROVIDENCE HOSPITAL

| | Total Billed | Billed Ins | Payment Amount | Adjust Amount | Amount You Owe |
|---|---|---|---|---|---|
| PATIENT INSURANCE | 104.00 | | 10.00- | | 94.00 |

CHARGES ARE FOR THE PHYSICIAN
SERVICES AT FT. LINCOLN FAMILY
MEDICAL CENTER.

Y - FRIDAY 8:00 - 4:30
ber:   202-269-7172

THIS BALANCE IS DUE FROM
YOU. PLEASE SEND PAYMENT
WITHIN 21 DAYS. THANK YOU

YOU HAVE QUESTIONS CALL US:

ENC ID:        0287714
1 Tax Id:      521275587    Off FTL

# Providence Hospital
Washington, D.C. 20017

| Statement Date | Service Date From | Service Date Thr |
|---|---|---|
| 1/10/2005 | 7/14/2004 | 7/14/2004 |
| | | 0000 |

ACCOUNT #      505500090

PATIENT NAME:      NWABIRA-SIMERA, SAMUEL

NWABIRA-SIMERA, SAMUEL
P.O. BOX 1405
WASHINGTON, DC    200131405

**For Billing Inquiries Call: 202/269-7890**

WALK-IN and TELEPHONE INQUIRIES MON-FRI, BETWEE
THE HOURS OF 8:30 a.m. – 12:30 p.m.,  1:30 p.m – 4:00 p.m

Your Service Representative is:

L. MAYHEW

| DESCRIPTION CHARGE SUMMARY | UNITS | AMOUNT |
|---|---|---|
| EMERGENCY ROOM | | 227.00 |
| RADIOLOGY | | 140.00 |
| PHARMACY | | 19.15 |

Rejection Reason Code #
See Reverse Side for Definition

BALANCE DUE ➡      386.15

NWABIRA-SIMERA, SAMUEL
P.O. BOX 1405

WASHINGTON, DC 200131405

***Return This Portion With Payment To***

PROVIDENCE HOSPITAL
P.O. BOX 17547
BALTIMORE, MD 21297-1547

**MAKE CHECK PAYABLE TO PROVIDENCE HOSPITAL**

To Pay By Credit

**Check The Applicable Card;**
fill in your charge account number and expira
date, sign in the space provided and return stub

Card Number

Signature - Charge Payment Only

ACCOUNT #    505500090

AMOUNT ENCLOSED:

# WASHINGTON MEDICAL GROUP, P.C.

Date: 4/17/06

**TO WHOM IT MAY CONCERN:**

_____Samuel Mwabira_____ is under my care. He/She

☐ Was seen in my office today.

☒ Is released to return to work on ____4/18/06_____

☐ Is unable to return to work at this time because_____

_____

☐ Is able to return to school on _____

☐ Is not able to participate in the physical education program at school.

☐ Is pregnant and estimated date of confinement is _____

☐ Surgery is scheduled for _____ and patient may return

to work after _____ weeks.

☐ Medications: _____

_____

_____

☐ Restrictions: _____

_____

_____

☐ Other: _____

_____

WASHINGTON MEDICAL GROUP, P.C.
1327 18TH STREET N.W.
WASHINGTON D.C. 20036
(202) 785-2400

(Signature)

5110 Ridgefield Road Suite 104 • Bethesda, Maryland 20816 • (301) 718-1885

1327 18th Street NW • Washington, D.C. 20034 • (202) 785-2400

# WASHINGTON MEDICAL GROUP, P.C.

Date: 9-13-06

**TO WHOM IT MAY CONCERN:**

_Samuel Mwabira_ is under my care. He/She

☐ Was seen in my office today.

☐ Is released to return to work on _____

☐ Is unable to return to work at this time because _____

_____

☐ Is able to return to school on _____

☐ Is not able to participate in the physical education program at school.

☐ Is pregnant and estimated date of confinement is _____

☐ Surgery is scheduled for _____ and patient may return

to work after _____ weeks.

☐ Medications: _____

_____

_____

☐ Restrictions: _____

_____

☑ Other: Patient is not going to be able
to work until April 18, 06. Patient
also have an appt for April 17 with
Dr. Macedo

WASHINGTON MEDICAL GROUP, P.C.
1327 18TH STREET N.W.
WASHINGTON D.C. 20036
(202) 785-2400

(Signature)

5110 Ridgefield Road Suite 104 • Bethesda, Maryland 20816 • (301) 718-1885

1327 18th Street NW • Washington, D.C. 20034 • (202) 785-2400

# WASHINGTON MEDICAL GROUP, P.C.

Date: 3-30-06

**TO WHOM IT MAY CONCERN:**

_____ Samuel Mwabira Simera is under my care. He/She

☐ Was seen in my office today.

☐ Is released to return to work on _____

☐ Is unable to return to work at this time because _____

_____

☐ Is able to return to school on _____

☐ Is not able to participate in the physical education program at school.

☐ Is pregnant and estimated date of confinement is _____

☐ Surgery is scheduled for _____ and patient may return

to work after _____ weeks.

☐ Medications: _____

_____

☑ Restrictions: Can only do light duties. (1 moth)
Limit to 10 lbs ; no standing no
more than 30 mins. (1 month)

☐ Other: _____

_____

WASHINGTON MEDICAL GROUP, P.C.
1327 18TH STREET N.W.
WASHINGTON D.C. 20036
(202) 785-2400

(Signature)

5110 Ridgefield Road Suite 104 • Bethesda, Maryland 20816 • (301) 718-1885

1327 18th Street NW • Washington, D.C. 20034 • (202) 785-2400

# WASHINGTON MEDICAL GROUP, P.C.

Date: _2/28/06_

## TO WHOM IT MAY CONCERN:

_Samuel Mwabira_ is under my care. He/She

☑ Was seen in my office today.

☐ Is released to return to work on _____

☑ Is unable to return to work at this time because _Trauma_ _____

_____

☐ Is able to return to school on _____

☐ Is not able to participate in the physical education program at school.

☐ Is pregnant and estimated date of confinement is _____

☐ Surgery is scheduled for _____ and patient may return

to work after _____ weeks.

☐ Medications: _____

_____

☐ Restrictions: _Patient will remain unable to work 2/26/06 – 3/6/06_

_____

☐ Other: _____

_____

_____
_(Signature)_

5110 Ridgefield Road Suite 104 • Bethesda, Maryland 20816 • (301) 718-1885

1327 18th Street NW • Washington, D.C. 20034 • (202) 785-2400

# WASHINGTON MEDICAL GROUP, P.C.

Date: 1/26/06

TO WHOM IT MAY CONCERN:

Samuel Mwabira _____ is under my care. He/She

☐ Was seen in my office today.

☐ Is released to return to work on _____

☐ As unable to return to work at this time because 1/10/06 - 2/26/06.
Due to his injuries.

☐ Is able to return to school on _____

☐ Is not able to participate in the physical education program at school.

☐ Is pregnant and estimated date of confinement is _____

☐ Surgery is scheduled for _____ and patient may return

to work after _____ weeks.

☐ Medications: _____

_____

_____

☐ Restrictions: _____

_____

_____

☐ Other: _____

_____

WASHINGTON MEDICAL GROUP, P.C.
1327 18TH STREET N.W.
WASHINGTON D.C.  20036
(202) 785-2400

_____
(Signature)

5110 Ridgefield Road Suite 104 • Bethesda, Maryland 20816 • (301) 718-1885

1327 18th Street NW • Washington, D.C. 20034 • (202) 785-2400

# WASHINGTON MEDICAL GROUP, P.C.

Date: 1/20/06

**TO WHOM IT MAY CONCERN:**

Samuel Mwabira-Simera is under my care. He/She

[✓] Was seen in my office today.

[ ] Is released to return to work on _____

[ ] Is unable to return to work at this time because _____

_____

[ ] Is able to return to school on _____

[ ] Is not able to participate in the physical education program at school.

[ ] Is pregnant and estimated date of confinement is _____

[ ] Surgery is scheduled for _____ and patient may return

to work after _____ weeks.

[ ] Medications: _____

_____

_____

[ ] Restrictions: _____

_____

[ ] Other: Questions please call (301)718-1885

_____

_____ (Signature)

5110 Ridgefield Road Suite 104 • Bethesda, Maryland 20816 • (301) 718-1885

1327 18th Street NW • Washington, D.C. 20034 • (202) 785-2400

# TIME OFF REQUEST

NAME: _SAMUEL H. MWABIRA-SIMERA "MWASI"_

TODAY'S DATE: _SEPTEMBER 23rd 2005_

DEPARTMENT: _____

DAY(S) & TIME REQUESTED OFF: _TWO TO FOUR WEEKS DEPEND ON RECOVERY_

REASON: _I AM UNDERGOING SURGERY OF MY LEFT ANKLE &_
_RIGHT KNEE ON SEPTEMBER 30th 2005_

APPROVED: _____

DISAPPROVED: _____     WHY? _____

MANAGERS SIGNATURE: _____

DATE: _____

ASSOCIATES SIGNATURE: _____

DATE: _September 23th 2005_

ANY TIME REQUESTED OFF MUST BE APPROVED "SEVEN DAYS IN ADVANCE"

— CAMPUS SERVICES —

# TIME OFF REQUEST

NAME: _SAMUEL H MWABIRA-SIMERA "MWASI"_

TODAY'S DATE: _AUGUST 17th 2005_

DEPARTMENT: _____

DAY(S) & TIME REQUESTED OFF: _ABOUT TWO-FOUR WEEKS_

REASON: _I AM UNDERGOING SURGERY ON 08/09th/05_

_____

APPROVED: _____

DISAPPROVED: _____    WHY? _____

MANAGERS SIGNATURE: _____

DATE: _____

ASSOCIATES SIGNATURE: _____

DATE: _____

ANY TIME REQUESTED OFF MUST BE APPROVED "SEVEN DAYS IN ADVANCE"

I. D. NO.:

NAME:

**97125371**

**MWABIRA-SIMERA, SAMUEL H**

M        N        **12/03/1960**

DATE:

Kensington Medical Center
10810 Connecticut Ave.        Kensington, MD 20895
Fax #: (301) 929-7360; (301) 929-7100

℞ (one per form)        Dispense quantity:

When first filled: _____

When refilled: _____ or

SAME (circle)

Please excuse
absence from work today.
He was a patient at The
Kaiser Permenente Surgery
Center.

8-19-05-   CX.

☐ DISPENSE AS WRITTEN:
— DAW 1 (M.D.)
— DAW 2 (PT)

Number of refills: _____ or
NONE (circle)

☐ VOLUNTARY FORMULARY PERMITTED

If neither box is marked, a Voluntary Formulary product must be dispensed.

SIGNATURE OF PRESCRIBER

Bupa

301-206-1790

Elizabeth Mdyn

NAME

AUTHORIZING OR DEA NU:

K

00018520 (9/01) Pharm.        KAISER PERMANE.

 ™ LexisNexis™     ™ LexisNexis™     ™ LexisNexis™



**KAISER PERMANENTE.**

Mid-Atlantic Permanente Medical group, P.C.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc
2101 East Jefferson Street Rockville, MD 20852

Samuel H Mwabira-Simera
97125371

## VERIFICATION OF TREATMENT

The above named patient has received medical treatment on 1/12/2006
Samuel H Mwabira-Simera
-Has had a disability: Foot surgery, from 9/29/2006 to 1/16/2006.
-May resume work on 1/17/2006 with the following restrictions - allow for lite
duty for approximately 1 month.

**Provider Signature :**
STEPHEN M ROSS DPM  1/12/2006   3:20 PM

Podiatry Nor Cap
1011 North Capitol Street
Washington, DC 20002

========================================  ========================

I certify that I have reviewed, understand and agree with the information above. I authorize the verification
of this VOT form by my school, my employer, or any person or entity that may be responsible for payment
of services provided through Kaiser Permanente MidAtlantic States.

Patient Signature                                    Date  2/11/2006

Dr Ross,
Pt will wait
until after 4pm.

Dr Ross,
-Weight restrictions
-Pt. works in restaurant
-? lifting
-? Standing - how long?
Pt wants details on
light duty. — Kristine

**KAISER PERMANENTE.**

Mid-Atlantic Permanente Medical group, P.C.
Kaiser Foundation Health Plan of Mid-Atlantic States, Inc.
2101 East Jefferson Street Rockville, MD 20852

Samuel H Mwabira-Simera
97125371

## VERIFICATION OF TREATMENT

The above named patient has received medical treatment on 1/12/2006
Samuel H Mwabira-Simera
-Has had a disability: Foot surgery,  from 9/29/2006 to 1/16/2006.
-May resume work on 1/17/2006 with the following restrictions - allow for lite
duty for approximately 1 month.

**Provider Signature :**
STEPHEN M ROSS DPM  1/12/2006   3:20 PM

Podiatry Nor Cap
1011 North Capitol Street
Washington, DC 20002

======================================================

 I certify that I have reviewed, understand and agree with the information above. I authorize the verification
of  this **VOT** form by my  school, my employer, or any person or entity that may be responsible for payment
of services provided through Kaiser Permanente MidAtlantic States.

_____          01/11/2006
**Patient Signature**                              **Date**

PODIATRY
DR. S. ROSS



Dee Thompson
Surgery Scheduler

Kaiser Permanente
Kensington, Maryland
Telephone 301-929-7248

Dear Member,

I would like to take this opportunity to explain to you some of the protocols, which pertain to scheduling your upcoming surgery and what you can anticipate from the Surgery Scheduling Department. Please be patient with the process as we work together to ensure the safest and most positive outcome for you.

After it has been concluded by you and your surgeon that surgery is necessary, your surgeon will forward a Surgical Request Form. When I receive this form I will begin the process of scheduling your surgery. Your surgery will be scheduled in the order that I receive your Surgical Request Form unless your surgeon indicates that it is medically necessary to schedule you sooner.

I will notify you by telephone of your surgery date within 4 weeks from the time of your visit with your surgeon. Please call me immediately if there is a change in your telephone number or address. Surgery is usually scheduled 4 to 6 weeks in advance. This will give you time to make any necessary arrangements. On occasion your surgeon may ask me to call you to move your surgery date up. I will assist in helping you make the necessary arrangements.

The following appointments **may** be ordered by your surgeon and scheduled by the Surgery Scheduling Department in preparation for your upcoming surgery;

**Pre-operative Appointment**—This appointment will be with your surgeon. You will have the opportunity to discuss your surgery with your surgeon. I suggest you take this opportunity to ask any questions or concerns regarding your care. Bring any documents for work or school leave so they can be completed at this time.



## SODEXHO

## CERTIFICATE OF GROUP HEALTH PLAN COVERAGE

*IMPORTANT - This certificate provides evidence of your prior health coverage. You may need to furnish this certificate if you become eligible under a group health plan that excludes coverage for certain medical conditions that you may have before you enroll. This certificate may need to be provided if medical advice, diagnosis, care, or treatment was recommended or received for the condition within the six-month period prior to your enrollment in this new plan. If you become covered under another group health plan, check with the plan administrator to see if you need to provide this certificate. You may also need this certificate to buy, for yourself or your family, an insurance policy that does not exclude coverage for medical conditions that are present before you enroll.

1.  Date of this certificate:          January 23, 2006

2.  Name of group health plan:         Kaiser Permanmente

3.  Name of participant:          **Simera Samuel Mwabira**

    Identification no. of participant:   **00578315695**

4.  Level of Coverage:          Family

5.  Name, address, and telephone number of plan administrator or issuer responsible for providing this certificate: **SODEXHO INC**
    **PO Box 352 – Labor Relations Department**
    **Buffalo, NY  14240**

7.  Further information, call: **(716) 633-2222, ext. 8608**

8.  If the individual identified in line 3 or any applicable dependents had at least 18 months of creditable coverage (disregarding periods of coverage before a 63-day break), check here     and skip lines 9 and 10.

9.  Date waiting period or affiliation period (if any) began: 04 01 04

10. Date coverage began     09 01 2004

11. Date coverage ended:     12 31 2005

    (or check if coverage is continuing as of the date of this certificate: ).

**Note:  Separate certificates will be furnished if information is not identical for the participant and each beneficiary.**

P. O. Box 352, Buffalo, New York  14240  (716) 633-2222 Fax: 716-626-6557



**KAISER PERMANENTE** ®



Mid-Atlantic Permanente Medical Group, P.C.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.

March 21, 2006

8118 4417535 001082
MWABIRA-SIMERA, SAMUEL H
1835 CENTRAL PLACE NE
WASHINGTON, DC 20002

Dear Subscriber:

**RE: CERTIFICATE #00915194**

Enclosed is a Certificate of Creditable Coverage from Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. (Kaiser Permanente). Kaiser Permanente is required by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) to send this certificate to you upon request, or when there has been a change in coverage for you or your dependent(s).

HIPAA protects you by limiting the circumstances under which health plan coverage may be excluded for preexisting medical conditions. This certificate may be required by a new health plan as proof of your Kaiser Permanente coverage. Your new health plan or your State Insurance Department can answer questions regarding HIPAA and how it affects you.

This certificate summarizes only up to the last 18 months of coverage. If there is no date in the block on your certificate labeled, "Date Coverage Ended," then your Kaiser Permanente coverage remains active. Any future changes to your coverage will result in a new certificate being sent to you.

If you have any questions about this certificate, you may contact the Kaiser Permanente Membership Accounting Department between the hours of 7:30 a.m. and 5:00 p.m., Monday through Friday at 301-468-6000 or outside the Washington D.C. Metropolitan area 1-800-777-7902.

Sincerely,

Member Services Department
Kaiser Foundation Health Plan of the Mid Atlantic States, Inc.



**KAISER PERMANENTE** ® 

Mid-Atlantic Permanente Medical Group, P.C.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.

---

## Health Insurance Coverage Certificate

---

This certificate is issued under the Health Insurance Portability and Accountability Act of 1996.

**IMPORTANT** : This certificate provides evidence of your prior health coverage. You may need to furnish this certificate if you become eligible under a group health plan that excludes coverage for a medical condition you have before you enroll. This certificate may need to be provided if medical advice, diagnosis, care or treatment was recommended or received for the condition within the 6-month period prior to your enrollment in the new plan. If you become covered under another group health plan, check with the plan administrator to see if you need to provide this certificate. You may also need this certificate to establish your right to buy coverage for yourself or your family, with no exclusion for previous medical conditions, if you are not covered under a group health plan. The portability rights documented by this certificate may expire if you do not act promptly.

1. Date of this certificate: **03/17/2006**

2. Name of health plan: **Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.**

3. Name of subscriber: **MWABIRA-SIMERA, SAMUEL H**

4. Medical record number of subscriber: **97125371**

5. Name and medical record number of any dependents to whom this certificate applies:

| | |
|---|---|
| **MUFOTO-SIMERA, TIMOTHY Z** | 16125396 |
| **SIMERA, OLIVIA I** | 28125365 |
| **NANDALA-SIMERA, JOHN E** | 34125623 |
| **MUTONYI-SIMERA, ESTHER E** | 89125369 |
| **MWABIRA-SIMERA, SAMUEL H** | 97125371 |

Please note that separate certificates will be supplied if coverage information (i.e., dates of coverage) is not identical for the subscriber and each dependent.

6. Name, address, phone number of plan administrator or issuer responsible for certificate:

**Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc**
**2101 East Jefferson Street**
**Rockville, Maryland 20849**
**Washington DC Area: 301-468-6000/ Baltimore Area: 1-800-777-7902**

7. If the individual(s) identified in items 3 and 5 has at least 18 months of creditable coverage with Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. (disregarding periods of coverage before a 63-day break), check here ❑

8. Date waiting period or affiliation period began (if appropriate):

9. Date coverage began: **09/01/2004**

10. Date coverage ended: **12/31/2005**             (or check here ❑ if coverage is continuing as of the date of this certificate)



**KAISER PERMANENTE** ®



Mid-Atlantic Permanente Medical Group, P.C.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.

March 21, 2006

MWABIRA-SIMERA, SAMUEL H
1835 CENTRAL PLACE NE
WASHINGTON, DC 20002

If your employer imposed a waiting period prior to your effective date of coverage, that period may be important for determining whether you are an "eligible individual" with a right to individual coverage. To obtain employer-imposed waiting period information, please contact your employer.

If you purchased your coverage individually (not through an employer-sponsored health plan), the period between your application for coverage and your effective date is considered a HIPAA portability waiting period. That period may be important for determining whether you are an "eligible individual" with a right to individual coverage. To obtain the specific dates of your waiting period, please contact the Kaiser Foundation Health Plan Member Services Call Center at 301-468-6000.

### Statement of HIPAA Portability Rights

IMPORTANT - KEEP THIS CERTIFICATE. This certificate is evidence of your coverage under this plan. Under a federal law known as HIPAA, you may need evidence of your coverage to reduce a preexisting condition exclusion period under another health plan, to help you get special enrollment in another plan, or to get certain types of individual health coverage even if you have health problems.

**Preexisting condition exclusions.** Some group health plans restrict coverage for medical conditions present before an individual's enrollment. These restrictions are known as "preexisting condition exclusions." A preexisting condition exclusion can apply only to conditions for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 months before your "enrollment date." Your enrollment date is your first day of coverage under the plan or if there is a waiting period, the first day of your waiting period (typically your first day of work). In addition, preexisting condition exclusion cannot last for more than 12 months after your enrollment date (18 months if you are a late enrollee). Finally, preexisting condition exclusion cannot apply to pregnancy and cannot apply to a child who is enrolled in health coverage within 30 days after birth, adoption, or placement for adoption.

If a plan imposes preexisting condition exclusion, the length of the exclusion must be reduced by the amount of your prior creditable coverage. Most health coverage is creditable coverage, including group health plan coverage, COBRA continuation coverage, coverage under an individual policy, Medicare, Medicaid, State Children's Health Insurance Program (SCHIP), and coverage through high-risk pools and the Peace Corps. Not all forms of creditable coverage are required to provide certificates like this one. If you do not receive a certificate for past coverage, talk to your new plan administrator.



**KAISER PERMANENTE** ® 

Mid-Atlantic Permanente Medical Group, P.C.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.

You can add up any creditable coverage you have, including the coverage shown on this certificate. However, if at any time you went for 63 days or more without any coverage (called a break in coverage) a plan may not have to count the coverage you had before the break.

➤ Therefore, once your coverage ends, you should try to obtain alternative coverage as soon as possible to avoid a 63-day break. You may use this certificate as evidence of your creditable coverage to reduce the length of any preexisting condition exclusion if you enroll in another plan.

**Right to get special enrollment in another plan.** Under HIPAA, if you lose your group health plan coverage, you may be able to get into another group health plan for which you are eligible (such as a spouse's plan), even if the plan generally does not accept late enrollees, if you request enrollment within 30 days. (Additional special enrollment rights are triggered by marriage, birth, adoption, and placement for adoption.)

➤ Therefore, once your coverage ends, if you are eligible for coverage under another plan (such as a spouse's plan), you should request special enrollment as soon as possible.

**Prohibition against discrimination based on a health factor.** Under HIPAA, a group health plan may not keep you (or your dependents) out of the plan based on anything related to your health. Also, a group health plan may not charge you (or your dependents) more for coverage, based on health, than the amount charged to a similarly situated individual.

**Right to individual health coverage.** Under HIPAA, if you are an "eligible individual," you have a right to buy certain individual health policies (or in some states, to buy coverage through a high-risk pool) without a preexisting condition exclusion. To be an eligible individual, you must meet the following requirements:

- You have had coverage for at least 18 months without a break in coverage of 63 days or more;
- Your most recent coverage was under a group health plan (which may be shown by this certificate);
- Your group coverage was not terminated because of fraud or nonpayment of premiums;
- You are not eligible for COBRA continuation coverage or you have exhausted your COBRA benefits (or continuation coverage under a similar state provision; and
- You are not eligible for another group health plan, Medicare, or Medicaid and do not have any other health insurance coverage.

The right to buy individual coverage is the same whether you are laid off, fired, or quit your job.

➤ Therefore, if you are interested in obtaining individual coverage and you meet the other criteria to be an eligible individual, you should apply for this coverage as soon as possible to avoid losing your eligible individual status due to a 63-day break.



**KAISER PERMANENTE** ®

Mid-Atlantic Permanente Medical Group, P.C.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.

**Special information for people on FMLA leave.** If you are taking leave under the Family and Medical Leave Act (FMLA) and you drop health coverage during your leave, any days without health coverage while on FMLA leave will not count towards a 63-day break in coverage. In addition, if you do not return from leave, the 30-day period to request special enrollment in another plan will not start before your FMLA leave ends.

> ➢ Therefore, when you apply for other health coverage, you should tell your plan administrator or health insurer about any prior FMLA leave.

**State flexibility.** This certificate describes minimum HIPAA protections under federal law. States may require insurers and HMOs to provide additional protections to individuals in the state.

The state of Maryland offers its own version of HIPAA portability coverage. Consequently, beginning July, 2005, Kaiser Permanente no longer offers HIPAA coverage to new applicants who reside in Maryland. Instead, if you are a Maryland resident, you may qualify for coverage under the Maryland Health Insurance Plan (MHIP). To receive additional information regarding MHIP you may contact the Maryland Health Insurance Plan, P.O. Box 47160, Baltimore, MD 21244-7160; telephone 1-866-780-7105. Information regarding MHIP may also be obtained from the Maryland Health Insurance Plan website at www.marylandhealthinsuranceplan.state.md.us.

**For more information.** If you have questions about this certificate, please contact the Member Services Call Center at 301-468-6000. If you have questions about your HIPAA rights, you may contact your state insurance department or the U.S Department of Labor, Employee Benefits Security Administration (EBSA) toll-free at 1-866-444-3272 (for free HIPAA publications ask for publications concerning changes in health care laws). You may also contact the CMS publication hotline at 1-800-633-4227 (ask for "Protecting Your Health Insurance Coverage"). These publications and other useful information are also available on the Internet at: http://www.dol.gov/ebsa, the DOL's interactive web pages - Health Elaws, or http://www.cms.hhs.gov/hipaa1.

**Subject: Conversion Rights Notice**

You have trusted Kaiser Permanente to help you stay healthy. We appreciate the trust you've placed in us. We want to let you know about your options for continued health care coverage since our records indicate that your membership in Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. (hereafter "Kaiser Permanente") has terminated. Please take a few minutes to review the following options, which enable you to retain your membership with Kaiser Permanente.

**Continuation of Group Coverage**
You and/or your eligible dependent(s) may be eligible to continue your group coverage under federal or state continuation of coverage requirements, such as COBRA. Please contact your group directly for information on how to continue your group coverage, the application process, and the applicable rates. If you are eligible to continue your group coverage, you must exhaust this coverage before you will be considered eligible to elect conversion coverage (you still must meet all requirements for Conversion coverage at that time).

**Mental hospitalization, and neurological surgery at Howard University Hospital, and still under psychiatric care.**

**Exhibit8**

OCT 1 0 2006

1715 Dennis cT
Forestville MD 20747
Phone 240.463.4363

**Affidavit**

My names are Professor Leorn Anderson, a qualified in Behavior Sciences (Psychiatric Conselling)

In many Captioned cases I do help the people who are depressed, stressed, and other sickness where counseling becomes an integral part of persons returning to normal life and be both productive and useful in our society. Most of these cases have been Church related where I actively participate in passing out more other things like food, clothings and other live sustaining items.

In this respect of visiting and performing the above mentioned activities, I have counseled and helped Mr. Samuel Mwabira-Simera, and his son John Simera-Nandala, and moreless the whole entire family especially before and after September 19th, 2003 where Mr. Samuel Mwabira-Simera, and his son John Simera-Nandala were alleged to be involved in Cafeteria incidence. The incidence deprived them of any resources for the daily sustainable living, and Mr. Samuel Mwabira-Simera, and his son John Simera-Nandala had been deeply affected with the traumatization since they had, especially the son been hosptilized in two mental hospital

Some of the studies and other authors like Dr.Robert C Scaer, MD, Author, The Body bears the Burden states: "When the trauma is inflicted by another person, is especially intense, or the traumatized person is extremely close to the trauma, the severity of traumatization may be especially profound" Trauma, Dissociation and Disease Persistent symptoms of increased arousal (not present before the trauma) as indicated by at least two of the following:1. Difficulty falling or staying asleep; 2. Irritability or outbursts of anger; 3. Difficulty concentrating; 4. hypervigilance; 5. Exaggerated startle response. The disturbance causes clinically significant distress or impairment in social, occupational or other important areas of functioning.

The focus of PTSD is a single life-threatening event or threat to integrity. However, the symptoms of traumatic stress also arise from an accumulation of small incidents rather than one major incident. Examples include: repeated involvement in dealing with serious crime, eg where violence has been used and especially where children are hurt; especially if children are involved;repeated violations such as in verbal abuse, physical abuse, emotional abuse and sexual abuse;regular intrusion and violation, both physical and psychological, as in bullying, stalking, harassment, domestic violence, etc.

You are free to call me for any information related to the above incidene

Respectifully

Subscribed and sworn to before me, in my presence,
this 18 day of October 2005, a Notary Public
in and for the State of Maryland

_____
Notary Public
My commission expires _____ 20____

DAVID W. BEANER JR
NOTARY PUBLIC
PRINCE GEORGE'S COUNTY
MARYLAND
MY COMMISSION EXPIRES MARCH

06 2052

**FILED**

NOV 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## Individuals with Disabilities Education Act

The Individuals with Disabilities Education Act (IDEA) (formerly called P.L. 94-142 or the Education for all Handicapped Children Act of 1975) requires public schools to make available to all eligible children with disabilities a free appropriate public education in the least restrictive environment appropriate to their individual needs.

IDEA requires public school systems to develop appropriate Individualized Education Programs (IEP's) for each child. The specific special education and related services outlined in each IEP reflect the individualized needs of each student.

IDEA also mandates that particular procedures be followed in the development of the IEP. Each student's IEP must be developed by a team of knowledgeable persons and must be at least reviewed annually. The team includes the child's teacher; the parents, subject to certain limited exceptions; the child, if determined appropriate; an agency representative who is qualified to provide or supervise the provision of special education; and other individuals at the parents' or agency's discretion.

If parents disagree with the proposed IEP, they can request a due process hearing and a review from the State educational agency, if applicable in that state. They also can appeal the State agency's decision to State or Federal court. For more information, contact:

Office of Special Education Programs
U.S. Department of Education
330 C Street, S.W., Room 3086
Washington, D.C. 20202

www.ed.gov/offices/OSERS/OSEP

(202) 205-5507 (voice/TTY)

15

## Section 504

Section 504 states that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under" any program or activity that either receives Federal financial assistance or is conducted by any Executive agency or the United States Postal Service.

Each Federal agency has its own set of section 504 regulations that apply to its own programs. Agencies that provide Federal financial assistance also have section 504 regulations covering entities that receive Federal aid. Requirements common to these regulations include reasonable accommodation for employees with disabilities; program accessibility; effective communication with people who have hearing or vision disabilities; and accessible new construction and alterations. Each agency is responsible for enforcing its own regulations. Section 504 may also be enforced through private lawsuits. It is not necessary to file a complaint with a Federal agency or to receive a "right-to-sue" letter before going to court.

For information on how to file 504 complaints with the appropriate agency, contact:

Disability Rights Section
Civil Rights Division
U.S. Department of Justice
P.O. Box 66738
Washington, D.C. 20035-6738

www.usdoj.gov/crt/ada/adahom1.htm

(800) 514-0301 (voice)
(800) 514-0383 (TTY)

17



**S★MH**
ST. MICHAEL'S HOSPITAL

30 Bond Street
Toronto, Ontario
M5B 1W8

A teaching hospital
affiliated with the
University of Toronto

August 14, 1997

Mr. Darryl E. Zeigler
Assistant Director
Howard University
2400 6th Street, North West
Washington, DC 20059
U.S.A.

Dear Mr. Zeigler:

Re:    MR. SAMUEL H. MWABIRA-SIMERA

Mr. Simera has been a patient of mine for the last two years. He has two major medical problems.

His first problem is Post Traumatic Stress Disorder. This followed from being a victim of torture in his native Uganda. He continues to suffer from several somatic problems including back ache, chest pains, abdominal pains and headaches. He has periodic bouts of depression.

His second problem is a hearing defect. These two problems are of a chronic nature and therefore I do not see any improvement in the short term.

I hope this information is sufficient for you to make a decision about the support he will require for his academic studies at Howard University.

Sincerely,

S. Devanesen, MD,CCFP,M.Cl.Sc,FCFP
Chief
Department of Family and Community Medicine

c:  .  Mr. Simera
    615 Irving Street, North West
    Washington, DC 20001

245 Sherbourne Street
Apartment 2
Toronto, Ontario
M5A 2R4

HOWARD UNIVERSITY
SPECIAL STUDENT SERVICES
OFFICE OF THE DEAN

'97 AUG 25 P12:40

RECEIVED

Toronto's Urban Angel

DETAINEE'S ROAD PASS

EXHIBIT

P.F. 23

DATE: 6th OCTOBER 1988

FULL NAME RPL. 45218 SAM SIMEKA

IDENTIFICATION CLEARED BY MBALE SCREENING COMMIT.

REASON FOR RELEASE AMNESTY OF THE PRESIDENT

HOME ADDRESS BUWABWALA VILL. BUBULO COUNTY, MBALE

INTENDED PLACE OF WORK SURVEYOR

INTENDED PLACE OF RESIDENCE BUWABWALA VILLAGE

DISTRICT MBALE

DETAINEE'S THUMB PRINT:-

OFFICER IN CHARGE
SIGNATURE DEPARTMENT IN CHARGEMAN.
P. O. Box 5753 KAMPALA

Chairman's Office,
Mbale Municipal Resistance Council,
P. O. Private Bag,
MBALE.

14th October, 1988

<u>TO WHICH IT MAY CONCERN</u>

This is to certify that Mr. Samuel H. M. Simera has
been released from Luzira Prison as per release note dated
6th October, 1988.

Before his arrest, he was a student at Kenya
Polytechnic-Nairobi. He is free to resume his studies
in Nairobi. He is a resident of Mbale District.

CHAIRMAN RC IV
MBALE MUNICIPALITY
DATE.........................
Wotalumbwa Mwanza
(CHAIRMN R.C IV)

EXHIBIT
ALL-STATE LEGAL®



HOWARD UNIVERSITY HOSPITAL

2041 GEORGIA AVENUE, N.W.
WASHINGTON, D.C. 20060

TELEPHONE (202) 865-6100

DEA REG. NO. ____

NAME Mwabira Simera Samuel AGE Adult

ADDRESS ____ DATE 12/18/01

NOT VAILD FOR CONTROLLED SUBSTANCES

℞

TO WHOM IT MAY CONCERN.

This is to certify that the bearer has in recent weeks had some health issues that necessitated hospitalization. He is currently stabilizing; however he is not at his prior level of functioning. I therefore request that he be allowed more time with his school work. Thanks.

LABEL

MBACHU RAPHAEL / Rmbachu. , M.D.

Print Name / Signature

REFILL ____ TIMES

HUH 460 REV (1/95)

Thallium Stress Test
Cardiology Department
Wednesday Dec. 05, 2001
at 9 am

* bring referral form to Admission Dept., get blue card.

S. Suresh, MD
#4348.

2041 Georgia A___, N.W.       202/865-6100
Washington, D.C. __060         202/745-3731 fax

RE: Mwabira-Simera, Samuel.

This 34 y/o, Howard University Graduate School Student was admitted in Howard University Hospital between 11/29/01 & 12/4/01. If you have any questions, you can call me @ 202-865-1487.

E. SURETI, M





# amnesty international

**INTERNATIONAL SECRETARIAT**
1 Easton Street London WC1X 8DJ
United Kingdom

## URGENT ACTION

**EXTERNAL (for general distribution)**          AI Index: AFR 59/12/90
                                                Distr: UA/SC

UA 359/90          Legal Concern/Torture          11 September 1990

UGANDA:          Peter EKUSAI, UPC official (Publications)
                 Abel OLERO, UPC official (Political Affairs)
                 Max OPII, UPC official (office superintendant)
                 Levi ODONGO, businessman
                 One other, name unknown

================================================================

Amnesty International is concerned about the reported arrest on 30 August 1990 of Peter Ekusai, Abel Olero and Max Opii, three Uganda People's Congress (UPC) officials, Levi Odongo, a businessman, and an unidentified man at the UPC party head office at Uganda House in Kampala. During the incident the security officers who carried out the arrests reportedly removed a number of UPC T-shirts, portraits, publications and documents from the office. The reasons for their arrest and their exact whereabouts have not been made known. It is believed that the five men may be in incommunicado detention where Amnesty International fears that they may be in danger of ill-treatment or torture.

### BACKGROUND INFORMATION

Under the present government, prisoners arrested for political reasons have been held by the army for long periods without charge or trial, sometimes for a year or more. They have usually been detained in military barracks, prohibited from receiving regular visits and sometimes subjected to beatings or torture during interrogations.

Another UPC official, Charles Kagenda-Atwooki, Professor of Geography at Makerere University and Publicity Secretary of the UPC was arrested on 10 December 1987 by officers of the police Special Branch shortly after he had given an interview to the British Broadcasting Corporation (BBC) in which he criticized aspects of the National Resistance Army's (NRA) human rights record. He was held incommunicado for some weeks at military intelligence headquarters in Kampala, where he is believed to have been tortured. He was eventually brought to court in March 1988 where he was charged with engaging in an act of terrorism and unlawfully possessing seditious publications. The more serious terrorism charge was later dropped and in September 1988 he was granted bail and was released a few weeks later.

Amnesty International is concerned that Peter Ekusai, Abel Olero, Mark Opii, Levy Odongo and the unidentified man may have been imprisoned on account of their non-violent political beliefs and that their secret detention puts them in danger of torture and other forms of ill-treatment. The organization is urging the Ugandan Government to release the five men if they are not charged with an offence of a recognizably criminal nature and brought promptly to trial.

### RECOMMENDED ACTION: Telegrams/telexes/express and airmail letters:

- seeking clarification for the reasons for the arrests of the five men and the legal basis of their detentions;

- asking where they are being detained and seeking assurances that they are being humanely treated and that they are permitted to receive visits from their lawyers, doctors and families;

- urging the government to ensure that the detainees are not held in incommunicado or secret detention where they might be in danger of torture or ill-treatment;

- urging that they be released if they are not to be charged with a recognizably criminal offence and brought promptly to trial.

☎ (44)(71) 413 5500  Telegrams: Amnesty London WC1  Telex: 28502  FAX: 956 1157

Amnesty International is an independent worldwide movement working for the international protection of human rights. It seeks the release of men and women detained anywhere because of their beliefs, colour, sex, ethnic origin, language or religious creed, provided they have not used or advocated violence. These are termed prisoners of conscience. It works for fair and prompt trials for all political prisoners and works on behalf of such people detained without charge or trial. It opposes the death penalty and torture or other cruel, inhuman or degrading treatment or punishment of all prisoners.

EXHIBIT

ALL-STATE LEGAL

## Ex-Minister, 17 Others Charged With Treason

EA050521089I Kampala Domestic Service
in English 1700 GMT 5 May 91

[Text] The police have announced that 18 people, including a former cabinet minister in the UNLF (Uganda National Liberation Front) government, are to appear in the chief magistrate's court in Kampala tomorrow morning charged with treason. The announcement follows the completion of preliminary inquiries conducted by the police in the Districts of Lira, Apac, Gulu, and Kitgum. The 18 suspects were arrested between March and April after they had been implicated in aiding and abetting rebellion in the north of the country during the ongoing military offensive against the rebels by units of the National Resistance Army, NRA.

The 18 suspects are Daniel Omara Atubo, minister of state for foreign and regional affairs and member of the National Resistance Council [NRC] for (?Otuboi) County in Lira District and member of the National Executive Council for Lira District; Mr. (Tiberio Otwoma Okeny), president of the Nationalistic Liberal Party and farmer in Kitgum District; Mr. Andrew Adimola, former minister of rehabilitation in the former UNLF government; Mr. Zachary Olum, NRC member for Moyo Country and NEC [expansion unknown] member for Gulu District; Miss Irene Apio Jullu, NRC women's representative for Kitgum District; Mr. (Morris Lagol), district education officer, Kitgum District; Mr. (Kwomal Atigo), chairman RC [Resistance Council] Five, Gulu District; Mr. (Philip Odwang), headmaster,

(Guliyo) pastoral primary school and RC Five councillor for Labongo Division, Kitgum District; Mrs. (Debbie Ochang Ochalamola), district staff officer and RC One chairman, Kitgum Central Ward; Mr. (Hashim Tomopira), RC Five councillor, Kitgum County Council; Mr. (John I. Ochera), RC Five councillor, Lango Division, Kitgum District; Mr. (Jacob Okello Orach), RC One chairman [word indistinct], Gulu District; Mr. (R.T. Odur), O.C. prisons, (Noro), Apac District; Mr. (Y.T. Ojok), agricultural officer and RC (?Six) chairman, (?Bazaar) Division, Gulu District; Mr. (Ojara P.C. Kanyamoi), [word indistinct] RC Five and pastor of Kitgum Teachers' College; Mr. (Tadewo Mal), RC Four chairman, Gulu Municipality; Mr. (James Olobo), RC Three councillor, Kitgum Town; and Mr. (Otieno Ando), RC Five councillor, Awach Division, Gulu District.

The police statement issued this afternoon says police inquiries are continuing.

## Paper Claims 1,600 Arrested in Crackdown

AB1105152691 Paris AFP in English 1049 GMT
11 May 91

[Text] Kampala, May 11 (AFP)—At least 1,600 people have been arrested in the ongoing military crackdown on rebels in northern Uganda, official NEW VISION newspaper reported Saturday.

The paper quoted Minister of State for Defence Major General David Tinyefuza as saying among the arrested are rebels, army deserters and civilians suspected of collaborating with rebels. 150 of the arrested are "confirmed rebels", he said.

The minister was speaking to a NEW VISION reporter in Lira army barracks, the headquarters of the northern division of the ruling National Resistance Army (NRA). The reporter had himself been detained by the rebels for four weeks.

Those arrested are detained in Kitgum, Gulu and Lira army barracks, the minister said.

Maj. Gen. told the paper the last battle between government troops and rebels took place on Tuesday in Padibe, about 40 kilometres (25 miles) north of Gulu where more than 180 rebels were killed.

A number of rebels, including Joseph Kony, leader of the Holy Spirit Movement, fled into Sudan after the battle.

# Pointers

## UGANDA: ASSAULT ON THE NORTH

At the end of March the army launched an exercise to screen rebels in the north. This was prepared by confiscating radio transmitters from non-governmental organisations and even the post offices. In Gulu, senior officials of the government's own Resistance Committees were detained when they objected to the heavy-handed treatment of civilians being screened. Hundreds of civilians were herded into Pece stadium, kept in poor conditions and some beaten. Okwonga Latigo, Omol Tadeo and Yoran Ojok were each given 50 strokes of the cane for protesting.

Another casualty of the screening exercise is the Lira police commander, S.P. Emutu, who was detained by the army for releasing prisoners whom it had placed in his custody. There are unconfirmed reports of heavy civilian casualties in Kitgum, including some who have died because of poor conditions while they were detained for screening.

Rebel groups are fragmented, notwithstanding the recent announcement by the former Holy Spirit leader Joseph Kony that he now heads the impressive-sounding Uganda People's Democratic Christian Army.

The screening exercise will probably turn up few genuine rebels but may well make the local population even less inclined to offer the government its cooperation.

Behind the arrest of a government minister and four parliamentarians lies a worsening security situation in northern Uganda, especially Gulu, Kitgum, Lira and Apac districts.

Daniel Omara Atubo, the Minister of State for Foreign Affairs, was arrested on 15 April in Kampala, along with Zachary Olum and Irene Apio, both members of the National Resistance Council (NRC), Uganda's parliament. The same day they had attended a meeting of NRC members from the north which had expressed concern over the impact of this month's screening exercise by the army in their home region. Atubo and Apio are from Lira, Olum from Gulu. At the same time, NRC members Michael Alip Atepo and Obedi Levi were arrested in Lira.

President Yoweri Museveni explained to a meeting of the National Executive Committee of the National Resistance Movement on 18 April that there was evidence that the detained parliamentarians had links with the rebels. However, both Atubo and Olum are staunch supporters of the Democratic Party, which is part of Museveni's governmental coalition. It is widely believed that it was their criticisms of the army which landed them in trouble.

EXHIBIT

ALL-STATE LEGAL

## Ex-Minister, 17 Others Charged With Treason

*EA0505210891 Kampala Domestic Service in English 1700 GMT 5 May 91*

[Text] The police have announced that 18 people, including a former cabinet minister in the UNLF (Uganda National Liberation Front) government, are to appear in the chief magistrate's court in Kampala tomorrow morning charged with treason. The announcement follows the completion of preliminary inquiries conducted by the police in the Districts of Lira, Apac, Gulu, and Kitgum. The 18 suspects were arrested between March and April after they had been implicated in aiding and abetting rebellion in the north of the country during the ongoing military offensive against the rebels by units of the National Resistance Army, NRA.

The 18 suspects are Daniel Omara Atubo, minister of state for foreign and regional affairs and member of the National Resistance Council [NRC] for (?Otuboi) County in Lira District and member of the National Executive Council for Lira District; Mr. (Tiberio Otwoma Okeny), president of the Nationalistic Liberal Party and farmer in Kitgum District; Mr. Andrew Adimola, former minister of rehabilitation in the former UNLF government; Mr. Zachary Olum, NRC member for Moyo County and NEC [expansion unknown] member for Gulu District; Miss Irene Apio Jullu, NRC women's representative for Kitgum District; Mr. (Morris Lagol), district education officer, Kitgum District; Mr. (Kwomal Atigo), chairman RC [Resistance Council] Five, Gulu District; Mr. (Philip Odwang), headmaster, (Guliyo) pastoral primary school and RC Five councillor for Labongo Division, Kitgum District; Mrs. (Debbie Ochang Ochalamola), district staff officer and RC One chairman, Kitgum Central Ward; Mr. (Hashim Tomopira), RC Five councillor, Kitgum County Council; Mr. (John I. Ochera), RC Five councillor, Lango Division, Kitgum District; Mr. (Jacob Okello Orach), RC One chairman [word indistinct], Gulu District; Mr. (R.T. Odur), O.C. prisons, (Noro), Apac District; Mr. (Y.T. Ojok), agricultural officer and RC (?Six) chairman, (?Bazaar) Division, Gulu District; Mr. (Ojara P.C. Kanyamoi), [word indistinct] RC Five and pastor of Kitgum Teachers' College; Mr. (Tadewo Mal), RC Four chairman, Gulu Municipality; Mr. (James Olobo), RC Three councillor, Kitgum Town; and Mr. (Otieno Ando), RC Five councillor, Awach Division, Gulu District.

The police statement issued this afternoon says police inquiries are continuing.

## Paper Claims 1,600 Arrested in Crackdown

*AB1105152691 Paris AFP in English 1049 GMT 11 May 91*

[Text] Kampala, May 11 (AFP)—At least 1,600 people have been arrested in the ongoing military crackdown on rebels in northern Uganda, official NEW VISION newspaper reported Saturday.

The paper quoted Minister of State for Defence Major General David Tinyefuza as saying among the arrrested are rebels, army deserters and civilians suspected of collaborating with rebels. 150 of the arrested are "confirmed rebels", he said.

The minister was speaking to a NEW VISION reporter in Lira army barracks, the headquarters of the northern division of the ruling National Resistance Army (NRA). The reporter had himself been detained by the rebels for four weeks.

Those arrested are detained in Kitgum, Gulu and Lira army barracks, the minister said.

Maj. Gen. told the paper the last battle between government troops and rebels took place on Tuesday in Padibe, about 40 kilometres (25 miles) north of Gulu where more than 180 rebels were killed.

A number of rebels, including Joseph Kony, leader of the Holy Spirit Movement, fled into Sudan after the battle.

# Pointers

## UGANDA: ASSAULT ON THE NORTH

At the end of March the army launched an exercise to screen rebels in the north. This was prepared by confiscating radio transmitters from non-governmental orranisations and even the post office. In Gulu, senior officials of the government's own Resistance Committees were detained when they objected to the heavy-handed treatment of civilians being screened. Hundreds of civilians were herded into Pece stadium, kept in poor conditions and some beaten. Okwonga Latigo, Omal Tadeo and Yeran Ojok were each given 50 strokes of the cane for protesting.

Another casualty of the screening exercise is the Lira police commander, S.P. Emesu, who was detained by the army for releasing prisoners whom it had placed in his custody. There are unconfirmed reports of heavy civilian casualties in Kitgum, including some who have died because of poor conditions while they were detained for screening.

Rebel groups are fragmented, notwithstanding the recent announcement by the former Holy Spirit leader Joseph Kony that he now heads the impressive-sounding Uganda People's Democratic Christian Army.

The screening exercise will probably turn up few genuine rebels but may well make the local population even less inclined to offer the government its cooperation.

Behind the arrest of a government minister and four parliamentarians lies a worsening security situation in northern Uganda, especially Gulu, Kitgum, Lira and Apac districts.

Daniel Omara Atubo, the Minister of State for Foreign Affairs, was arrested on 15 April in Kampala, along with Zachary Olum and Irene Apio, both members of the National Resistance Council (NRC), Uganda's parliament. The same day they had arrested a meeting of NRC members from the north which had expressed concern over the impact of this month's screening exercise by the army in their home region. Atubo and Apio are from Lira, Olum from Gulu. At the same time, NRC members Michael Atip Atepo and Obedi Lovi were arrested in Lira.

President Yoweri Museveni explained to a meeting of the National Executive Committee of the National Resistance Movement on 18 April that there was evidence that the detained parliamentarians had links with the rebels. However, both Atubo and Olum are staunch supporters of the Democratic Party, which is part of Museveni's governmental coalition. It is widely believed that it was their criticisms of the army which landed them in trouble.

3



the government to inform it of the

had been systematic and widespread under
of torture was a publicly declared aim of
s Uganda's ratification of the United
Other Cruel, Inhuman or Degrading
a mechanism for hearing individual
Although the government has succeeded in
ere is still abundant evidence that the
ith extrajudicial executions, the problem
is armed conflict, although Amnesty
ument torture in Kampala, both in NRA
nd Internal Security Organization

method of torture under the NRM
or kandooya. This involves tying the
behind the back. It can be used as a
i as being extremely painful and so can
coerce prisoners into making statements
s tied kandooya-style are beaten at the
up behind their back as well and they
ie" or "briefcase"). Unusually, the
kandooya, which for a long time was
traint. The government apparently did
late method of torture but was convinced,
-treatment. An order banning kandooya
land and it is a measure of army
obeyed – although kandooya is
le areas of armed conflict.

This young man was severely beaten
NRA soldiers in Karamoja in 1987.
s left arm shows marks of kandooya
ee page 32]

circulating to the lower part of the
lysis – sometimes indefinitely. On
m has had to be amputated. During a
1988, Amnesty International delegates
d been tied kandooya-style some 18
k up a pen with one hand. In April 1987
men were arrested by the NRA at Kisoro
uggling. They allege that they were
of a bicycle tyre. They had been tied
ned that they could no longer use their
en a month later revealed scars on the
the lower arm, hands and fingers was
in prick was reduced in both hands in
he case of the other. The second man
ick in his left hand. In each case the
that the victim had sustained severe
nar and median) of both forearms and
e to use both forearms and hands. The



Joseph Luzze – detained
ommunicado and without charge since
ober 1988.(see page 32)



6. This man from Soroti was beaten
with iron rods by NRA soldiers in 1988
(see page 32)



8. Lance Seera Muwanga - human rights
activist detained for a year for
criticizing NRA (see page 44)

publicity. Amnesty Inter
findings of the inquiry.


### 4.3 Torture

Torture and ill-treatment
previous governments. The
the new government and an
Nations Convention Against
Treatment or Punishment, w
complaints at the internal
greatly reducing the use o
practice has not been elin
is greatest in those areas
International has also con
barracks and in military f
headquarters.

The best-known and mo
government has been "three
victim's arms together abo
method of restraint, but i
be used deliberately to ca
during interrogation. Some
same time; sometimes their
are suspended (this is kno
government has acknowledge
authorized in the NRA as a
not accept that it was use
in early 1907, that it was
was issued through the NRA
discipline that this ban h
undoubtedly still used, es

In many cases kandooy
arm and damages the nerves
occasions gangrene has set
visit to Luzira Upper Pris
interviewed a man who clai
months previously. He was
(after kandooya had been f
in western Uganda, apparen
tied kandooya-style with th
for about an hour and a ha
arms. A medical examination
upper arms above the elbow
seriously impaired. The r
the case of one man and in
experienced increased pain
doctor making the examinat
injuries to the major nerve
hands. At the present tim

HELL TORTURE



Once in this position the victim then undergoes systematic torture ........Fire is then set.

KANDOOYA - BRIEF CASE TORTURE



Modification of 2 piece tying ......The victim
can be dropped chest down - Chests rupture

THREE PIECE TYING (KANDOYA)



....This still continues freely unabated in the
countryside.



S.H.Mwabira-Simera tortured above brutalized below lying in a pool of blood after Lt Colonel Paulo Kagema's 200 strokes at Lubiri  Uganda



# AMERICAN Almanac

THE NEW FEDERALIST
February 17, 1997

## A Schiller Institute's Uwe Friesecke

# Britain's Deadly Game of Geopolitics and

"We are speaking about a new phase of British geopolitics, to destroy institutions and people on a mass scale in Africa, combined with a new phase of raw materials looting. . . ."

## Africa's ex-rebels go back to war against new foes

### War fears grow as Rwandan troops attack Hutu camps

"The Executive Outcomes mercenaries are not simply guns-for-hire. They are the advance guard for major business interests, engaged in a latter-day scramble for the mineral wealth of Africa."

## Why the Empire must strike back

## U.S. Warns Museveni, London's Puppet in Africa

Bullying, harassment and discrimination: what they are and what you can do about them    Page 1 of 3



Bully Online is the web site of the UK National Workplace Bullying
Advice Line and is funded by sales of books from Success Unlimited
Half the population are bullied and harassed ... most only recognize it when they read this

## Bullying, harassment and discrimination
### including sexual harassment, sex discrimination, racial harassment, racial discrimination

### What is harassment?

Harassment is any form of unwanted and unwelcome behaviour which may range from mildly unpleasant remarks to physical violence.

Harassment is termed *sexual harassment* if the unwanted behaviours are linked to your gender or sexual orientation. The EU definition of sexual harassment is "unwanted conduct of a sexual nature or other conduct based on sex affecting the dignity of men and women at work".

*Racial harassment* is when the behaviours are linked to your skin colour, race, cultural background, etc. In countries with sectarian tradition (eg as in Ireland) the term *sectarian harassment* is often used if the behaviours are linked to your religious beliefs or perceived religious origin or inclination. If the harassment is physical, the criminal law of assault may be appropriate. If the harassment comprises regular following, watching, repeated unsolicited contact or gifts, etc, the term *stalking* may be appropriate.

Discrimination is when you are treated differently (eg less favourably) because of your gender, race or disability.

The differences between harassment and bullying are summarised on the page on bullying. Briefly, harassment tends to have a strong physical component and is usually linked to gender, race, disability or physical violence; bullying tends to be a large number of incidents (individually trivial) over a long period comprising constant unjustified and unsubstantiated criticism. To see quickly if you're being bullied click here.

### Areas of UK law that apply to harassment

The principal areas of UK law relating to harassment comprise:

- **Sex Discrimination Act 1975**: discrimination on the grounds of sex by dismissing an employee or submitting them to "any other detriment"
- **Race Relations Act 1976**: ditto on racial grounds
- **Disability Discrimination Act 1995**: ditto on grounds of disability
- **Protection from Harassment Act 1996**: harassment and stalking
- **Criminal Justice & Public Order Act 1994**: intentional harassment for causing another person harassment, alarm or distress by using threatening, abusive or insulting words or behaviour
- Criminal law of **assault**

Bullying is the common denominator of harassment, discrimination, abuse, violence etc, so see other relevant laws on the legal page and case law page. The source of most bullying and harassment can usually be traced to one individual. Most people know one person in their life with this profile - who is it in your life?

Bullying and harassment (at work, in society, at school and at home) is a major cause of injury to health, both physical and mental. To see how prolonged negative stress (such as that caused by bullying and harassment) causes injury to health, click here. Over time, bullying and harassment result in trauma, which is a psychiatric injury, the collective symptoms of which often constitute Post Traumatic Stress Disorder, or PTSD. Click here for details; the page also tell you the difference between mental illness and psychiatric injury - important for re-empowerment and legal action.

---

## Links

Sexual harassment Internet resources

---

### Where now at Bully OnLine?
How can I recognise that I'm being bullied?
What is bullying and why me? | Definitions of bullying
Frequently asked questions (FAQs) about bullying
Overcoming myths, misperceptions and stereotypes
The answer to Why don't you stand up for yourself?
Bullying and vulnerability
Why have my colleagues deserted me?
What is mobbing? | What is harassment and discrimination?
Why grievance procedures are inappropriate for dealing with bullying
The difference between bullying and management
Facts, figures, surveys, costs of bullying | Cost of bullying to UK plc
UK National Workplace Bullying Advice Line statistics
Profile of the serial bully - who does this describe in your life?
Antisocial Personality Disorder | Narcissistic Personality Disorder
Paranoid Personality Disorder | Borderline Personality Disorder
Bullies and attention-seeking behaviour
Munchausen Syndrome and MSBP
Information for nurses | Information for voluntary sector employees
Information for teachers being bullied
Bullying in the social services sector
Bullying in the public sector - the political dimension and why
trade unions refuse to support their members
Bullying in the military | Bullying of students
Scheduled training and conferences on bullying | Other events about bullying
Articles on bullying available online | Media requests to feature cases etc
Bullying on TV, radio and in print media
Requests to take part in surveys etc | Bullying issues needing research
Tim Field's quotes on bullying | Vision for bullying
Feedback about Bully OnLine | Survivor testimonies
The Secret Tragedy of Working: Work Abuse - PTSD Chauncey Hare
Bullying resources in: Australia | Canada | Finland | France | Germany | Ireland | Sweden | USA

Bully OnLine: Site search | Site map | Site index
Welcome page for new visitors

Bullying, harassment and discrimination: what they are and what you can do about them     Page 3 of 3

**Home Pages**
**The Field Foundation | Bully OnLine**
Workplace bullying | School bullying | Family bullying
Bullying news | Press and media centre
Bullying case histories | Bullying resources
Stress, PTSD and psychiatric injury
Action to tackle bullying | Related issues

**Success Unlimited**
Books on bullying and related issues

Complex post traumatic stress disorder (complex ptsd, pdsd, shell shock, nervous shock, c... Page 1 of 23



**Stress
Injury to health
Trauma, PTSD**

*Those who can, do. Those who can't bully.*

A page from Bully OnLine, web site of the UK National Workplace Bullying Advice Line

I only recognised bullying was the cause of my PTSD when I <u>read this</u>

## Symptoms of Post Traumatic Stress Disorder (PTSD)
**Complex Post Traumatic Stress Disorder, PTSD, and trauma caused by bullying, harassment and abusive life experiences**
**What is PTSD? How do I recognise the symptoms of PTSD? How do I recover from PTSD?**
**Updated 6 November 2004**

**On this page**
<u>Definition of Post Traumatic Stress Disorder - what is PTSD?</u>
<u>DSM-IV diagnostic criteria for Post Traumatic Stress Disorder</u>
<u>Causes of Post Traumatic Stress Disorderr</u>
<u>Complex PTSD, PDSD and bullying</u>
<u>Mapping the health effects of bullying onto the diagnostic criteria for PTSD</u>
<u>Common symptoms of Post Traumatic Stress Disorder (PTSD)</u>
<u>Associated symptoms of PTSD - survivor guilt etc</u>
***New!*** <u>Transformation</u>
<u>The difference between *mental* breakdown and *stress* breakdown</u>
<u>Differences between mental illness and psychiatric injury</u>
<u>Features of Complex PTSD specific to bullying, especially feelings of guilt</u>
<u>Post Traumatic Stress Disorder and fatigue</u>
<u>Incidence of PTSD and Complex PTSD in the general population</u>
<u>Legal aspects of Post Traumatic Stress Disorder</u>
<u>Bullying causes PTSD: the legal case</u>
<u>Complex PTSD and stress, especially stress at work</u>
<u>David Kinchin's book *Post Traumatic Stress Disorder: the invisible injury*</u>
<u>Tim Field's book *Bully in sight* validates the experience of psychological violence</u>
<u>Recommended reading on PTSD</u> | <u>Bookshops</u> | <u>Articles on PTSD</u>
<u>Seminars on Post Traumatic Stress Disorder and recovery</u>
<u>Links to PTSD, Complex PTSD and trauma sites</u>

*"When the trauma is inflicted by another person, is especially intense, or the traumatized person is extremely close to the trauma, the severity of traumatization may be especially profound"*
Robert C Scaer, MD, Author, *The Body bears the Burden: Trauma, Dissociation and Disease*

## Definition

Post Traumatic Stress Disorder (PTSD) is a natural emotional reaction to a deeply shocking and disturbing experience. It is a *normal* reaction to an *abnormal* situation.

Post Traumatic Stress Disorder (PTSD) is defined in DSM-IV, the fourth edition of the American Psychiatric Association's Diagnostic and Statistical Manual. For a doctor or mental health professional to be able to make a diagnosis, the condition must be defined in DSM-IV or its international equivalent, the World Health Organization's ICD-10.

In the previous version of DSM (DSM-III) a criterion of Post Traumatic Stress Disorder was for the

sufferer to have faced a single major life-threatening event; this criterion was present because a) it was thought that PTSD could not be a result of "normal" events such as bereavement, business failure, interpersonal conflict, bullying, harassment, stalking, marital disharmony, working for the emergency services, etc, and b) most of the research on PTSD had been undertaken with people who *had* suffered a threat to life (eg combat veterans, especially from Vietnam, victims of accident, disaster, and acts of violence).

In DSM-IV the requirement was eased although most mental health practitioners continue to interpret diagnostic criterion A1 as applying only to a single major life-threatening event. There is growing recognition that Post Traumatic Stress Disorder can result from many types of emotionally shocking experience including an accumulation of small, individually non-life-threatening events in which case the resultant PTSD is referred to as Complex PTSD.

 **DSM-IV diagnostic criteria for Post Traumatic Stress Disorder (PTSD)**

The diagnostic criteria for Post Traumatic Stress Disorder (PTSD) are defined in DSM-IV as follows:

A. The person experiences a traumatic event in which both of the following were present:

  1. the person experienced or witnessed or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others;
  2. the person's response involved intense fear, helplessness, or horror.

B. The traumatic event is persistently re-experienced in any of the following ways:

  1. recurrent and intrusive distressing recollections of the event, including images, thoughts or perceptions;
  2. recurrent distressing dreams of the event;
  3. acting or feeling as if the traumatic event were recurring (eg reliving the experience, illusions, hallucinations, and dissociative flashback episodes, including those on wakening or when intoxicated);
  4. intense psychological distress at exposure to internal or external cues that symbolise or resemble an aspect of the traumatic event;
  5. physiological reactivity on exposure to internal or external cues that symbolise or resemble an aspect of the traumatic event.

C. Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma) as indicated by at least three of:

  1. efforts to avoid thoughts, feelings or conversations associated with the trauma;
  2. efforts to avoid activities, places or people that arouse recollections of this trauma;
  3. inability to recall an important aspect of the trauma;
  4. markedly diminished interest or participation in significant activities;
  5. feeling of detachment or estrangement from others;
  6. restricted range of affect (eg unable to have loving feelings);
  7. sense of a foreshortened future (eg does not expect to have a career, marriage, children or a normal life span).

ᛪ D. Persistent symptoms of increased arousal (not present before the trauma) as indicated by
at least two of the following:

1. difficulty falling or staying asleep;
2. irritability or outbursts of anger;
3. difficulty concentrating;
4. hypervigilance;
5. exaggerated startle response.

E. The symptoms on Criteria B, C and D last for more than one month.

F. The disturbance causes clinically significant distress or impairment in social,
occupational or other important areas of functioning.

ᛪ The focus of PTSD is a single life-threatening event or threat to integrity. However, the symptoms of
traumatic stress also arise from an accumulation of small incidents rather than one major incident.
Examples include:

- repeated exposure to horrific scenes at accidents or fires, such as those endured by members of the
emergency services (eg bodies mutilated in car crashes, or horribly burnt or disfigured by fire, or
dismembered or disembowelled in aeroplane disasters, etc)
- repeated involvement in dealing with serious crime, eg where violence has been used and
especially where children are hurt
- breaking news of bereavement caused by accident or violence, especially if children are involved
- repeated violations such as in verbal abuse, physical abuse, emotional abuse and sexual abuse
- regular intrusion and violation, both physical and psychological, as in bullying, stalking,
harassment, domestic violence, etc

Where the symptoms are the result of a series of events, the term Complex PTSD (formerly referred to
unofficially as Prolonged Duress Stress Disorder or PDSD) may be more appropriate. Whilst Complex
PTSD is not yet an official diagnosis in DSM-IV or ICD-10, it is often used in preference to other terms
such as "rolling PTSD", "PDSD", and "cumulative stress". See the National Center for PTSD fact page
on Complex PTSD.

ᛪ **Causes of PTSD**

PTSD resulting from accident, disaster, war, terrorism, torture, kidnap, etc has been extensively studied
and literature is available elsewhere. The first written reference to PTSD symptoms comes from the
sixth century BC; Post Traumatic Stress Disorder is nothing new - and neither is the willingness of some
people to discredit and deny the existence of the disorder.

This section of **Bully OnLine** focuses on PTSD and Complex PTSD resulting from bullying, primarily in
the workplace, however anyone suffering PTSD (however caused) will find this page enlightening.

Most of the information on this page and web site is relevant to other types of bullying, eg at school, in
relationships (including domestic violence), by families, by neighbours or landlords, in the care of the
elderly, in the armed services, etc. Bullying is behind harassment, discrimination, prejudice and
persecution, therefore targets of repeated sexual harassment or racial discrimination or religious or
ethnic persecution will also identify with the symptoms. The insight about bullying on this web site is
therefore also relevant to more serious issues including physical abuse, repeated verbal abuse, sexual

abuse, violent crime, kidnap, abduction, rape, war, terrorism, torture, and denial and abuse of human rights. Those exploring Contact Experience may also find this page helpful.

## PTSD, Complex PTSD and bullying

It's widely accepted that PTSD can result from a single, major, life-threatening event, as defined in DSM-IV. Now there is growing awareness that PTSD can also result from an accumulation of many small, individually non-life-threatening incidents. To differentiate the cause, the term "Complex PTSD" is used. The reason that Complex PTSD is not in DSM-IV is that the definition of PTSD in DSM-IV was derived using *only* people who had suffered a single major life-threatening incident such as Vietnam veterans and survivors of disasters.

It seems that Complex PTSD can potentially arise from any prolonged period of negative stress in which certain factors are present, which may include any of captivity, lack of means of escape, entrapment, repeated violation of boundaries, betrayal, rejection, bewilderment, confusion, and - crucially - lack of control, loss of control and disempowerment. It is the overwhelming nature of the events and the inability (helplessness, lack of knowledge, lack of support etc) of the person trying to deal with those events that leads to the development of Complex PTSD. Situations which might give rise to Complex PTSD include bullying, harassment, abuse, domestic violence, stalking, long-term caring for a disabled relative, unresolved grief, exam stress over a period of years, mounting debt, contact experience, etc. Those working in regular traumatic situations, eg the emergency services, are also prone to developing Complex PTSD.

A key feature of Complex PTSD is the aspect of captivity. The individual experiencing trauma by degree is unable to escape the situation. Despite some people's assertions to the contrary, situations of domestic abuse and workplace abuse can be extremely difficult to get out of. In the latter case there are several reasons, including financial vulnerability (especially if you're a single parent or main breadwinner - the rate of marital breakdown is approaching 50% in the UK), unavailability of jobs, ageism (many people who are bullied are over 40), partner unable to move, and kids settled in school and you are unable or unwilling to move them. The real killer, though, is being unable to get a job reference - the bully will go to great lengths to blacken the person's name, often for years, and it is this lack of reference more than anything else which prevents people escaping.

Until recently, little (or no) attention was paid to the psychological harm caused by bullying and harassment. Misperceptions (usually as a result of the observer's lack of knowledge or lack of empathy) still abound: *"It's something you have to put up with"* (like rape or repeated sexual abuse?) and *"Bullying toughens you up"* (ditto). Armed forces personnel faced threats of being labelled with "cowardice" and "lack of moral fibre" (LMF) if they gave in to the symptoms of PTSD. In World War I, 306 British and Commonwealth soldiers were shot as "cowards" and "deserters" on the orders of General Haig in an act which today would be treated as a war crime - see separate page on this injustice.

In the UK at least 16 children kill themselves each year because they are being bullied at school. This figure is established in the book *Bullycide: death at playtime*. Each of these deaths is **unnecessary, foreseeable**, and **preventable**. The UK has one of the highest adult suicide rates in Europe: around 5000 a year. The number of adults in the UK committing suicide because of bullying is unknown. Each year 19,000 children attempt suicide in the UK - one every half hour. in the UK, suicide is the number one cause of death for 18-24-year-old males. Females also attempt suicide in large numbers but tend to use less successful means.

Since Andrea Adams first identified workplace bullying and gave it its name in 1988, recognition of

adult bullying has grown steadily. Tim Field's UK National Workplace Bullying Advice Line has logged over 8000 cases in seven years; in the majority of cases (over 80%), the caller is a white-collar worker who has become the prey of a serial bully whose behaviour profile suggests a disordered personality. Callers refer to predecessors who have had stress breakdowns, taken early or ill-health retirement, or been dismissed on grounds of ill-health - all caused by the same individual. Sometimes callers refer to suicides of fellow employees.

## Mapping the health effects of bullying onto PTSD and Complex PTSD

Repeated bullying, often over a period of years, results in symptoms of Complex PTSD. How do the symptoms resulting from bullying meet the criteria in DSM-IV?

A. The prolonged (chronic) negative stress resulting from bullying has lead to threat of loss of job, career, health, livelihood, often also resulting in threat to marriage and family life. The family are the unseen victims of bullying.

A.1.One of the key symptoms of prolonged negative stress is reactive depression; this causes the balance of the mind to be disturbed, leading first to thoughts of, then attempts at, and ultimately, suicide.

A.2.The target of bullying may be unaware that they are being bullied, and even when they do realise (there's usually a moment of enlightenment as the person realises that the criticisms and tactics of control etc are invalid), they often cannot bring themselves to believe they are dealing with a disordered personality who lacks a conscience and does not share the same moral values as themselves. Naivety is the great enemy. The target of bullying is bewildered, confused, frightened, angry - and after enlightenment, very angry. For an answer to the question *Why me?* click here.

B.1. The target of bullying experiences regular intrusive violent visualisations and replays of events and conversations; often, the endings of these replays are altered in favour of the target.

B.2. Sleeplessness, nightmares and replays are a common feature of being bullied.

B.3. The events are constantly relived; night-time and sleep do not bring relief as it becomes impossible to switch the brain off. Such sleep as is achieved is non-restorative and people wake up as tired, and often more tired, than when they went to bed.

B.4. Fear, horror, chronic anxiety, and panic attacks are triggered by any reminder of the experience, eg receiving threatening letters from the bully, the employer, or personnel about disciplinary hearings etc.

B.5. Panic attacks, palpitations, sweating, trembling, ditto.

Criteria B4 and B5 manifest themselves as immediate physical and mental paralysis in response to any reminder of the bullying or prospect of having to take action against the bully.

C. Physical numbness (toes, fingertips, lips) is common, as is emotional numbness (especially inability to feel joy). Sufferers report that their spark has gone out and, even years later, find they just cannot get motivated about anything.

C.1. The target of bullying tries harder and harder to avoid saying or doing anything which reminds them of the horror of the bullying.

C.2. Work, especially in the person's chosen field becomes difficult, often impossible, to undertake; the place of work holds such horrific memories that it becomes impossible to set foot on the premises; many targets of bullying avoid the street where the workplace is located.

C.3. Almost all callers to the UK National Workplace Bullying Advice Line report impaired memory; this may be partly due to suppressing horrific memories, and partly due to damage to the hippocampus, an area of the brain linked to learning and memory (see John O'Brien's paper below)

C.4. the person becomes obsessed with resolving the bullying experience which takes over their life, eclipsing and excluding almost every other interest.

C.5. Feelings of withdrawal and isolation are common; the person just wants to be on their own and solitude is sought.

C.6. Emotional numbness, including inability to feel joy (anhedonia) and deadening of loving feelings

towards others are commonly reported. One fears never being able to feel love again.

✗C.7. The target of bullying becomes very gloomy and senses a foreshortened career - usually with justification. Many targets of bullying ultimately give up their career; in the professions, severe psychiatric injury, severely impaired health, refusal by the bully and the employer to give a satisfactory reference, and many other reasons, conspire to bar the person from continuance in their chosen career.

D.1. Sleep becomes almost impossible, despite the constant fatigue; such sleep as is obtained tends to be unsatisfying, unrefreshing and non-restorative. On waking, the person often feels more tired than when they went to bed. Depressive feelings are worst early in the morning. Feelings of vulnerability may be heightened overnight.

D.2. The person has an extremely short fuse and is often permanently irritated, especially by small insignificant events. The person frequently visualises a violent solution, eg arranging an accident for, or murdering the bully; the resultant feelings of guilt tend to hinder progress in recovery.

D.3. Concentration is impaired to the point of precluding preparation for legal action, study, work, or search for work.

D.4. The person is on constant alert because their fight or flight mechanism has become permanently activated.

D.5. The person has become hypersensitized and now unwittingly and inappropriately perceives almost any remark as critical.

E. Recovery from a bullying experience is measured in years. Some people never fully recover.

F. For many, social life ceases and work becomes impossible; the overwhelming need to earn a living combined with the inability to work deepens the trauma.

**Common symptoms of PTSD and Complex PTSD that sufferers report experiencing**

- hypervigilance (feels like but is *not* paranoia)
- exaggerated startle response
- irritability
- sudden angry or violent outbursts
- flashbacks, nightmares, intrusive recollections, replays, violent visualisations
- triggers
- sleep disturbance
- exhaustion and chronic fatigue
- reactive depression
- guilt
- feelings of detachment
- avoidance behaviours
- nervousness, anxiety
- phobias about specific daily routines, events or objects
- irrational or impulsive behaviour
- loss of interest
- loss of ambition
- anhedonia (inability to feel joy and pleasure)
- poor concentration
- impaired memory
- joint pains, muscle pains
- emotional numbness
- physical numbness

- low self-esteem
- an overwhelming sense of injustice and a strong desire to do something about it

## ⚡Associated symptoms of Complex PTSD

*Survivor guilt:* survivors of disasters often experience abnormally high levels of guilt for having survived, especially when others - including family, friends or fellow passengers - have died. Survivor guilt manifests itself in a feeling of *"I should have died too"*. In bullying, levels of guilt are also abnormally raised. The survivor of workplace bullying may have develop an intense albeit unrealistic desire to work with their employer (or, by now, their former employer) to eliminate bullying from their workplace. Many survivors of bullying cannot gain further employment and are thus forced into self-employment; excessive guilt may then preclude the individual from negotiating fair rates of remuneration, or asking for money for services rendered. The person may also find themselves being abnormally and inappropriately generous and giving in business and other situations.

*Shame, embarrassment, guilt, and fear* are encouraged by the bully, for this is how all abusers - including child sex abusers - control and silence their victims.

*Marital disharmony*: the target of bullying becomes obsessed with understanding and resolving what is happening and the experience takes over their life; partners become confused, irritated, bewildered, frightened and angry; separation and divorce are common outcomes.

## ⚡ Breakdown

The word "breakdown" is often used to describe the mental collapse of someone who has been under intolerable strain. There is usually an (inappropriate) inference of "mental illness". All these are lay terms and mean different things to different people. I define two types of breakdown:

**Nervous breakdown** or **mental breakdown** is a consequence of mental illness

**Stress breakdown** is a psychiatric injury, which is a *normal* reaction to an *abnormal* situation

The two types of breakdown are distinct and *should not be confused*. A stress breakdown is a natural and normal conclusion to a period of prolonged negative stress; the body is saying "I'm not designed to operate under these conditions of prolonged negative stress so I am going to do something dramatic to *ensure* that you reduce or eliminate the stress otherwise your body may suffer irreparable damage; you must take action now". A stress breakdown is often predictable days - sometimes weeks - in advance as the person's fear, fragility, obsessiveness, hypervigilance and hypersensitivity combine to evolve into paranoia (as evidenced by increasingly bizarre talk of conspiracy or MI6). If this happens, a stress breakdown is only days or even hours away and the person needs urgent medical help. The risk of suicide at this point is heightened.

Often the cause of negative stress in an organisation can be traced to the behaviour of one individual. The profile of this individual is on the serial bully page. I believe bullying is the main - but least recognised - cause of negative stress in the workplace today. To see the effects of prolonged negative stress on the body click here.

The person who suffers a *stress* breakdown is often treated as if they have had a *mental* breakdown; they are sent to a psychiatrist, prescribed drugs used to treat mental illness, and may be encouraged -

sometimes coerced or sectioned - into becoming a patient in a psychiatric hospital. The sudden transition from professional working environment to a ward containing schizophrenics, drug addicts and other people with genuine long-term mental health problems *adds to* rather than alleviates the trauma. Words like "psychiatrist", "psychiatric unit" etc are often translated by work colleagues, friends, and sometimes family into "nutcase", "shrink", "funny farm", "loony" and other inappropriate epithets. The bully encourages this, often ensuring that the employee's personnel record contains a reference to the person's "mental health problems". Sometimes, the bully produces their own amateur diagnosis of mental illness - but this is more likely to be a projection of the bully's own state of mind and should be regarded as such.

During the First World War, British soldiers suffering PTSD and stress breakdown were labelled as "cowards" and "deserters". During the Second World War, soldiers suffering PTSD and stress breakdowns were again vilified with these labels; Royal Air Force personnel were labelled as "lacking moral fibre" and their papers stamped "LMF". For further commentary on this issue, click here. It's noticeable that those administrators and top brass enforcing this labelling were themselves always situated a safe distance from the fighting; see the section on projection.

The person who is being bullied often thinks they are going mad, and may be encouraged in this belief by those who do not have that person's best interests at heart. They are not going mad; PTSD is an injury, *not* an illness.

Sometimes, the term "psychosis" is applied to mental illness, and the term "neurosis" to psychiatric injury. The main difference is that a psychotic person is *unaware* they have a mental problem, whereas the neurotic person is *aware* - often acutely. The serial bully's lack of insight into their behaviour and its effect on others has the hallmarks of a psychosis, although this obliviousness would appear to be a choice rather than a condition. With targets of bullying, I prefer to avoid the words "neurosis" and "neurotic", which for non-medical people have derogatory connotations. Hypersensitivity and hypervigilance are likely to cause the person suffering PTSD to react unfavourably to the use of these words, possibly perceiving that they, the target, are being blamed for their circumstances.

A frequent diagnosis of stress breakdown is "brief reactive psychosis", especially if paranoia and suicidal thoughts predominate. However, a key difference between mental breakdown and stress breakdown is that a person undergoing a stress breakdown will be intermittently lucid, often alternating seamlessly between paranoia and seeking information about their paranoia and other symptoms. The person is also likely to be talking about resolving their work situation (which is the cause of their problems), planning legal action against the bully and the employer, wanting to talk to their union rep and solicitor, etc.

**Transformation**

A stress breakdown is a transformational experience which, with the right support, can ultimately enrich the experiencer's life. However, completing the transformation can be a long and sometimes painful process. The Western response - to hospitalise and medicalize the experience, thus hindering the process - may be well-intentioned, but may lessen the value and effectiveness of the transformation. How would you feel if, rather than a break*down*, you viewed it as a break*through*? How would you feel if it was suggested to you that the reason for a stress breakdown is to awaken you to your mission in life and to enable you to discover the reason why you have incarnated on this planet? How would it change your view of things if it was also suggested to you that a stress breakdown reconfigures your brain to enable you to embark on the path that will culminate in the achievement of your mission?

## Differences between mental illness and psychiatric injury

The person who is being bullied will eventually say something like "*I think I'm being paranoid...*"; however they are correctly identifying *hypervigilance*, a symptom of PTSD, but using the popular but misunderstood word *paranoia*. The differences between hypervigilance and paranoia make a good starting point for identifying the differences between mental illness and psychiatric injury.

| Paranoia | Hypervigilance |
|---|---|
| • paranoia is a form of mental *illness*; the cause is thought to be internal, eg a minor variation in the balance of brain chemistry | • is a response to an external event (violence, accident, disaster, violation, intrusion, bullying, etc) and therefore an *injury* |
| • paranoia tends to endure and to not get better of its own accord | • wears off (gets better), albeit slowly, when the person is out of and away from the situation which was the cause |
| • the paranoiac will not admit to feeling paranoid, as they cannot see their paranoia | • the hypervigilant person is acutely aware of their hypervigilance, and will easily articulate their fear, albeit using the incorrect but popularised word "paranoia" |
| • sometimes responds to drug treatment | • drugs are not viewed favourably by hypervigilant people, except in extreme circumstances, and then only briefly; often drugs have no effect, or can make things worse, sometimes interfering with the body's own healing process |
| • the paranoiac often has delusions of grandeur; the delusional aspects of paranoia feature in other forms of mental illness, such as schizophrenia | • the hypervigilant person often has a diminished sense of self-worth, sometimes dramatically so |
| • the paranoiac is convinced of their self-importance | • the hypervigilant person is often convinced of their worthlessness and will often deny their value to others |
| • paranoia is often seen in conjunction with other symptoms of mental illness, but *not* in conjunction with symptoms of PTSD | • hypervigilance is seen in conjunction with other symptoms of PTSD, but *not* in conjunction with symptoms of mental illness |
| • the paranoiac is convinced of their plausibility | • the hypervigilant person is aware of how implausible their experience sounds and often doesn't want to believe it themselves (disbelief and denial) |
| • the paranoiac feels persecuted by a person or persons unknown (eg "*they're* out to get me") | • the hypervigilant person is hypersensitized but is often aware of the inappropriateness of their heightened sensitivity, and can identify the person responsible for their psychiatric injury |
| • sense of persecution | • heightened sense of vulnerability to victimisation |
| | • the hypervigilant person's sense of threat is well-founded, for the serial bully *is* out to |

| | |
|---|---|
| • the sense of persecution felt by the paranoiac is a delusion, for usually no-one is out to get them | get rid of them and has often coerced others into assisting, eg through mobbing; the hypervigilant person often cannot (and refuses to) see that the serial bully is doing everything possible to get rid of them |
| • the paranoiac is on constant alert because they *know* someone is out to get them | • the hypervigilant person is on alert *in case* there is danger |
| • the paranoiac is certain of their belief and their behaviour and expects others to share that certainty | • the hypervigilant person cannot bring themselves to believe that the bully cannot and will not see the effect their behaviour is having; they cling naively to the mistaken belief that the bully will recognise their wrongdoing and apologise |

Other differences between mental illness and psychiatric injury include:

| Mental illness | Psychiatric injury |
|---|---|
| • the cause often cannot be identified | • the cause is easily identifiable and verifiable, but denied by those who are accountable |
| • the person may be incoherent or what they say doesn't make sense | • the person is often articulate but prevented from articulation by being traumatised |
| • the person may appear to be obsessed | • the person is obsessive, especially in relation to identifying the cause of their injury and both dealing with the cause and effecting their recovery |
| • the person is oblivious to their behaviour and the effect it has on others | • the person is in a state of acute self-awareness and aware of their state, but often unable to explain it |
| • the depression is a clinical or endogenous depression | • the depression is reactive; the chemistry is different to endogenous depression |
| • there may be a history of depression in the family | • there is very often *no* history of depression in the individual or their family |
| • the person has usually exhibited mental health problems before | • often there is *no* history of mental health problems |
| • may respond inappropriately to the needs and concerns of others | • responds empathically to the needs and concerns of others, *despite* their own injury |
| • displays a certitude about themselves, their circumstances and their actions | • is often highly sceptical about their condition and circumstances and is in a state of disbelief and bewilderment which they will easily and often articulate (*"I can't believe this is happening to me"* and *"Why me?"* - click here for the answer) |
| • may suffer a persecution complex | • may experience an unusually heightened sense of vulnerability to possible victimisation |

| | |
|---|---|
| • suicidal thoughts are the result of despair, dejection and hopelessness | • suicidal thoughts are often a logical and carefully thought-out solution or conclusion |
| • exhibits despair | • is driven by the anger of injustice |
| • often doesn't look forward to each new day | • looks forward to each new day as an opportunity to fight for justice |
| • is often ready to give in or admit defeat | • refuses to be beaten, refuses to give up |

## Common features of Complex PTSD from bullying

People suffering Complex PTSD as a result of bullying report consistent symptoms which further help to characterise psychiatric injury and differentiate it from mental illness. These include:

Fatigue with symptoms of or similar to Chronic Fatigue Syndrome (formerly ME)
An anger of injustice stimulated to an excessive degree (sometimes but improperly attracting the words "manic" instead of motivated, "obsessive" instead of focused, and "angry" instead of "passionate", especially from those with something to fear)
An overwhelming desire for acknowledgement, understanding, recognition and validation of their experience
A simultaneous and paradoxical unwillingness to talk about the bullying (click here to see why) or abuse (click here to see why)
A lack of desire for revenge, but a strong motivation for justice
A tendency to oscillate between conciliation (forgiveness) and anger (revenge) with objectivity being the main casualty
Extreme fragility, where formerly the person was of a strong, stable character
Numbness, both physical (toes, fingertips, and lips) and emotional (inability to feel love and joy)
Clumsiness
Forgetfulness
Hyperawareness and an acute sense of time passing, seasons changing, and distances travelled
An enhanced environmental awareness, often on a planetary scale
An appreciation of the need to adopt a healthier diet, possibly reducing or eliminating meat - especially red meat
Willingness to try complementary medicine and alternative, holistic therapies, etc
A constant feeling that one has to justify everything one says and does
A constant need to prove oneself, even when surrounded by good, positive people
An unusually strong sense of vulnerability, victimisation or possible victimisation, often wrongly diagnosed as "persecution"
Occasional violent intrusive visualisations
Feelings of worthlessness, rejection, a sense of being unwanted, unlikeable and unlovable
A feeling of being small, insignificant, and invisible
An overwhelming sense of betrayal, and a consequent inability and unwillingness to trust anyone, even those close to you
In contrast to the chronic fatigue, depression etc, occasional false dawns with sudden bursts of energy accompanied by a feeling of "I'm better!", only to be followed by a full resurgence of symptoms a day or two later
Excessive guilt - when the cause of PTSD is bullying, the guilt expresses itself in forms distinct from "survivor guilt"; it comes out as:

- an initial reluctance to take action against the bully and report him/her knowing that he/she could lose his/her job
- later, this reluctance gives way to a strong urge to take action against the bully so that others, especially successors, don't have to suffer a similar fate
- reluctance to feel happiness and joy because one's sense of other people's suffering throughout the world is heightened
- a proneness to identifying with other people's suffering
- a heightened sense of unworthiness, undeservingness and non-entitlement
- a heightened sense of indebtedness, beholdenness and undue obligation
- a reluctance to earn or accept money because one's sense of poverty and injustice throughout the world is heightened
- an unwillingness to take ill-health retirement because the person doesn't want to believe they are sufficiently unwell to merit it
- an unwillingness to draw sickness, incapacity or unemployment benefit to which the person is entitled
- an unusually strong desire to educate the employer and help the employer introduce an anti-bullying ethos, usually proportional to the employer's lack of interest in anti-bullying measures
- a desire to help others, often overwhelming and bordering on obsession, and to be available for others at any time regardless of the cost to oneself
- an unusually high inclination to feel sorry for other people who are under stress, including those in a position of authority, even those who are not fulfilling the duties and obligations of their position (which may include the bully) but who are continuing to enjoy salary for remaining in post [hint: to overcome this tendency, every time you start to feel sorry for someone, say to yourself "sometimes, when you jump in and rescue someone, you deny them the opportunity to learn and grow"]

## Fatigue

The fatigue is understandable when you realise that in bullying, the target's fight or flight mechanism eventually becomes activated from Sunday evening (at the thought of facing the bully at work on Monday morning) through to the following Saturday morning (phew - weekend at last!). The fight or flight mechanism is designed to be operational only briefly and intermittently; in the heightened state of alert, the body consumes abnormally high levels of energy. If this state becomes semi-permanent, the body's physical, mental and emotional batteries are drained dry. Whilst the weekend theoretically is a time for the batteries to recharge, this doesn't happen, because:

- the person is by now obsessed with the situation (or rather, resolving the situation), cannot switch off, may be unable to sleep, and probably has nightmares, flashbacks and replays;
- sleep is non-restorative and unrefreshing - one goes to sleep tired and wakes up tired
- this type of experience plays havoc with the immune system; when the fight or flight system is eventually switched off, the immune system is impaired such that the person is open to viruses which they would under normal circumstances fight off; the person then spends each weekend with a cold, cough, flu, glandular fever, laryngitis, ear infection etc so the body's batteries never have an opportunity to recharge.

When activated, the body's fight or flight response results in the digestive, immune and reproductive systems being placed on standby. It's no coincidence that people experiencing constant abuse, harassment and bullying report malfunctions related to these systems (loss of appetite, constant infections, flatulence, irritable bowel syndrome, loss of libido, impotence, etc). The body becomes awash with cortisol which in high prolonged doses is toxic to brain cells. Cortisol kills off

neuroreceptors in the hippocampus, an area of the brain linked with learning and memory. The hippocampus is also the control centre for the fight or flight response, thus the ability to control the fight or flight mechanism itself becomes impaired.

Most survivors of bullying experience symptoms of Chronic Fatigue Syndrome - see underline health page for details.

## Legal

In law, gaining compensation for psychiatric injury is a long arduous process which can take five years of more. The areas most commonly quoted are breach of duty of care under the Health and Safety at Work Act (1974), and personal injury. There is little case law for personal injury caused by bullying (although there have been settlements which are subject to gagging clauses).

The most frequently quoted case is *Walker* v. *Northumberland County Council* [1995] IRLR35 (High Court). John Walker was a social worker dealing with child abuse cases. He suffered a stress breakdown caused by work overload, recovered and went back to work; his employer, having been informed of the cause of his stress breakdown, took no steps to reduce his workload and Mr Walker subsequently suffered a second stress breakdown. The award was made by the courts on the basis of the *second* stress breakdown.

In May 2001 the case of *Long* v. *Mercury Mobile Communications Services* resulted in Mr Long (the target of bullying, in this case in the form of a vendetta) winning his case on the basis of a *first* stress breakdown. This has become the new precedent. The House of Lords judgment in *Barber* v. *Somerset County Council* has also set a new precedent.

In July 1999 Beverley Lancaster won her case for stress against Birmingham City Council, and in September 2000 in the case of *Waters* v. *London Metropolitan Police* the UK House of Lords judged that an employee (or in this case an office holder) has the right in law to sue for negligence if bullying and harassment which the employer knew about but failed to deal with resulted in psychiatric injury.

However, the law at present is clearly inadequate:

**the better a person qualifies to pursue a claim for personal injury by satisfying PTSD DSM-IV diagnostic criteria B4, B5, C1, C2, C3, D3, E and F, the more they are, ipso facto, frustrated from pursuing the claim**

B4. intense psychological distress at exposure to internal or external cues that symbolise or resemble an aspect of the traumatic event;
B5. physiological reactivity on exposure to internal or external cues that symbolise or resemble an aspect of the traumatic event.
C. Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness:
C1. efforts to avoid thoughts, feelings or conversations associated with the trauma;
C2. efforts to avoid activities, places or people that arouse recollections of this trauma;
C3. inability to recall an important aspect of the trauma;
D3. difficulty concentrating;
E. The symptoms on Criteria B, C and D last for more than one month.
F. The disturbance causes clinically significant distress or impairment in social, occupational or other important areas of functioning.

The Diagnostic Criteria are exacerbated by the abusive and aggressive behaviour of the bully, the employer, and the employer's legal representatives in their defence and rejection of the claim.

In its Consultation Paper on Liability for Psychiatric Illness (No 137) the Law Commission recommended, among other things, that

> 6.2 There should continue to be liability for negligently inflicted psychiatric illness that does not arise from a physical injury to the plaintiff;
> 6.15 Damages for psychiatric illness should continue to be recoverable irrespective of whether the psychiatric illness is of a particular severity;
> 6.20 Subject to standard defences, there should be liability where an employer has negligently overburdened its employee with work thereby foreseeably causing him or her to suffer a psychiatric illness.

There are a growing number of personal injury cases (for psychiatric injury caused by bullying) in the pipeline, with the first settled out of court in February 1998. See the case law page for recent cases and settlements.

### *New!* Bullying causes PTSD: the legal case

Many people, especially guilty parties and their accomplices and lawyers, reject the notion that PTSD can arise from bullying. However, this research proves otherwise:

- *European Journal of Work and Organizational Psychology* (EJWOP), 1996, 5(2), whole issue devoted to bullying and its effects, including PTSD. Published by Psychology Press, 27 Church Road, Hove, East Sussex BN3 2FA, UK.
- The late Professor Heinz Leymann was one of the first people to identify the symptoms of injury to health caused by bullying as PTSD.
- Research from Warwick University, England, identifies bullying as a cause of PTSD

### Incidence of PTSD and Complex PTSD

The number of people suffering PTSD is unknown but David Kinchin estimates in his book *Post Traumatic Stress Disorder: the invisible injury* that at any time around 1% of the population are experiencing PTSD. This figure is only for PTSD resulting from traditional causes such as accident, violence or disaster.

The incidence of Complex PTSD is unknown; with estimates of the number of people being bullied at work in the UK ranging from 1 in 8 (IPD, November 1996) to 1 in 2 (Staffordshire University Business School, 1994), the figure could be as high as 14 million - or more. The silent suffering is considerable; symptoms prevent sufferers from realising their potential and contributing fully to society. Many sufferers are claiming benefit, often reluctantly, as people who suffer Complex PTSD are often hard working and industrious prior to their injury. Anyone who is on benefit and unable to work is also not paying tax and national insurance.

> *Within some groups of society, the incidence of PTSD must be expected to be much higher than one per cent. Within the emergency services (fire, police and ambulance) and the armed forces (army, navy and air force) the incidence of PTSD can be as high as 15 per cent. It is a disturbing probability that out of every hundred police officers currently engaged in uniformed patrol duties in our towns and cities, fifteen will be suffering from*

*symptoms in accord with PTSD.*
David Kinchin, Author, *Post Traumatic Stress Disorder*

## Stress

Stress is on everybody's minds these days. However, whilst almost everyone seems to feel "stressed", most people are unaware that stress comes in two forms: *positive* and *negative*.

Positive stress (what Abraham Maslow calls *eustress*) is the result of good management and excellent leadership where everyone works hard, is kept informed and involved, and - importantly - is valued and supported. People feel in control.

Negative stress (what Maslow calls *distress*) is the result of a bullying climate where threat and coercion substitute for non-existent management skills. When people use the word "stress" on its own, they usually mean "negative stress".

I define stress as "the degree to which one feels, perceives or believes one is not in control of one's circumstances". Control - or people's perception of being in control - seems to be key to susceptibility to experiencing PTSD.

The UK, and much of the Western world, adopts a *blame-the-victim* mentality as a way of avoiding having to deal with difficult issues. When dealing with stress it is essential to identify the *cause* of stress and work to reduce or eliminate the cause. Sending employees on stress management courses may sound good on paper but coercing people to endure more stress without addressing the cause is going to result in further psychiatric injury.

**Stress is not the employee's inability to cope with excessive workload and excessive demands but a consequence of the employer's failure to provide a safe system of work as required by the Health and Safety at Work Act 1974.**

Stress is known to cause brain damage. Dr John T O'Brien, consultant in old-age psychiatry at Newcastle General Hospital, published a paper in March 1997 entitled *"The glucocorticoid cascade hypothesis in man"* (and presumably woman), helpfully subtitled *"Prolonged stress may cause permanent brain damage"*.
If Dr O'Brien's research proves correct, then employers who encourage stressful regimes comprising long hours, threat and coercion might soon find themselves on the wrong end of a string of expensive personal injury lawsuits.

Further discussion of stress is on the health page.

---

### Understanding and recovering from Post Traumatic Stress Disorder (PTSD)



**Post Traumatic Stress Disorder
The invisible injury, 2005 edition**
by
**David Kinchin**

ISBN 0952912147
Published by Success Unlimited 2004
Paperback, 16 chapters, 224 pages, resources, index
Click book cover (left) for more information

*"This is the book I so badly wanted when I was traumatised."*
David Kinchin, Author

Few people realise that trauma and psychiatric injury can be more devastating and long-lasting than physical injury. Traumatic events strike unexpectedly turning everyday experiences upside-down and destroying the belief that *'it could never happen to me'*.

PTSD is a natural emotional reaction to a deeply shocking and disturbing experience after which it can be difficult to believe that life will ever be the same again. The symptoms are surprisingly common and include sleep problems, nightmares and waking early, flashbacks and replays, impaired memory, inability to concentrate, hypervigilance (feels like but is *not* paranoia), jumpiness and an exaggerated startle response, fragility and hypersensitivity, detachment and avoidance behaviours, depression, irritability, violent outbursts, joint and muscle pains, panic attacks, fatigue, low self-esteem, feelings of nervousness and undue anxiety. Survivors endure abnormal feelings of guilt, perhaps for having survived when those around them didn't.

Untreated, PTSD symptoms can last a lifetime, impairing health, damaging relationships and preventing people achieving their potential. Sufferers often find that knowledge and treatment of PTSD (and especially Complex PTSD) is difficult to obtain. However, prospects for recovery are good when you have the right counsel and are in the company of fellow survivors and those with genuine insight, empathy and experience.

Now in its fourth edition, *Post Traumatic Stress Disorder: the invisible injury* furnishes PTSD sufferers (and their carers, families and professionals) with knowledge, belief and advice to hasten recovery, re-establish relationships and enable people to once more find meaning, purpose and pleasure in life.

*Post Traumatic Stress Disorder: the invisible injury* is a reassuring and sensitively-written book which validates, explains and relieves the silent unseen psychological suffering of trauma and is essential reading for survivors of accident, disaster, violence, rape, bullying, physical abuse, sexual abuse, crime, abduction, kidnap, terrorism, war, torture, bereavement, trauma, and those witnessing such events. Their rescuers, relatives, families, carers, counsellors and therapists will also gain insight into the suffering endured by their loved ones or clients.

This book provides a unique insight for anyone working in the areas of healthcare, social work, employment, personnel and HR, legal services, research and victim support as well as those in the emergency services, uniformed services, rescue services, critical incident debriefing and traumatic incident reduction.

Anyone suffering unusual levels of stress and anxiety will also find relief in this clear and enlightening text, as will those with an interest in stress, psychiatric injury, and the Disability Discrimination Act.

David Kinchin's *Post Traumatic Stress Disorder: the invisible injury, 2004 edition* is a revised and updated edition of *Post Traumatic Stress Disorder: a practical guide to recovery* published by Thorsons in 1994 and the republished edition *Post Traumatic Stress Disorder: the invisible injury*, published by Success Unlimited in 1998 and 2001.

Order a copy:
**Online with secure credit card ordering**
**By fax or letter with printed order form**

---

**How bullying and harassment at school cause psychiatric injury, trauma, PTSD, and suicide**



**Bullycide**
**Death at playtime**
**An exposé of child suicide caused by bullying**
by
**Neil Marr** and **Tim Field**
Introduction by Jo Brand
ISBN 0952912120
Published by Success Unlimited in January 2001
Paperback, 18 chapters, 320 pages, 30 b/w pictures, resources, index
Click book cover (left) for more details

*"An excellent book."*
Times Education Supplement, May 2001
*"Require reading in every LEA [Local Education Authority] in the UK."*
Yorkshire Evening Post, March 2001

Using a blend of powerful testimony, moving narrative, insightful analysis and practical advice, *Bullycide: death at playtime* reveals the full and long-lasting extent of the psychiatric injury caused by bullying at school and in childhood. Contains new interviews with bereaved families, survivors and people who have overcome the trauma of bullying at school to succeed in life - sometimes spectacularly. Includes initiatives to combat bullying, helplines, organisations, suggested reading and web sites.

More reviews and reader feedback

Order a copy:
**Online with secure credit card ordering**
**By fax or letter with printed order form**

---

**Identifying and dealing with workplace bullying, harassment and injury to health**



**Bully in sight**
**How to predict, resist, challenge and combat workplace bullying**
**Overcoming the silence and denial by which abuse thrives**
by Tim Field
Foreword by Diana Lamplugh OBE
ISBN 0952912104
Published by Success Unlimited 1996, reprinted 1998, 1999 and 2001
Paperback, 16 chapters, 384 pages, resources, index
Click book cover (left) for more details

Case 1:06-cv-02052-RWR   Document 1-3   Filed 11/30/2006   Page 105 of 110

*"Thank you for writing **Bully in sight** ... it's like a torch in the darkness."*

*"I have been through a horrendous 6 years, and for the last 2 years your website and book have been my lifeline. Your insight into the bully's behaviour is incredible. You deserve all the praise you get and more! I am still battling but I know now that I am right and the bullies are wrong."*

More readers' feedback and comments.

*Bully in sight* identifies bullying as the common denominator of harassment, discrimination, prejudice, abuse, conflict and violence, and describes the principal perpetrator of psychological violence, the serial bully.

Written with the experience and insight only a fellow experiencer can impart, *Bully in sight* validates the experience of bullying when everyone else is trying to ignore or deny it.

Packed with insight, ideas, guidance and direction, plus sources of help and suggested reading.

**Order a signed copy:**
**Online with secure credit card ordering**
**By fax or letter with printed order form**

---

## Further reading on psychiatric injury

*Post Traumatic Stress Disorder: the invisible injury, 2001 edition*, David Kinchin, Success Unlimited, 2001, ISBN 0-9529121-3-9

*Supporting Children with Post-traumatic Stress Disorder: a practical guide for teachers and professionals*, David Kinchin and Erica Brown, David Fulton Publishers, £12.00, ISBN 1-85346-727-8

*Stress and employer liability*, Earnshaw & Cooper, IPD, 1996, £16.95, ISBN 0 85292 615 4 (updated edition in preparation)

*Why zebras don't get ulcers: an updated guide to stress, stress-related diseases, and coping*, Robert M Sapolsky, Freeman, 1998, ISBN 0-7167-3210-6

*The Body Bears the Burden: Trauma, Dissociation and Disease*, Robert C Scaer, MD, The Haworth Medical Press, NY, ISBN 0-7890-1246-4

*Recovering damages for psychiatric injury*, M Napier & K Wheat, Blackstone Press, £19.95, ISBN 1 85431 352 5

*Understanding stress breakdown*, Dr William Wilkie, Millennium Books, 1995

*Understanding stress*, V Sutherland & C Cooper, Chapman and Hall

*Trauma and transformation: growing in the aftermath of suffering*, R Tedeschi & L Calhoun, Sage, 1996

*The Railway Man*, Eric Lomax, Vintage, 1996, ISBN 0-09-958231-7 (a poignant story of undiagnosed PTSD from World War II)

---

**Bookshops and services**

The Oxford <u>Stress and Trauma Centre bookshop</u>

<u>The Inner Bookshop</u>, 111 Magdalen Road, Oxford OX4 1RQ: mind, body, spirit, esoteric, holistic, paranormal, contact experience etc.

---

**Articles**

*European Journal of Work and Organizational Psychology* (EJWOP), 1996, 5(2), whole issue devoted to bullying and its effects, including PTSD. Published by Psychology Press, 27 Church Road, Hove, East Sussex BN3 2FA, UK.

British Journal of Psychiatry, (1997), 170, 199-201, *The 'glucocorticoid cascade' hypothesis in man: prolonged stress may cause permanent brain damage*, Dr John T O'Brien MRCPsych, Department of Psychiatry and Institute for the Health of the Elderly, University of Newcastle.

*Cortisol - keeping a dangerous hormone in check*, David Tuttle, <u>LE Magazine July 2004</u>

*T cells divide and rule in Gulf War syndrome* (and asthma, TB, cancer, ME), Jenny Bryan, Immunology section in The Biologist, (1997) 44 (5)

Bullied workers suffer 'battle stress' and show the same symptoms of armed forces personnel who have been engaged in war: <u>http://news.bbc.co.uk/1/hi/business/3563450.stm</u>

---

**Seminars and workshops**

Tim Field's seminars *Understanding and tackling bullying at work*, and recovery from the symptoms of Complex PTSD *Recovery and re-empowerment after bullying and abusive life events*

David Kinchin's <u>own web page</u> and <u>PTSD workshops</u>

---

**Links**

The late Professor Heinz Leymann was one of the world's pioneers and foremost authorities on mobbing (bullying) and PTSD, with over a decade of experience. His <u>web site</u> is essential reading for anyone studying the effects of bullying on health.

David Kinchin, author of *Post traumatic Stress Disorder: the invisible injury, 2001 edition*

BBC News Online: bullying at school causes PTSD, name calling and verbal abuse worse than physical bullying

National Center for PTSD factsheets:

> *Complex PTSD* - recommended.
>
> *Coping with PTSD and Recommended Lifestyle Changes for PTSD Patients*: http://www.ncptsd.org/facts/treatment/fs_coping.html
>
> *Anger and trauma*: http://www.ncptsd.org/facts/specific/fs_anger.html
>
> You can join the NCPTSD mailing list to be alerted to updates on PTSD information at their site.

PTSD Public Service Announcement Website

The Traumatic Stress Clinic in London has good online information about PTSD.

UK Trauma Group web site.

Contact information about local specialist resources in the UK offering advice about the assessment or treatment of people with psychological reactions to major traumatic events.

*New!* Hospital Anxiety and Depression Scale (HADS): a simple, standardised self-assessment questionnaire for measuring the severity of anxiety and depression.

CODT - Cooperative Online Dictionary of Trauma, a dictionary of trauma terms:

The National Institute for Clinical Excellence (NICE) page on Post Traumatic Stress Disorder (PTSD).

For some time the American Psychological Association (APA) has been looking at the traumatic effects of psychological violence

American Psychiatric Association (APA) public information on Posttraumatic Stress Disorder

Dave Baldwin's site at http://www.trauma-pages.com/ contains comprehensive links.

Brain Injury Resource Center page on Post Traumatic Stress Disorder

The Trauma Center in Alston, Massachusetts. The Medical Director of the Trauma Center is Dr Bessel van der Kolk.

Trauma in the Family by Family Trauma Group Centre.

Partners with PTSD by Frank Ochberg, M.D.

The trauma of betrayal

Why a broken heart hurts so much; social rejection may affect your brain as much as physical pain

Legal Abuse Syndrome: how the courts and legal system may cause Post Traumatic Stress Disorder

Essentials for litigating Post Traumatic Stress Disorder (PTSD) claims:
http://www.lawandpsychiatry.com/html/Litigating%20PTSD%20Claims%20-%20Final.pdf

Pre-action protocol for disease/illness claims:
http://www.apil.com/pdf/publicdocs/DISEASE_PROTOCOL_approved_version.pdf

Descriptions of Post Traumatic Stress Disorder (PTSD) and Acute Stress Disorder (ASD).

Gift From Within is a private, non-profit organization dedicated to those who suffer post-traumatic stress disorder (PTSD), those at risk for PTSD, and those who care for traumatized individuals.

TACT is the UK Trauma After Care Trust.

Regular verbal abuse more damaging than physical assault: research from Warwick University, England.

Articles from Psychology Today: *When Disaster Strikes* by Hara Estroff Marano, *Recovering From Trauma* and *Life Lessons* by Ellen McGrath Ph.D., plus *Trauma Do's and Don'ts*

The site at http://www.bein.com/trauma/ is dedicated to trauma support and PTSD recovery. It is the official home site of the world's only 12-step support group for PTSD: *Trauma Anonymous*. Check out the discussion board here and all the great links to a world of information about trauma and PTSD.

Trauma is covered on the Mental Health Network at http://www.mhnet.org/guide/trauma.htm

The Healing Centre Online is at http://www.healing-arts.org/

Ask the Internet Therapist

Institute of Psychiatry library listing on traumatic stress.

The International Society for Traumatic Stress Studies (ISTSS) has a comprehensive web site on various aspects of trauma and its causes.

The European Society for Traumatic Stress Studies (ESTSS) web site.

The Invisible Epidemic: Post-Traumatic Stress Disorder, Memory and the Brain by J. Douglas Bremner, M.D.

Information for for ex-servicemen & servicewomen who think they are suffering from PTSD.

A glossary of trauma terms

PTSD and dissociation

Information on Falsification of Type (Dr Carl Gustav Jung's description for an individual whose most developed and/or used skills were outside one's area of greatest natural preference) and PASS

(Prolonged Adaption Stress Syndrome) is at http://www.benziger.org/pass.html

Rebecca Coffey's PTSD bibliography at http://www.sover.net/~schwcof/ptsd.html

Canadian Traumatic Stress Network page at http://play.psych.mun.ca/~dhart/trauma_net/index.html and the useful web connections page at http://play.psych.mun.ca/~dhart/trauma_net/useful.html

Australian Trauma Web is at http://www.psy.uq.edu.au/PTSD

Links to PTSD and PTSD-related sites are at http://www.ptsd.com/

Gillian Kelly, barrister at law, looks at the development of Post Traumatic Stress Disorder and the legal recognition thereof on her web site at http://www.telecoms.net/law/index.html

Hope E. Morrow's Trauma Central contains a large collection of links to online articles on trauma and related subjects.

*Risk Factors in PTSD and Related Disorders: Theoretical, Treatment, and Research Implications*, Anne M Dietrich MA, Doctoral Candidate, University of British Columbia, Canada

*See the ability, not the disability* list of PTSD links

If your health has suffered but those around you cannot or will not see your hurt, see *Why Seeing Is Not Believing When Dealing With A Chronic Illness*

---

Copyright © Tim Field 1996-2004. Information on this site may be reproduced freely for non-commercial purposes - please acknowledge the source by quoting the web site address http://www.bullyonline.org/stress/ptsd.htm

The views on this web site are those of Tim Field and result from personal experience of being bullied out of his job and experiencing a stress breakdown caused by the bullying, thereafter setting up and running the UK National Workplace Bullying Advice Line since January 1996 and Bully OnLine since 1997, and liaising with over 10,000 cases of bullying. I believe this to be the largest number of targets of workplace bullying that any one person has ever dealt with. I am not a mental health professional. Whilst every effort has been made to ensure accuracy, no responsibility can be accepted. In all matters, consult a qualified competent professional.

---

**Stress, injury to health, trauma and PTSD**
How bullying, harassment and abuse damage health and cause trauma
Stress, trauma and PTSD Home Page
The cause of stress revealed
Stress at work, injury to health, fatigue, depression, suicide
PTSD (Post Traumatic Stress Disorder) and Complex PTSD
Bullying, stress and self-harm | Bullying and suicide | Stress and debility
Denial | Trauma | Shell shock: PTSD in WW1
David Kinchin's book *Post Traumatic Stress Disorder: the invisible injury*
validates and relieves the silent unseen suffering of trauma
Profile of David Kinchin | PTSD workshops by David Kinchin
Neil Marr and Tim Field's book *Bullycide: death at playtime* reveals the
secret toll of children who attempt or commit suicide because of bullying

**Home Pages**

**The Field Foundation** | **Bully OnLine**
Workplace bullying | School bullying | Family bullying
Bullying news | Press and media centre
Bullying case histories | Bullying resources
Stress, PTSD and psychiatric injury
Action to tackle bullying | Related issues

**Success Unlimited**
Books on bullying and related issues